# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| PRETERM-CLEVELAND, INC., et al., | : : : | Case No. 1:18-cv-109 |
| | : | Judge Timothy S. Black |
| Plaintiffs, | : : | Magistrate Judge Karen Litkovitz |
| vs. | : : | |
| | : | **PLAINTIFFS' REPLY TO** |
| LANCE HIMES, et al., | : : | **DEFENDANTS' MEMORANDUM IN OPPOSITION TO MOTION** |
| Defendants. | : : | **FOR TEMPORARY RESTRAINING ORDER AND** |
| | : | **PRELIMINARY INJUNCTION** |

## INTRODUCTION

After reading Defendants' Response in Opposition to Motion for Temporary Restraining Order and Preliminary Injunction ("Def. Resp."), the Court may be left with a false impression of the challenged Act, Ohio House Bill 214 ("H.B. 214" or "the Act"). Contrary to what Defendants would have this Court believe, H.B. 214 does not protect any person with disabilities from discrimination in law, education, housing, employment, or medical care. It does not expand opportunities or access to necessary services for people with disabilities. Chestnut Dec. ¶¶ 4-14; Thrower Dec. ¶¶ 6-14. Nor is H.B. 214 an informed consent measure: it does not ensure that women will be given the information they need—in a non-judgmental, non-coercive manner—to make an informed decision about whether to carry a pregnancy to term after learning of a fetal Down syndrome diagnosis. Rather, H.B. 214 is a ban on previability abortions. As such, it is clearly and unavoidably unconstitutional. Yet, Defendants' brief is almost entirely unresponsive to Plaintiffs' legal arguments on this score. Defendants' description of the constitutional doctrine pertaining to reproductive decision-making is unrecognizable. And, while certainly numerous,

1

the hundreds of pages of exhibits appended by Defendants are nothing more than an attempt to distract this Court from the determination of the simple constitutional issue at hand.

For the reasons set forth below and in Plaintiffs' opening brief, this Court should grant Plaintiffs' request for a preliminary injunction against the enforcement of the Act, because it violates well-settled Supreme Court precedent holding that a previability abortion ban violates the Fourteenth Amendment.

## ARGUMENT

There is no question that parenting a child with Down syndrome can bring tremendous joy, and that the lives of individuals with Down syndrome are just as valuable and worth living as anyone else's. Chestnut Dec. ¶¶ 15, 18; Thrower Dec. ¶¶ 4, 16. There is also no question that continuing a pregnancy after a diagnosis of Down syndrome is the right course of action for some women, and that no woman should be coerced into terminating, or continuing, a pregnancy. Lappen Dec. ¶ 35, 37[1]; France Dec. ¶ 5-6, 9. Until viability, the Constitution leaves the decision to the woman to make, in consultation with her family, her physician, her spiritual advisor, or whomever else she chooses.

Defendants' extended discussion of this country's lengthy and shameful history of eugenics can only be described as ironic, since the longstanding jurisprudence protecting women's right to reproductive autonomy arose out of the Supreme Court's repudiation of that history. In *Skinner v. Oklahoma*, the U.S. Supreme Court held unconstitutional a state law permitting compulsory sterilization of individuals convicted of certain crimes, articulating for the first time that the right to procreate is a "basic civil right[]." 316 U.S. 535, 541 (1942). The Court

---

[1] Dr. Lappen's curriculum vitae was inadvertently omitted from his Declaration. It is attached hereto as Exhibit 1.

later cited *Skinner* as precedent for the fundamental constitutional rights to access contraception and abortion recognized in *Griswold v. Connecticut*, 381 U.S. 479, 485 (1965), and *Roe v. Wade*, 410 U.S. 113, 152 (1973).

