UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

PRETERM-CLEVELAND, *et al.*,                    Case No. 1:18-cv-109

      Plaintiffs,                                   Judge Timothy S. Black

vs.

LANCE HIMES, *et al.*,

      Defendants.

**ORDER GRANTING PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

## <u>Overview</u>

As the top law enforcement official in the nation, United States Attorney General,

Jefferson B. Sessions III, forcefully reminded the country recently, in a different context:

"Federal law is the law of the land."

Federal law derives in large part from the fundamental promises contained within

the United States Constitution, as interpreted by the United States Supreme Court.

Forty-five years ago, the Supreme Court held that the fundamental right to privacy

guaranteed by the Fourteenth Amendment includes a woman's right to decide whether or

not to terminate her pregnancy pre-viability, free from <u>any</u> governmental involvement.

*Roe v. Wade*, 410 U.S. 113, 153-54 (1973).

Twenty years later, the Supreme Court reaffirmed *Roe*'s essential holding,

restating it, in part, as "[b]efore viability, the State's interests are not strong enough to

support a prohibition of abortion or the imposition of a substantial obstacle to the

woman's effective right to elect the procedure." *Planned Parenthood of Southeastern*

*Pa. v. Casey*, 505 U.S. 833, 846 (1992). As the Supreme Court stated bluntly: "The woman's right to terminate her pregnancy before viability is the most central principle of *Roe v. Wade*. It is a rule of law and a component of liberty we [the United States Supreme Court] cannot renounce." *Id*. at 871.

After *Casey*, federal courts have unanimously found state laws that proscribe pre-viability abortions to be unconstitutional.[1] And most recently, Federal Judge Tanya Walton Pratt declared unconstitutional an Indiana law proscribing abortion on the basis of, *inter alia*, a diagnosis of Down syndrome. *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r, Ind. State Dep't of Health*, 265 F. Supp. 3d 859 (S.D. Ind. 2017). Judge Pratt held that the Indiana law "clearly violate[d]" the Supreme Court's holdings in *Roe* and *Casey* because it "prevent[s] women from obtaining abortions before fetal viability" and "[t]he woman's right to choose to terminate a pregnancy pre-viability is categorical." *Id*. at 866 (citing *Casey*, 505 U.S. at 870, 879). As Judge Pratt explained:

> **[I]t is <u>a woman's right to *choose*</u> an abortion that is protected, which, of course, <u>leaves no room for the State to examine, let alone prohibit, the basis or bases upon which a woman makes her choice</u>.**

*Id*. at 867 (emphasis added).

Here, this Court is asked to review the constitutionality of Ohio's proposed new law, H.B. 214, which criminalizes performing an abortion if the person performing the abortion knows that one reason, in whole or in part, for the woman's decision to terminate her pregnancy is a fetal indication of Down syndrome.

---

[1] *See* citations, *infra*, at pp. 9-10.

However, federal law is the law of the land. And <u>federal law is crystal clear</u>: "a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability." *Casey*, 505 U.S. at 879; *Roe*, 410 U.S. at 163-64. Here, Ohio's new law wrongfully does just that: it violates the right to privacy of every woman in Ohio and is unconstitutional on its face.

Accordingly, this Court preliminarily enjoins the implementation and enforcement of H.B. 214, including the laws amended and enacted by H.B. 214—Ohio Revised Code §§ 2919.10, 2919.101, and 3701.79—for the reasons more fully articulated in the body of this Order.

# I.    INTRODUCTION

This case is before the Court on Plaintiffs' motion for preliminary injunction (Doc. 3) and the parties' responsive memoranda (Docs. 25, 26).  Specifically, Plaintiffs ask the Court to enter an Order enjoining Defendants, their officers, agents, servants, employees, and attorneys, from enforcing Ohio's newly created law, H.B. 214, which becomes effective on March 22, 2018.  The Plaintiffs here are abortion providers, and the Defendants are the state officials responsible for implementing and/or enforcing the new law.  The parties to this lawsuit are identified more fully in the endnote to this Order.[i]

## A.  Facts Giving Rise to Plaintiffs' Claims.

On December 22, 2017, Ohio Governor John Kasich signed H.B. 214 into law. (Doc. 1 at ¶ 2).