Indeed, by the time the Supreme Court decided *Planned Parenthood of Se. Pa. v. Casey*, it left no doubt that constitutional protection for the right to decide whether and when to bear a child stands as a bulwark against the abuses of the past, explaining:

> If indeed the woman's interest in deciding whether to bear and beget a child had not been recognized as in *Roe,* the State might as readily restrict a woman's right to choose to carry a pregnancy to term as to terminate it, to further asserted state interests in population control, or eugenics, for example. Yet *Roe* has been sensibly relied upon to counter any such suggestions.

505 U.S. 833, 859 (1992) (citing *Skinner*). Accordingly, as the Supreme Court has clearly recognized, the right to reproductive autonomy necessarily precludes a state from passing any law that would prevent a woman from bearing, or force her to bear, a child.

For these reasons, the State's arguments entirely miss the mark and fail to respond to Plaintiffs' legal argument. Plaintiffs have demonstrated that they are entitled to preliminary injunctive relief, and nothing in the record or Defendants' brief undermines that demonstration.

**I. H.B. 214 Violates Plaintiffs' Patients' Right to Substantive Due Process.**

The Supreme Court has already spoken to the issue before this Court, clearly and unmistakably: "Before viability, the State's interests are not strong enough to support a prohibition of abortion. . . Regardless of whether exceptions are made for particular circumstances, a State may not prohibit *any* woman from making the ultimate decision to terminate her pregnancy before viability." *Casey*, 505 U.S. at 846, 837 (emphasis added); *see also Planned Parenthood of Indiana & Kentucky, Inc. v. Comm'r, Indiana State Dep't of Health*, 265 F. Supp. 3d 859, 866 (S.D. Ind. 2017) ("*PPINK*"). Thus, the Supreme Court has already decided that, no matter how legitimate, a State's asserted interests in prohibiting abortion must

3

give way where, as here, the law bans abortion—or any class of abortions—before viability. *Roe*, 410 U.S. at 163; *Casey*, 505 U.S. at 846. That the U.S. Supreme Court has never considered a case precisely like this one is irrelevant: every appellate court to consider the question has recognized that—regardless of where a particular state has drawn the line, regardless of whether there are any exceptions, and regardless of whether the Supreme Court has previously considered a virtually identical law—a law prohibiting any woman from making the ultimate decision to terminate a pre-viability pregnancy violates the Fourteenth Amendment's guarantee of substantive due process. *See* Pls.' Br. at 13 n.3.

### A. Defendants Misstate the Relevant Legal Standard.

Defendants do not appear to dispute that H.B. 214 constitutes a total ban on previability abortions for a class of women, nor do they seem to deny the basic principle that the Supreme Court has held that previability abortion bans are unconstitutional. However, rather than concede that over four decades of unbroken Supreme Court and Circuit precedent condemn H.B. 214 as unconstitutional, Defendants contend that "[t]he Ohio law does not interfere with the abortion right in *Roe* and *Casey*" and therefore the Act should be subject to mere rational basis review. Def. Resp. 20. This outlandish argument is based on two fundamentally flawed propositions: (1) that *Roe* and *Casey* protect the right to abortion only when the pregnancy is the result of "unplanned activity" or contraceptive failure, Def. Resp. 19; and (2) that, notwithstanding that it criminalizes an entire category of previability abortions, the Act is a mere abortion regulation, not a ban, which somehow renders it automatically constitutionally valid. Were they not the crux of Defendants' argument, these absurd assertions would barely merit a response, for they flatly contradict the Supreme Court's jurisprudence, including its most recent decision in *Whole Woman's Health v. Hellerstedt*, reaffirming that restrictions on a fundamental right such as

4

abortion are not subject to rational basis review. 136 S. Ct. 2292, 2309–10 (2016), *as revised* (June 27, 2016). Indeed, Defendants' theory not only lacks support in law but also conflicts with decision after decision holding previability abortion bans unconstitutional.