H.B. 214 amends Section 3701.79 of the Ohio Revised Code and enacts Sections 2919.10 and 2919.101.  (Doc. 3 at 7).  Section 2919.10 (the "Ban") prohibits any person from purposely performing or inducing or attempting to perform or induce an abortion if the person has knowledge that the pregnant woman is seeking the abortion, in whole or in part, because of any of the following: (1) a test result indicating Down syndrome in an unborn child; (2) a prenatal diagnosis of Down syndrome in an unborn child; or (3) "any other reason to believe" that an unborn child has Down syndrome.  Ohio Rev. Code § 2919.10(B).[2]  Violation of the Ban constitutes a fourth-degree felony, punishable by up to 18 months in prison.  Ohio Rev. Code §§ 2919.10(C) and 2929.14(A)(4).  The Ban

---

[2] The provision defines "Down syndrome" as "a chromosome disorder associated either with an extra chromosome twenty-one, in whole or in part, or an effective trisomy for chromosome twenty-one."  Ohio Rev. Code § 2910.10(A)(1).

further requires the state medical board to revoke the license of a physician who violates it and makes that physician liable in a civil action for compensatory and exemplary damages.

H.B. 214 also requires a performing physician to attest in writing that he or she is not aware that fetal Down syndrome is a reason for the woman's decision to terminate her pregnancy. Section 2919.101 states: "In the abortion report required under section 3701.79 of the Revised Code, the attending physician shall indicate that the attending physician does not have knowledge that the pregnant woman was seeking the abortion, in whole or in part, because of any [indications of fetal Down syndrome]." Ohio Rev. Code § 2919.101(A).

Finally, H.B. 214 also requires the Ohio Department of Health to adopt rules to "assist in compliance with" Section 2919.101 within 90 days of its effective date. Ohio Rev. Code § 2919.101(B).

### B. Plaintiffs' Complaint.

On February 15, 2018, Plaintiffs commenced this lawsuit. (Doc. 1).

**The Complaint alleges that H.B. 214 violates Plaintiffs' patients' rights to liberty and privacy, guaranteed by the Fourteenth Amendment, because H.B. 214 prohibits pre-viability abortions based on the woman's reason for seeking the care**. (*Id.* at ¶ 49). The Complaint requests, *inter alia*, a declaratory judgment that the laws amended and enacted by H.B. 214—Ohio Revised Code §§ 2919.10, 2919.101, and 3701.79—are facially unconstitutional. (*Id.* at 13).

At the time of filing the complaint, Plaintiffs also filed the motion for preliminary injunction. (Doc. 3).[3] The motion requests a preliminary injunction declaring H.B. 214 unconstitutional and enjoining all Defendants, their officers, agents, servants, employees, and attorneys, and any persons in active concert or participation with them, from enforcing or complying with H.B. 214. (*Id.* at 1). Plaintiffs requested a decision by March 15, 2018, to provide time for an orderly transition in scheduling patients if H.B. 214 were to take effect. (*Id.*)

## II.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 65(a) permits a party to seek injunctive relief when the party believes that it will suffer immediate and irreparable injury, loss, or damage. Nevertheless, an "injunction is <u>an extraordinary remedy</u> which should be granted only if the movant carries his burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (emphasis supplied).

In determining whether to grant injunctive relief, this Court must weigh four factors: (1) whether the moving party has shown a strong likelihood of success on the merits; (2) whether the moving party will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction. *Ne. Ohio*

---

[3] Plaintiffs' motion requests a temporary restraining order and a preliminary injunction. The purpose of a temporary restraining order is to immediately preserve the *status quo* until there is an opportunity to consider the application for preliminary injunction. Because the parties fully briefed the issue of a preliminary injunction prior to H.B. 214's effective date, the Court considers Plaintiffs' request for a temporary restraining order moot and considers exclusively the issue of a preliminary injunction.

*Coal. For Homeless & Serv. Emp. Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1099 (6th Cir. 2006). These four considerations are factors to be balanced, not prerequisites that must be met. *McPherson v. Michigan High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459 (6th Cir. 1997). "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs,* 225 F.3d 620, 625 (6th Cir. 2000).