First, neither *Roe* nor *Casey* in any way limits the abortion right to circumstances in which the woman did not wish to have a child at all and the pregnancy was unplanned. To the contrary, at the heart of those decisions lies the woman's right to autonomous deliberation and decision-making, which the State may not unduly burden or coerce. *Roe*, 410 U.S. at 153; *Casey*, 505 U.S. at 851 ("At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State."); *see also PPINK*, 265 F. Supp. 3d at 868 ("The difficulty with the State's position is that there is nothing in *Roe* or *Casey* that limits the right to terminate a pregnancy pre-viability to women who do not want to have a child ever as opposed to those who do not want to see a particular pregnancy through to birth."). As the U.S. District Court for the Southern District of Indiana recently explained, rejecting a virtually identical argument and striking a similar law banning abortions in cases of fetal anomalies,

> The lack of authority supporting the State's position likely stems from the fact that it is contrary to the core legal rights on which a woman's right to choose to terminate her pregnancy prior to viability are predicated. The Supreme Court has mandated that this right stems from a liberty right protected by the Fourteenth Amendment—specifically, a woman's right to *privacy*. Such a right "includes the interest in independence in making certain kinds of important decisions," such as whether to terminate a pregnancy…. Under the State's theory, a woman either wants to have a child or does not; and, once a woman chooses the former, she cannot then terminate her pregnancy for reasons, whatever they may be, the State deems improper. *But the very notion that, pre-viability, a State can examine the basis for a woman's choice to make this private, personal and difficult decision, if she at some point earlier decided she wants a child as a general matter, is inconsistent with the notion of a right rooted in privacy concerns and a liberty right to make independent decisions.*

*PPINK*, 265 F. Supp. 3d at 868 (internal citations omitted) (emphasis added).[2] Indeed, as the Supreme Court explained in *Casey*, the impact of being forced to carry a pregnancy to term, for whatever reason, is "too intimate and personal for the State to insist, without more, upon its own vision of the woman's role, however dominant that vision has been in the course of our history and our culture. The destiny of the woman must be shaped to a large extent on her own conception of her spiritual imperatives and her place in society." *Casey*, 505 U.S. at 852.

Second, Defendants incorrectly analogize H.B. 214 to laws that only "limit" or impose certain procedural requirements on "certain abortions prior to viability," Def. Resp. 21, suggesting that the Act is therefore not *per se* unconstitutional. However, even if Defendants' theory that the Act is simply a limitation rather than a ban on abortion were correct (which it is not), H.B. 214 would still be subject to the undue burden standard, not rational basis, as Defendants propose. *Casey*, 505 U.S. at 874*; Whole Woman's Health*, 136 S.Ct. at 2309 (holding that applying rational-basis review to abortion restrictions is inconsistent with *Casey* and incorrectly "equate[s] the judicial review applicable to the regulation of a constitutionally protected personal liberty with the less strict review applicable where, for example, economic

---

[2] Moreover, even if this argument were legally cognizable, it rests on a blatant misreading of the statute. Unlike in *PPINK*, where the challenged statute banned abortions only when the *sole* reason was a prenatal diagnosis, 265 F. Supp. 3d at 862, the Act prohibits performing an abortion when *any part of a* woman's decision to have an abortion is due to an actual or potential diagnosis of fetal Down syndrome, Ohio Rev. Code § 2919.10(B) (forbidding abortion if the person knows "that the pregnant woman is seeking the abortion, *in whole or in part*, because of" Down syndrome (emphasis added)). As Plaintiffs' evidence shows, "[t]he decision to terminate a pregnancy is motivated by diverse, complex, and interrelated factors that are intimately related to the individual woman's values and beliefs, culture and religion, health status and reproductive history, and resources and economic stability." Lappen Decl. ¶ 37; *see also* France Dec. ¶5; Harvey Dec. ¶ 5. Therefore, under the statute, a woman who seeks to terminate an unplanned pregnancy because it is not the right time in her life to become a parent, as well as because she believes that the fetus has or may have Down syndrome, will instead be forced to carry the pregnancy to term.

legislation is at issue"). And, as Plaintiffs explained in their opening brief, the Act is just as unconstitutional under the undue burden test because it has both the purpose *and* effect of placing a substantial (in fact, complete) obstacle in the path of an entire class of women seeking previability abortions.³ Mot. for TRO/PI at 14-16. Yet Defendants utterly fail even to address the undue burden standard in their response.