### III.   ANALYSIS

#### A. Success on the Merits.

Plaintiffs allege that they are substantially likely to succeed on their claim that H.B. 214 violates the rights to liberty and privacy guaranteed by the Due Process Clause of the Fourteenth Amendment, because H.B. 214 bans some pre-viability abortions based on the women's reasons for seeking them. (Doc. 3 at 10-14). The Court agrees.

#### 1.   __Under binding Supreme Court precedent, women have the right to choose to terminate, or to continue, a pregnancy prior to viability.__

The Supreme Court has recognized that the specific guarantees in the Bill of Rights have penumbras, formed by emanations from those guarantees that help give them life and substance. *Griswold v. Connecticut*, 381 U.S. 479, 484 (1965). One of those substantive rights that is not expressly provided is the right to privacy. *Id.* at 484-86. Personal rights that can be deemed "fundamental" or "implicit in the concept of ordered liberty" are included in the constitutional guarantee of personal privacy. *Roe v. Wade*, 410 U.S. 113, 152 (1973) (citing *Palco v. Connecticut*, 302 U.S. 319, 325 (1937)). Whether grounded in "liberty" or "privacy," the Supreme Court has consistently

recognized that individuals have constitutionally guaranteed rights to make personal decisions pertaining to their intimate and familial relationships. *See Obergefell v. Hodges*, 135 S. Ct. 2584, 2599 (2015) (the Due Process Clause encompasses "the right to personal choice regarding marriage"); *Griswold*, 381 U.S. at 484-86 (holding that a "zone of privacy" emanates from multiple constitutional guarantees that does not permit a state to forbid a married couple to use contraceptives); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534-35 (1925) (parents and guardians have a constitutionally protected liberty interest in directing the upbringing and education of their children).

In 1973, the Supreme Court expressly held in *Roe v. Wade* that the right of privacy guaranteed by the Fourteenth Amendment is "broad enough to encompass a woman's decision whether or not to terminate her pregnancy." 410 U.S. at 153. In *Roe*, plaintiffs challenged the constitutionality of Texas's criminal abortion laws which proscribed procuring or attempting an abortion except for the purpose of saving the mother's life. The Court explained "the right of personal privacy includes the abortion decision, but . . . this right is not unqualified and must be considered against important state interests in regulation." *Id.* at 154. However, the Court held that the state's interest in potential life, while important and legitimate, only becomes "compelling" enough to justify limiting the woman's right to choose at the point of viability. *Id.* at 163. The Court struck down the Texas laws at issue because they did not distinguish between abortions that were performed early in the pregnancy and those that were performed later. *Id.* at 164.

Twenty years later, the Supreme Court reaffirmed *Roe*'s essential holding, restating it, in part, as "[b]efore viability, the State's interests are not strong enough to

support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure." *Casey*, 505 U.S. at 846 (1992). In *Casey*, the Supreme Court explained that the state's interest in protecting potential life may allow it to enact rules and regulations designed to provide a reasonable framework for the woman to make the decision, so long as the regulation does not impose an "undue burden." That is, the State may implement some regulations, so long as the regulations do not place a substantial obstacle in the path of any woman seeking a pre-viability abortion. *Id.* at 872-73; 877-78. In so holding, the Supreme Court expressly and unambiguously reiterated that women have an unfettered constitutional right, pre-viability, to choose whether to terminate or to continue their pregnancy: "The woman's right to terminate her pregnancy before viability is the most central principle of *Roe v. Wade*. It is a rule of law and a component of liberty we cannot renounce." *Id.* at 871.

After *Casey*, federal courts have unanimously found state laws that proscribe pre-viability abortions to be unconstitutional. *See MKB Mgmt. Corp. v. Stenehjem*, 795 F.3d 768, 773 (8th Cir. 2015) (North Dakota statute prohibiting physicians from aborting fetuses with detectable heartbeats was unconstitutional because heartbeats are generally detectable prior to viability and "we are bound by Supreme Court precedent holding that states may not prohibit pre-viability abortions"); *Isaacson v. Horne*, 716 F.3d 1213, 1225 (9th Cir. 2013) (Arizona statute banning abortions at 20 weeks was unconstitutional because "[t]he parties here agree that no fetus is viable at twenty weeks"); *Sojourner T v. Edwards*, 974 F.2d 27, 30-31 (5th Cir. 1992) (Louisiana statute that proscribed pre-viability abortions was facially unconstitutional).