Instead, Defendants cite to the decision in *Gonzales*, upholding a federal law prohibiting the use of a single, rare abortion method, without any explanation of the underlying analysis. *Gonzales v. Carhart*, 550 U.S. 124 (2007). To the extent Defendants rely on the decisions in *Gonzales* and *Casey* upholding certain restrictions on previability abortions under the undue burden standard, that reliance is misplaced. The mere fact that the Court held that one particular, and very different, law was not an undue burden does not mean the Act is *ipso facto* unconstitutional. Indeed, the *Gonzales* Court expressly noted that the government may advance its interest in fetal life if and only if it does not "strike at the right itself." 550 U.S. at 157-58. Thus, if anything, *Gonzales* underscores that bans such as the Act, which indisputably strike at the right itself by banning previability abortion for a class of women, are invalid regardless of the state's asserted interests.⁴

---

³ Defendants also mistakenly characterize Plaintiffs as arguing for an "absolute" right to abortion. (Def. Resp. 21-22.) Plaintiffs do not claim that the abortion right is absolute, or that it is somehow favored over other constitutional rights. Plaintiffs argue merely that binding Supreme Court precedent dictates that a ban on abortion prior to viability is per se unconstitutional, whereas other previability abortion limitations are constitutionally acceptable if they do not impose an undue burden on the abortion right.

⁴ Similarly, contrary to Defendants' assertion, nothing in the Supreme Court's decisions on laws regulating parental involvement in a minor's abortion counsels a different result. It is well-settled that the state could not enact a law prohibiting minors from obtaining a pre-viability abortion. *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 74-75 (1976). Instead, because of their unique status as minors, the state may impose certain procedural requirements

## B. The Various State Interests Asserted by Defendants Are Both Inapposite and Insufficient to Override a Woman's Constitutional Right.

Defendants' creative description of the state interests they claim are at stake cannot save the law from unconstitutionality. As noted above and set forth in Plaintiffs' opening brief, the Supreme Court has squarely rejected the claim that any State interest can justify a ban on abortion prior to viability—including the interest in protecting potential life, no matter what variant of that interest is put forward. *See Casey*, 505 U.S. at 846. And, as also noted above and set forth in Plaintiffs' opening brief, even under the undue burden standard, the presence of valid state interests cannot save a provision that imposes a substantial obstacle in the path of a woman seeking a previability abortion. *Casey*, 505 U.S. at 877 ("[A] statute which, while furthering the interest in potential life or some other valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends"); *see also, e.g.*, *Gonzales*, 550 U.S. at 126 ("Regulations which do no more than create a structural mechanism by which the State . . . may express profound respect for the life of the unborn are permitted, if they are not a substantial obstacle to the woman's exercise of the right to choose.") (citing *Casey*, 505 U.S. at 877) (emphasis added). Accordingly, the Defendants' asserted interests in the Act fail as a matter of law. What is more, as is demonstrated below, these interests are not actually advanced by the Act.

---

on minors seeking abortions to ensure they are *either* capable of giving informed consent to abortion without parental involvement or that, even if they are not capable of giving such consent, an abortion is in their best interest. *Bellotti v. Baird*, 443 U.S. 622, 642-44 (1979). This limitation on minors' abortion rights is hardly the same as a categorical ban on an entire class of previability abortions.