9

In light of this history, the Federal Court for the Southern District of Indiana recently found unconstitutional an Indiana law that, like H.B. 214, criminalized performing abortions sought for certain enumerated reasons. *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r, Ind. State Dep't of Health*, 265 F. Supp. 3d 859 (S.D. Ind. 2017) ("*PPINK*"). The law at issue in *PPINK* provided a person may not perform or attempt to perform an abortion if the person knows the pregnant woman is seeking an abortion "solely because of the sex of the fetus," "solely because the fetus has been diagnosed with, or has a potential diagnosis of, Down syndrome or any other disability," or "solely because of the race, color, national origin, or ancestry of the fetus." *Id.* at 862. The court held that the Indiana law "clearly violate[d]" the Supreme Court's holdings in *Roe* and *Casey* because it "prevent[s] women from obtaining abortions before fetal viability" and "[t]he woman's right to choose to terminate a pregnancy pre-viability is categorical." *Id.* at 866 (citing *Casey*, 505 U.S. at 870, 879). As Judge Pratt explained:

> For this Court to hold such a law constitutional would require it to recognize an exception where none have previously been recognized. Indeed, the State has not cited a single case where a court has recognized an exception to the Supreme Court's categorical rule that a woman can choose to terminate a pregnancy before viability. This is unsurprising given that it is a woman's right to *choose* an abortion that is protected, which, of course, leaves no room for the State to examine, let alone prohibit, the basis or bases upon which a woman makes her choice.

*Id.* at 867 (emphasis in original).

Similarly, Ohio's law violates a woman's right to choose, in clear derogation of federal law.

**2. H.B. 214 prevents certain women from obtaining pre-viability abortions, and H.B. 214 is therefore unconstitutional on its face.**

Here, Plaintiffs are highly likely to succeed on their claim that H.B. 214 violates the Due Process Clause. Because H.B. 214 prevents women from making the choice to terminate their pregnancy prior to viability, it is unconstitutional on its face. *Casey*, 505 U.S. at 879 ("Regardless of whether exceptions are made for particular circumstances, a State may not prohibit <u>any woman</u> from making the ultimate decision to terminate her pregnancy before viability") (emphasis supplied); *see also Roe*, 410 U.S. at 163-64; *PPINK*, 265 F. Supp. 3d at 867.

The Court agrees with Plaintiffs that because H.B. 214 is an unconstitutional infringement of a categorical right, *Casey*'s "undue burden" test does not apply. (Doc. 3 at 14). *Casey* defined an "undue burden" as a "substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." 505 U.S. at 877. <u>The very definition of an "undue burden" contemplates that women still have the absolute right to a pre-viability abortion</u>. This Court agrees with the Ninth Circuit Court of Appeals that the "undue burden" test is not an appropriate measure of a law that unconditionally eliminates that right for a defined class of women. *See Isaacson v. Home*, 716 F.3d 1213, 1225 (9th Cir. 2013) ("this 'undue burden' / 'substantial obstacle' mode of analysis has no place where, as here, the state is *forbidding* certain women from choosing pre-viability abortions rather than specifying the [reasonable] conditions under which such abortions are to be allowed").

In any event, even if the undue burden analysis applies, the Court likewise finds, upon this alternative basis, that Plaintiffs are likely to succeed on their claim that H.B. 214 is unconstitutional. H.B. 214 is clearly an "undue burden." The "obstacle" it places in the path of women seeking a pre-viability abortion for one of the proscribed reasons is not merely "substantial," it is insurmountable. H.B. 214 does not "burden" the right of such women to choose a pre-viability abortion, it eradicates the right entirely. Because H.B. 214 prevents certain women from choosing to terminate a pregnancy pre-viability, and because "the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure," H.B. 214 is unconstitutional. *Casey*, 505 U.S. at 846.