### (1) H.B. 214 does not prevent discrimination against people with Down syndrome.

As a threshold matter, any "interest" in preventing a woman from making the decision to terminate a pregnancy so as to ensure she continues the pregnancy is an interest in protecting potential life. Defendants' mischaracterization of a woman's decision to end a pregnancy because of a fetal Down syndrome diagnosis as an "invidiously discriminatory practice" does not transform their interest in blocking that woman's abortion into anything other than an interest in potential life, which is insufficient to justify a previability ban on abortions. In any event, H.B. 214 does nothing to forbid discrimination against persons with Down syndrome. It does not, for example, strengthen enforcement of anti-discrimination laws, nor does it provide additional resources for education about, or prevention of, discrimination against individuals with Down syndrome.[5] If anything, it is unclear how H.B. 214 can be a statute that promotes the state's interest in "conveying to *all* members of society that they are equally valued" and "[p]reventing discrimination in *all* of its forms," when it singles out one disability—Down syndrome—for special, favored treatment. Def. Resp. 26 (emphasis added). Finally, to the extent Defendants posit that H.B. 214 is designed to send a symbolic "*moral* message" that all members of society are equally valued, Def. Resp. at 26, again, there is no legal warrant for the view that such messages can be promoted by means of commandeering women's bodies, futures, and constitutionally-protected procreative liberty.

### (2) H.B. 214 does not protect the medical profession.

The Act also does not "protect[] the medical profession." Def. Opp. at 27. On the

---

[5] To the extent that the State's argument depends on treating a fetus as equivalent to a person who has already been born, the Supreme Court has already made clear that embryos and fetuses are not "persons" with rights under the Fourteenth Amendment. *Roe*, 410 U.S. at 158.

9

contrary, by criminalizing one health care option—abortion—it prevents physicians from respecting their patients' right to make autonomous decisions, in violation of their ethical obligations. Lappen Dec. at ¶ 47. As Defendants' declarant Dr. Dennis Sullivan acknowledges, respect for a patient's autonomy—along with beneficence, non-maleficence, and justice—is a key principle of ethical medical practice. Def. Exh. B ¶ 21. It is the State of Ohio, not Plaintiffs, that seeks to limit and coerce women's ability to make the best reproductive decisions for themselves and their families.

Moreover, as with the State's interest in potential life, the Supreme Court has already considered states' interest in ethical medical practice and concluded that such an interest cannot justify a pre-viability ban on abortion. Indeed, the Court noted in *Gonzales v. Carhart* that this "legitimate" (not compelling) interest may be sufficient in some circumstances to justify a requirement that physicians use one safe, common abortion procedure rather than a rare one, but it is not sufficient to justify creating a substantial obstacle to the abortion right itself. *Carhart*, 550 U.S. at 158 (holding a law that bars one safe abortion procedure and substitutes another is constitutional only if it does not constitute an undue burden).

**(3) H.B. 214 does not protect the Down syndrome community.**

Finally, the State's asserted interest in "[p]rotecting the Down [s]yndrome [c]ommunity and [i]ts [c]ivic [v]oice," Def. Resp. at 27, appears to be a restatement of its purported interest in preventing discrimination, Def. Resp. at 29, which is itself just another way of asserting the state's interest in protecting potential life. As explained above, that interest is not advanced by

this law, and the state's interest in preventing discrimination is not, in any case, strong enough to overcome the fundamental right to procreative liberty.[6]

**C. The Act Unconstitutionally Fails to Provide an Exception to Protect the Health and Life of the Woman.**

Contrary to Defendants' assertion, H.B. 214 does not contain an "implicit[]" exception for medically necessary abortions. Def. Resp. at 29. The Act criminalizes the termination of a pregnancy if *a* reason (not the *sole* reason) for the woman's decision is a Down syndrome diagnosis or indiciation. Ohio Rev. Code § 2919.10(B) ("No person shall purposely perform or induce or attempt to perform or induce an abortion on a pregnant woman if the person has knowledge that the pregnant woman is seeking the abortion, in whole or in part, because of" an indication of fetal Down syndrome). Therefore, if a woman seeks an abortion because of a medical condition that threatens her health if she continues the pregnancy, but also because she cannot take care of a child with Down syndrome, she would be forbidden to terminate the pregnancy (and a woman with an identical medical indication but no Down syndrome diagnosis would be allowed to terminate the pregnancy). *See* Lappen Dec. ¶¶ 39-43 (explaining that women sometimes have serious medical indications requiring pregnancy termination, together with a fetal Down syndrome diagnosis).