### 3. <u>The State's arguments lack merit.</u>

The State argues that *Roe* and *Casey* do not apply for two reasons. First, the State argues the "Supreme Court of the United States has never recognized a right to abort an unborn child on the basis of a disability." (Doc. 25 at 19). The State suggests that *Roe* and *Casey* only apply to women who <u>accidentally</u> become pregnant. (*Id.* at 19-20). The State argues that women only have the right to choose whether to have <u>a</u> child, not the right to decide whether to have <u>a particular</u> child. (*Id.*)

This argument is not well-taken. <u>The interest protected by the Due Process Clause is a woman's right to choose to terminate her pregnancy pre-viability, and that right is categorical.</u> *Casey*, 505 U.S. at 879. The State cannot dictate what factors a woman is permitted to consider in making her choice. The State's attempt to carve out exceptions to a categorical right where none exist fails as a matter of law. *Id.* at 851 ("At the heart of

liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State"); *see also PPINK*, 265 F. Supp. 3d at 867-68.

The State's argument that a woman must make this choice from behind a veil of ignorance, oblivious to the circumstances of the child she is carrying, finds no support in the law. The Supreme Court's decisions in *Roe* and *Casey* contemplate that a woman will exercise her right to choose while being <u>well-informed</u> and considering not only the implications of pregnancy but also the circumstances of motherhood. *See Roe*, 410 U.S. at 153; *Casey*, 505 U.S. at 877 ("the means chosen by the State to further the interest in potential life <u>must be calculated to inform the woman's free choice, not hinder it</u>.") (emphasis supplied).

Further, contrary to the State's suggestion, neither *Roe* nor *Casey* limited their holdings to women who accidentally become pregnant. To the contrary, *Casey* could not have been more clear that a state may not prohibit "<u>any</u> woman" from choosing to terminate her pregnancy before viability. 505 U.S. at 879 (emphasis supplied). This Court agrees with the Southern District of Indiana that "the very notion that, pre-viability, a State can examine the basis for a woman's choice to make this private, personal and difficult decision, if she at some point earlier decided she wants a child as a general matter, is inconsistent with the notion of a right rooted in privacy concerns and a liberty right to make independent decisions." *PPINK*, 265 F. Supp. 3d at 868 (citations omitted).

Second, the State argues that H.B. 214 is justified by three state interests that were not considered by the Supreme Court in *Roe* or *Casey*: (1) Ohio's interest in preventing discrimination, (2) Ohio's interest in protecting the medical profession, and (3) Ohio's interest in protecting the Down syndrome community. (Doc. 25 at 23-29). None of these arguments are availing.

The State's arguments regarding the first and third interests—preventing discrimination and protecting the Down syndrome community—are especially not well-taken at law. The State argues that unborn children with a fetal indication of Down syndrome are "disproportionately selected for abortion" and claims this will lead to a corresponding reduction of the Down syndrome community. (Doc. 25 at 25; 27-28). But these arguments simply rephrase the State's interest in <u>potential</u> life, which the Supreme Court has already held does not become compelling under the law until viability. *Roe*, 410 U.S. at 163-64.[4]

Moreover, the State's argument regarding the integrity of the medical profession similarly fails.[5] While the Supreme Court has acknowledged that a state has a legitimate interest in protecting the integrity and ethics of the medical profession, the Supreme Court has recognized that a state cannot use its regulatory power to impose an undue

---

[4] To the extent the State's argument suggests an interest in preventing the type of discrimination prohibited by the Equal Protection Clause, that argument fails, because the Supreme Court has expressly held that embryos and fetuses are not "persons" with Fourteenth Amendment rights. *Roe*, 410 U.S. at 158.

[5] The State argues that "medical principilism" includes "distributive justice," *i.e.*, treating all patients equally. The Court finds it interesting that this statement is offered in support of H.B. 214, a bill that has the express and intended purpose of not permitting doctors to treat all patients equally.

burden on a woman's right to choose. *Gonzales v. Carhart*, 550 U.S. 124, 157-58 (2007). Accordingly, the State's interest in the integrity of the medical profession cannot justify a ban on pre-viability abortions.[6]

## B. Irreparable Injury.

Having found that Plaintiffs are highly likely to succeed on their claim, the Court considers whether injunctive relief is required to prevent an irreparable injury.