Defendant's second argument – that the lack of a health exception does not provide a basis for striking down the law on its face—is only relevant if the law is not facially unconstitutional for other reasons. Here, the law facially violates the Fourteenth Amendment's guarantee of substantive due process because it bans an entire class of previability abortions.

---

[6] Moreover, while Defendants claim that its three interests are "compelling" and that the Act can withstand strict scrutiny, they make no attempt – nor could they – to explain how a complete ban is the most narrowly tailored way to advance their purported goals.

11

### D. The Remaining Preliminary Injunction Factors Also Favor an Injunction.

Defendants do not dispute that H.B. 214 irreparably harms women in the exercise of their constitutional rights. Defendants do argue that the other two factors—harm to others (or equities) and the public interest—favor the State, because H.B. 214 prevents discrimination. This argument depends, however, on Defendants' mischaracterization of the Act and of constitutional doctrine. As noted above, the Act serves no such interest and, even if it did, over four decades of Supreme Court precedent establish that a woman's constitutional right to procreative liberty—which is severely infringed by the Act, and which the public interest protects—must prevail over any such interest.

## II. Most of Defendants' Exhibits Are Irrelevant.

Although trial courts are "allowed to give even inadmissible evidence *some* weight" when deciding a motion for preliminary injunction, they should do so only "when it is thought advisable to do so in order to serve the primary purpose of preventing irreparable harm." *Ohio State Conference of N.A.A.C.P. v. Husted,* 768 F.3d 524, 535 n. 2 (6th Cir. 2014) (emphasis added) *vacated on other grounds*, *Ohio State Conference of the N.A.A.C.P. v. Husted*, No. 14-3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014). In making this calculus, the trial court must ask "whether, weighing all the attendant factors, including the need for expedition, this type of evidence [is] appropriate given the character and objectives of the injunctive proceeding." *Federal Trade Com'n v. National Testing Services, LLC,* No. 3:05-0613, 2005 WL 2000634 at *2 (M.D. Tenn., Aug. 18, 2005), citing *Asseo v. Pan American Grain Co. Inc.,* 805 F.2d 23, 26 (1st Cir. 1986).

Even under the somewhat relaxed standard for evidentiary submissions on a motion for preliminary injunction, the Defendants' voluminous evidence is almost entirely irrelevant to the

issues before the Court and should be disregarded or, at a minimum, accorded little weight. Defendants have submitted over 350 pages of documents, most of which have nothing to do with the State of Ohio. Thus, this Court should disregard most of this evidence in its entirety; what remains, should be afforded little, if any, weight. *Johnson v. Wolgemuth*, 257 F. Supp. 2d 1013, 1024 (S.D. Ohio 2003).

Defendants' evidentiary submissions fall into six categories. First, Defendants submit several medical journal studies: one on self-perceptions of people with Down syndrome (Def. Exh. J); one on the portrayal of Down syndrome in prenatal screening information pamphlets in Canada (Def. Exh. S); one on patients' experiences with receiving the initial Down syndrome diagnosis (Def. Exh. Z); one on whether prenatal testing will cause babies with Down syndrome to disappear (Def. Exh. AA); one that evaluates the opinions of women who choose to carry Down syndrome pregnancies to term about their health care providers and finds them mostly positive, but with room for improvement (Exh. CC); and an "Ethics Watch" column in a medical journal article from 2009 about noninvasive prenatal testing in Germany (Exh. DD). Similarly, Defendants submit a Master's thesis in Sociology from the University of Louisville surveying and studying the opinions of parents in Kentucky and Indiana about prenatal genetic testing and "selective abortion" for Down syndrome. Def. Exh. L. Notably, none of these studies addresses the legal issue at the heart of Plaintiff's claims. In fact, some of these journal articles rely on data from other countries (Def. Exh. S, DD).[7] All of the exhibits in this category should therefore be disregarded.