Initially, in light of the Court's conclusion that Plaintiffs have demonstrated a strong likelihood of success on their claim that H.B. 214 violates the Due Process Clause, Plaintiffs are not required to separately demonstrate an irreparable injury. *See Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) ("when reviewing a motion for a preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated") (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Deerfield Med. Ctr. v. Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) (holding the conclusion that the right to abortion is "either threatened or in fact being impaired" mandates a finding of irreparable injury).[7]

---

[6] As explained in Section III(A)(2), *supra*, an "undue burden" is a "substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey*, 505 U.S. at 877. The "undue burden" test implies that a regulation still allows women to choose to have a pre-viability abortion, which is why courts do not apply it to laws that ban such procedures. *See Isaacson*, 716 F.3d at 1225. Here, H.B. 214 is far more than merely an undue burden; it actually serves to ban certain women from obtaining pre-viability abortions.

[7] The fact that the due process rights implicated by H.B. 214 are actually those of Plaintiffs' patients is of no consequence. Doctors have standing to assert the rights of their patients. *See Women's Med. Prof'l Corp. v. Voinovich*, 911 F. Supp. 1051, 1058 (S.D. Ohio 1995). Accordingly, the Court may consider the irreparable harm Plaintiffs' patients will incur for purposes of determining the appropriateness of the requested preliminary injunction. *Id.* at 1091.

In any event, Plaintiffs have indeed demonstrated that their patients will be irreparably harmed. If H.B. 214 becomes law as scheduled on March 22, 2018, the Plaintiffs will be required to stop providing abortion care to any patient they suspect is seeking the care due to a belief that the fetus has, or may have, Down syndrome. (Doc. 3-2 at ¶ 12; Doc. 3-3 at ¶ 12; Doc. 3-4 at ¶ 10). Plaintiffs will have to counsel those patients to travel out of state to seek the desired care. (Doc. 3-2 at ¶ 12; Doc. 3-3 at ¶ 12). Some of these women will not be able to afford the cost of traveling out of state; but even those who have the means and financial resources to travel will experience delays that can increase the risks related to the abortion procedure. (Doc. 3-4 at ¶ 11).

That Plaintiffs' patients will have to either travel out of state to obtain the care to which they are constitutionally entitled, or otherwise carry a child to term against their wishes, establishes that they will incur an irreparable injury. *See June Med. Servs. LLC v. Kliebert*, 250 F. Supp. 3d 27, 89 (M.D. La. 2017) ("some women's total inability to access abortion care, and unreasonable and dangerous delays experienced by others in scheduling an abortion procedure, will constitute irreparable harm for Louisiana women seeking abortions"); *Planned Parenthood Se., Inc. v. Bentley*, 951 F. Supp. 2d 1280, 1289 (M.D. Ala. 2013).

### C. Balance of Harms/Public Interest.

The third and fourth factors in the injunctive relief analysis are whether granting the injunction would cause harm to others and/or serve the public interest. "The irreparable injury [the plaintiffs] will suffer if their motion for injunctive relief is denied must be balanced against any harm which will be suffered by [others] as a result of the

granting of the injunctive relief." *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982).

First, the State repeats its argument that H.B. 214 serves the public interest by preventing "unequal treatment for individuals who have Down syndrome." (Doc. 25 at 30). This argument fails for the reasons asserted in Section III(A)(3), *supra*: H.B. 214 does not affect any "person," as that term is used in the Constitution, with Down syndrome, and the State's interest in <u>potential</u> life—whether couched as anti-"discrimination" or otherwise—does not become compelling until viability.

Second, the State argues that a preliminary injunction will harm the State because "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (Doc. 25 at 31). This argument is not well-taken. This Court refuses to find that the State will be injured by an Order enjoining it from implementing laws that are <u>unconstitutional on their face</u>.

Balancing the harms and the public interest is not difficult here. The "harms" identified by the State are not legally cognizable, and, in any event, pale in comparison to the harms facing Plaintiffs, their patients, and the public if H.B. 214 were to become effective.

### D. No Bond is Required.

Pursuant to Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The Court is required to consider the question of

requiring a bond before issuing a preliminary injunction. *Roth v. Bank of the Commonwealth*, 583 F.2d 527, 539 (6th Cir. 1978). However, the "amount of security required and whether a bond is needed is up to the discretion of the district court." *Bunn Enters. v. Ohio Operating Eng'rs. Fringe Benefit Programs*, No. 2:13-cv-357, 2013 U.S. Dist. LEXIS 86211, at * 46 (S.D. Ohio, June 19, 2013). No bond may be required when a strong public interest is involved. *See Moltan Co. v. Eagle-Picher Indus. Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995); *Cheatham v. Donovan*, 07-13168, 2009 U.S. Dist. LEXIS 81125, at * 30 (E.D. Mich. Sept. 8, 2009) ("because of the strong public interest involved in this litigation, no bond is required").