---

[7] Moreover, even under relaxed evidentiary standards, it is questionable to submit medical articles with no context or analysis rather than providing them in connection with expert testimony. *Clark v. W & M Kraft, Inc.*, 476 Fed.Appx. 612, 616 (6th Cir. 2012) (noting that Rule 702 "permits the introduction of scientific, technical, or other specialized knowledge *through*

13

Second, Defendants submit op-ed pieces, short online news articles, and editorials or commentaries from scientific journals that report on various matters not before this Court or in any way related to H.B. 214. Def. Exh. C, K, O, P, Q, R, T, U, V, BB, GG, HH. However, as above, many of these articles reference social and legal developments in other countries (Exh. C, K, P, R, T, U, V, GG, HH), which are not relevant here. Others condemn state or private coercion of women with respect to their procreative decisions (Def. Exh. O, Q), yet, as explained above, the only coercion at issue in this case is H.B. 214, an enactment to coerce women who desire an abortion to give birth. Another calls for academics and practitioners to be mindful of the context of their research in the ethical dilemmas of public health practice and the lived experiences of persons with Down Syndrome (Exh. K). Finally, one article, from May 1995, notes changing attitudes among OB/GYNs toward abortion (Exh. BB), but it is difficult to see any conceivable relevance of this 23-year-old article to the legal question of the constitutionality of H.B. 214. All of the submissions in this category should also be disregarded or accorded minimal weight.

Third, Defendants submit declarations by two bioethicists who opine about the potential eugenic consequences of prenatal testing and argue that H.B. 214 is intended to counteract the hypothetical possibility of eliminating Down syndrome entirely. Def. Exh. B, D. These declarations are not only irrelevant to the constitutionality of H.B. 214, but should be considered in light of the undisputed evidence of the Plaintiffs' practices, which are not coercive, but rather honor the woman's decision-making autonomy as she reaches the best decision for herself and

---

*expert testimony* if it will help the trier of fact to understand the evidence or to determine a fact in issue") (internal citations omitted) (emphasis added).

her family.[8] Indeed, the declarations submitted by Defendants demonstrate that many women make the voluntary, uncoerced, and informed decision to carry a pregnancy to term after a fetal Down syndrome diagnosis. Def. Exh. G, I, Y. Those women were operating under the current status quo, according to which they are free decide, after such a diagnosis, whether to parent, choose adoption, or carry a pregnancy to term.

Fourth, Defendants submit sponsor testimony that was presented to the Ohio General Assembly in support of H.B. 214 and its Senate version, S.B. 164. Def. Exh. H, W, X, II. While this testimony is arguably relevant and need not be disregarded, because it is non-expert evidence motivated by a desire for a particular policy outcome, it should be weighed appropriately.

Fifth, Defendants submit declarations from *Planned Parenthood of Indiana & Kentucky, Inc. v. Comm'r, Indiana State Dep't of Health*, 265 F. Supp. 3d 859 (S.D. Ind. 2017), a challenge to Indiana's currently enjoined ban on abortion when the sole reason for the abortion is a prenatal anomaly. These declarations do not discuss Down syndrome at all and do not relate to the Ohio

---

[8] As Plaintiffs' declarations explain, they strive to continue to respect women's choices, ensuring that they are aware of all of their options before proceeding to an abortion. For example, at Preterm, patients engage in a "non-directive discussion, which means that the patient's wishes and concerns should guide the process and she should not be pushed toward any particular option." France Dec. ¶ 9. Women are asked, "What brought you here today?" and whether they have considered her other options, such as continuing the pregnancy to term or placing the child for adoption. *Id.* Similarly, Dr. Lappen notes that he provides fetal anomaly patients with as much information as they need or wish to have, letting the patient's concerns drive the counseling session. Lappen Dec. ¶ 34. He also refers patients to Down syndrome education and support resources, including local groups such as the Upside of Downs. *Id.*; *see also* Dec. of Kelly Kuhns ¶ 5 (Def. Exh. G) (noting that she met with a genetic counselor after learning of a fetal Down syndrome diagnosis and that she was given information and resources on Down syndrome).

law challenged in this case, which differs from the Indiana law in important respects. These declarations should therefore be disregarded in their entirety. Def. Exh. EE, FF.