Here, Plaintiffs requested that "if a bond is required, it be set at $1.00." (Doc. 3 at 1). The State did not brief the issue of whether a security should be required (and, if so, in what amount). Nor did the State set forth evidence indicating that it will sustain any costs or damages if enjoined. In light of the strong public interest implicated in this case, the Court finds that no bond is required.

## IV.    CONCLUSION

The purpose of a preliminary injunction is to preserve the *status quo* until a trial on the merits can be held. *See Certified Restoration Dry Cleaning Network LLC v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007).

Here, the *status quo* is forty-five years of binding Supreme Court precedent holding that women have the unfettered right to choose whether to terminate, or continue, a pregnancy pre-viability. Plaintiffs have demonstrated that they are highly likely to succeed on their claim that H.B. 214 is an unconstitutional infringement of that right, and

a preliminary injunction is appropriate to preserve the right during the pendency of this lawsuit.

Accordingly, Plaintiffs' motion for preliminary injunction (Doc. 3) is **GRANTED**. Specifically, Defendants, their officers, agents, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of this Order, are enjoined from implementing and enforcing H.B. 214, including the laws amended and enacted by H.B. 214—Ohio Revised Code §§ 2919.10, 2919.101, and 3701.79—pending further Order of this Court. Plaintiffs need not post a bond.

**IT IS SO ORDERED**.

Date: 3/14/2018

Timothy S. Black
United States District Judge

---

<sup>i</sup> The Parties to this lawsuit include:

Plaintiff Preterm-Cleveland ("Preterm") is a nonprofit corporation organized under the laws of the State of Ohio. (Doc. 1 at ¶ 8). Preterm has operated a health clinic in Cleveland, Ohio since 1974. (*Id.*) Preterm provides a range of reproductive health services, including family planning services; pregnancy testing; testing and treatment for sexually transmitted diseases; and medical and surgical abortion services. (*Id.*) Preterm provides medication abortions through 70 days LMP and surgical abortions up to 21 weeks 6 days LMP, which is the same as twenty weeks post-fertilization. (*Id.*) The physicians who perform abortions at Preterm are threatened with criminal penalties, loss of their medical license, and civil suits if they violate the laws amended and enacted by H.B. 214. (*Id.*) Preterm is also threatened with criminal liability. (*Id.*) Preterm sues on its own behalf; on behalf of its current and future medical staff, servants, officers, and agents; and on behalf of its patients. (*Id.*)

Planned Parenthood Southwest Ohio Region ("PPSWO") is a non-profit corporation organized under the laws of the State of Ohio. (Doc. 1 at ¶ 9). It and its predecessor organizations have provided care in Ohio since 1929. (*Id.*) PPSWO provides a broad range of medical services to women and men at seven health centers in Southwest Ohio, including: birth control, annual gynecological examinations, cervical pap smears, diagnosis and treatment of vaginal infections, testing and treatment for certain sexually transmitted diseases, HIV testing, pregnancy testing, and abortions. (*Id.*) PPSWO provides surgical abortions up to 21 weeks 6 days of pregnancy LMP and medication abortions through 70 days LMP. (*Id.*) The physicians who perform abortions at PPSWO are threatened with criminal penalties, loss of their medical license, and civil suits if they violate the laws enacted and amended by H.B. 214. (*Id.*) PPSWO is also threatened with criminal liability. (*Id.*) PPSWO sues on its own behalf; on behalf of its current and future medical staff, servants, officers, and agents; and on behalf of its patients. (*Id.*)

Plaintiff Women's Medical Group Professional Corporation ("WMGPC") owns and operates a facility known as Women's Med Center of Dayton ("WMCD") in Kettering, Ohio. (Doc. 1 at ¶ 10). WMCD provides surgical and medical abortions, pregnancy testing, and birth control health care services to women. (*Id.*) WMCD provides surgical abortions up to 21 weeks 6 days LMP and medication abortions through 70 days LMP. (*Id.*) The physicians who perform abortions at WMCD are threatened with criminal penalties, loss of their medical license, and civil suits if they violate the laws enacted and amended by H.B. 214. (*Id.*) WMGPC is also threatened with criminal liability. (*Id.*) WMGPC sues on its own behalf; on behalf of its current and future medical staff, servants, officers, and agents; and on behalf of its patients. (*Id.*)