Finally, Defendants submit multiple declarations from and about people with Down syndrome, including parents of children with Down syndrome. Def. Exh. A, E, F, G, I, M, N, Y. Plaintiffs affirm the equal value and dignity of the lives of individuals with Down syndrome, and Plaintiffs fully support a woman's decision to give birth to and parent a child with Down syndrome. However, the sole question before this Court is whether Ohio women are constitutionally entitled to the same right as Defendants' declarants to decide whether the best course for them and their families after receiving a prenatal test indicating Down syndrome is to terminate the pregnancy or carry to term. Accordingly, these affidavits should be given only the weight they deserve, given that not all Down syndrome parents and advocates believe that H.B. 214 demonstrates respect for the lives of individuals with Down syndrome. Chestnut Decl. ¶ 4, 16-20; Thrower Decl. ¶ 5-6, 11, 15.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant a preliminary injunction against the enforcement H.B. 214.

Respectfully submitted,

/s/ B. Jessie Hill
B. Jessie Hill #0074770

Alexa Kolbi-Molinas (admission *Pro Hac Vice granted*)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2633
akolbi-molinas@aclu.org
*Counsel for Plaintiff Preterm*

Cooperating Counsel for the ACLU of Ohio Foundation
ACLU of Ohio
4506 Chester Ave.
Cleveland, OH 44103
(216) 368-0553
(216) 368-2086 (fax)
bjh11@cwru.edu
*Counsel for Plaintiff Preterm*

16

| | |
|---|---|
| Carrie Y. Flaxman (admission *Pro Hac Vice granted*)<br>Planned Parenthood Federation of America<br>1110 Vermont Avenue, NW, Suite 300<br>Washington, DC 20005<br>(202) 973-4800<br>(202) 296-3480 (fax)<br>carrie.flaxman@ppfa.org<br>*Counsel for Plaintiffs Planned Parenthood of Greater Ohio and Planned Parenthood Southwest Ohio Region*<br><br>Melissa Cohen *(admission Pro Hac Vice granted)*<br>Planned Parenthood Federation of America<br>123 William Street, Floor 9<br>New York, NY 10038<br>(212) 541-7800<br>(212) 247-6811 (fax)<br>melissa.cohen@ppfa.org<br>*Counsel for Plaintiffs Planned Parenthood of Greater Ohio and Planned Parenthood Southwest Ohio Region*<br><br>Freda J. Levenson #0045916<br>ACLU of Ohio Foundation, Inc.<br>4506 Chester Avenue<br>Cleveland, OH 44103<br>(216) 472-2220<br>(216) 472-2210 (fax)<br>flevenson@acluohio.org<br>*Counsel for Plaintiff Preterm* | Jennifer L. Branch # 0038893<br>*Trial Attorney for Plaintiffs*<br>Alphonse A. Gerhardstein # 0032053<br>Gerhardstein & Branch Co. LPA<br>441 Vine Street, Suite 3400<br>Cincinnati, OH 45202<br>(513) 621-9100<br>(513) 345-5543 (fax)<br>agerhardstein@gbfirm.com<br>jbranch@gbfirm.com<br>*Counsel for Plaintiffs Planned Parenthood Southwest Ohio Region, Roslyn Kade, M.D., and Women's Med Group Professional Corporation* |

**CERTIFICATE OF SERVICE**

I hereby certify that on March 9, 2018 a copy of the foregoing pleading was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I further certify that a copy of the foregoing pleading and the Notice

of Electronic Filing has been served by ordinary U.S. mail and email upon all parties for whom counsel has not yet entered an appearance electronically, including:

/s/ B. Jessie Hill
Attorney for Plaintiffs