Plaintiff Roslyn Kade, M.D. ("Dr. Kade") is a physician licensed to practice medicine in Ohio since 1987. (Doc. 1 at ¶ 11). Dr. Kade performs surgical abortions up to 21 weeks 6 days LMP, provides medication abortions through 70 days LMP, provides birth control, treats certain sexually transmitted diseases, and provides other health care services to women in the Greater Cincinnati and Greater Dayton regions. (*Id.*) Dr. Kade is the Medial Director at PPSWO, where she occasionally provides abortions, and she also provides abortions at WMCD. (*Id.*)

Plaintiff Planned Parenthood of Greater Ohio ("PPGOH") is a non-profit corporation organized under the laws of the State of Ohio. (Doc. 1 at ¶ 12). PPGOH provides a broad range of medical services to women and men at nineteen health centers throughout Ohio, including birth control, annual gynecological examinations, cervical pap smears, diagnosis and treatment of vaginal infections, testing and treatment for certain sexually transmitted diseases, HIV testing, pregnancy testing, and abortions. (*Id.*) PPGOH provides surgical abortions up to 19 weeks 6 days LMP and medication abortions through 70 days LMP. (*Id.*) The physicians who perform abortions at PPGOH are threatened with criminal penalties, loss of their medical license, and civil suits if they violate the laws enacted and amended by H.B. 214. (*Id.*) PPGOH is also threatened with criminal liability. (*Id.*) PPGOH sues on its own behalf; on behalf of its current and future medical staff, servants, officers, and agents; and on behalf of its patients. (*Id.*)

Defendant Lance Himes is the Director of the Ohio Department of Health, which is responsible for promulgating rules to assist in compliance with H.B. 214. (Doc. 1 at ¶ 13). He is charged with administering the Department of Health and with enforcing the abortion reporting requirements in Ohio Revised Code § 3701.79. (*Id.*) He is sued in his official capacity. (*Id.*)

Defendant Kim G. Rothermel, M.D., is the Secretary of the State Medical Board of Ohio, which is charged with enforcing the physician licensing penalties contained in H.B. 214. (Doc. 1 at ¶ 18). She is sued in her official capacity. (*Id.*)

Defendant Bruce R. Saferin, D.P.M., is the Supervising Member of the State Medical Board of Ohio, which is charged with enforcing the physician licensing penalties contained in H.B. 214. (Doc. 1 at ¶ 19).

Defendants Saferin, Rothermel, and Himes are referred to collectively as the "State."

Defendant Joseph T. Deters is the Hamilton County Prosecutor and is charged with enforcing the criminal provisions contained in H.B. 214 within his jurisdiction. (Doc. 1 at ¶ 14).

Defendant Michael C. O'Malley is the Cuyahoga County Prosecutor and is charged with enforcing the criminal provisions contained in H.B. 214 within his jurisdiction. (Doc. 1 at ¶ 15).

Defendant Mat Heck, Jr. is the Montgomery County Prosecutor and is charged with enforcing the criminal provisions contained in H.B. 214 within his jurisdiction. (Doc. 1 at ¶ 16).

Defendant Ron O'Brien is the Franklin County Prosecutor and is charged with enforcing the criminal provisions contained in H.B. 214 within his jurisdiction. (Doc. 1 at ¶ 17).

Defendants Deters, O'Malley, Heck, and O'Brien (the "Prosecutor Defendants") are sued in their official capacity. (*Id.*)

The Prosecutor Defendants have represented that their only interest in this case is potential responsibility for enforcing the laws that H.B. 214 would amend and enact if it were to become effective.  (Doc. 19).  The Prosecutor Defendants represent that they are not responsible for, nor interested in, defending the constitutionality of  H.B. 214, and have expressly deferred to the Ohio Attorney General on that issue.  (*Id*.)  Plaintiffs have agreed to not seek attorney fees from the Prosecutor Defendants if they take no action to defend the constitutionality of H.B. 214. (Doc. 20 at 1).