# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540

Deborah S. Hunt    POTTER STEWART U.S. COURTHOUSE    Tel. (513) 564-7000
Clerk    CINCINNATI, OHIO 45202-3988    www.ca6.uscourts.gov


Filed:  April 13, 2021


Mr. Samuel R. Bagenstos
Samuel Bagenstos
625 S. State Street
Suite LR 910
Ann Arbor, MI 48104

Mr. Stephen P. Carney
Office of the Attorney General
of Ohio
30 E. Broad Street
25th Floor
Columbus, OH 43215

Ms. Tiffany L. Carwile
Law Offices
115 W. Main Street
Fourth Floor
Columbus, OH 43215

Mr. Thomas E. Chandler
U.S. Department of Justice
Civil Rights Division, Appellate Section
P.O. Box 14403
3708
Washington, DC 20044-4403

Ms. Melissa Cohen
Planned Parenthood Federation of America
123 William Street, 10th Floor
New York, NY 10038

Ms. Ruth Colker
Moritz College of Law
Ohio State University
55 W. 12th Avenue
Columbus, OH 43210-1391

Mr. Thomas Molnar Fisher
Office of the Attorney General of Indiana
302 W. Washington Street
Fifth Floor
Indianapolis, IN 46204

Ms. Carrie Y. Flaxman
Planned Parenthood Federation of America
1110 Vermont Avenue
Suite 300
Washington, DC 20005

Mr. Benjamin Michael Flowers
Office of the Attorney General
30 E. Broad Street
14th Floor
Columbus, OH 43215

Mr. Alphonse A. Gerhardstein
Friedman, Gilbert & Gerhardstein
441 Vine Street
Suite 3400
Cincinnati, OH 45202

Fadwa A. Hammoud
Office of the Attorney General
of Michigan
P.O. Box 30217
Lansing, MI 48909

Ms. Beatrice Jessie Hill
Case Western Reserve University
School of Law
11075 E. Boulevard
Cleveland, OH 44106

Mr. Chris Hollinger
O'Melveny & Myers
Two Embarcadero
28th Floor
San Francisco, CA 94111

Ms. Karla Z. Keckhaver
Wisconsin Department of Justice
P.O. Box 7857
Madison, WI 53707-7857

Ms. Susan J. Kohlmann
Jenner & Block
919 Third Avenue
38th Floor
New York, NY 10022

Ms. Alexa Kolbi-Molinas
American Civil Liberties Union
125 Broad Street
18th Floor
New York, NY 10004

Ms. Freda Levenson
ACLU of Ohio Foundation
4506 Chester Avenue
Cleveland, OH 44103

Ms. Kimberly A. Parker
Wilmer Hale
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006

Ms. Elise W. Porter
Law Office
141 Orchard Lane
Columbus, OH 43214

Ms. Anna Rich
Office of the Attorney General
of California
1515 Clay Street
20th Floor
Oakland, CA 94612

Lindsay Sara See
Office of the Attorney General
of West Virginia
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25305

Ms. Kristina W. Supler
Kohrman Jackson Krantz
1375 E. Ninth Street
29th Floor
Cleveland, OH 44114

Mr. Edward Lawrence White
American Center for Law and Justice
3001 Plymouth Road
Suite 203
Ann Arbor, MI 48105

                  Re:  Case No. 18-3329, *Preterm-Cleveland, et al v. Stephanie McCloud, et al*
                            Originating Case No. : 1:18-cv-00109

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

                        Yours very truly,

                        Deborah S. Hunt, Clerk

                        Cathryn Lovely
                        Deputy Clerk

cc:  Mr. Richard W. Nagel

Enclosures

Mandate to issue.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0083p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

PRETERM-CLEVELAND; PLANNED PARENTHOOD
SOUTHWEST OHIO REGION; WOMEN'S MED GROUP
PROFESSIONAL CORPORATION; ROSLYN KADE, M.D.;
PLANNED PARENTHOOD OF GREATER OHIO,

*Plaintiffs-Appellees*,

*v.*

STEPHANIE MCCLOUD, Director, Ohio Department of
Health; KIM G. ROTHERMEL, Secretary, State Medical
Board of Ohio; BRUCE R. SAFERIN, Supervising
Member, State Medical Board of Ohio,

*Defendants-Appellants*.

⎫
⎪
⎪
⎬  No. 18-3329
⎪
⎪
⎭

———————————

On Petition for Rehearing En Banc
United States District Court for the Southern District of Ohio at Cincinnati;
No. 1:18-cv-00109—Timothy S. Black, District Judge.

Argued En Banc:  March 11, 2020

Decided and Filed:  April 13, 2021

Before:  COLE; Chief Judge; BATCHELDER, MOORE, CLAY, GIBBONS, SUTTON,
GRIFFIN, KETHLEDGE, WHITE, STRANCH, DONALD, THAPAR, BUSH, LARSEN,
NALBANDIAN, and READLER, Circuit Judges.[*]

———————————

## COUNSEL

**ARGUED EN BANC:**  Benjamin M. Flowers, OFFICE OF THE OHIO ATTORNEY
GENERAL, Columbus, Ohio, for Appellants.  B. Jessie Hill, ACLU OF OHIO FOUNDATION,
INC., Cleveland, Ohio, for Appellees.  Alexander V. Maugeri, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus Curiae.  **ON SUPPLEMENTAL
BRIEF:**  Benjamin M. Flowers, Stephen P. Carney, Tiffany L. Carwile, OFFICE OF THE OHIO

———————————

[*]Judge Murphy recused himself from participation in this case.

No. 18-3329 *Preterm-Cleveland v. McCloud* Page 2

ATTORNEY GENERAL, Columbus, Ohio, for Appellants. B. Jessie Hill, Freda J. Levenson, ACLU OF OHIO FOUNDATION, INC., Cleveland, Ohio, Alexa Kolbi-Molinas, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, Jennifer L. Branch, GERHARDSTEIN & BRANCH CO. LPA, Cincinnati, Ohio, for Appellees. Alexander V. Maugeri, Eric S. Dreiband, Thomas E. Chandler, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Thomas M. Fisher, OFFICE OF THE INDIANA ATTORNEY GENERAL, Indianapolis, Indiana, Chris A. Hollinger, O'MELVENY & MYERS LLP, San Francisco, California, Ruth Colker, THE OHIO STATE UNIVERSITY, Columbus, Ohio, Samuel Bagenstos, Ann Arbor, Michigan, Kimberly A. Parker, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, D.C., Devi M. Rao, JENNER & BLOCK LLP, Washington, D.C., for Amici Curiae.

BATCHELDER, J., delivered the opinion of the court comprising Parts I–IV, V-A, V-C, and VII, in which SUTTON, GRIFFIN, KETHLEDGE, THAPAR, BUSH, LARSEN, NALBANDIAN, and READLER, JJ., joined, delivered a lead opinion comprising Parts V-B, V-D, and VI in which SUTTON, GRIFFIN, THAPAR, BUSH, and READLER, JJ., joined, and announced the judgment of the court. SUTTON, J. (pp. 31–35), GRIFFIN, J. (pp. 36–39), and BUSH, J. (pp. 40–52), delivered separate concurring opinions. KETHLEDGE, J. (pg. 53), in which LARSEN and NALBANDIAN, JJ., joined, delivered a separate opinion concurring in the opinion of the court and in the judgment. COLE, C.J. (pp. 54–55), in which MOORE, CLAY, GIBBONS, WHITE, STRANCH, and DONALD, JJ., joined, MOORE, J. (pp. 56–71), in which COLE, C.J., CLAY, STRANCH, WHITE, and DONALD, JJ., joined, CLAY, J. (pp. 72–78), in which COLE, C.J., MOORE, GIBBONS, WHITE, STRANCH, and DONALD, JJ., joined, GIBBONS, J. (pp. 79–80), in which COLE, C.J., MOORE, CLAY, WHITE, STRANCH, and DONALD, JJ., joined, WHITE, J. (pg. 81), in which COLE, C.J., joined, and DONALD, J. (pp. 82–111), in which COLE, C.J., MOORE, CLAY, GIBBONS, WHITE, and STRANCH, JJ., joined, delivered separate dissenting opinions.

————————

**OPINION**

————————

ALICE M. BATCHELDER, Circuit Judge. This is an appeal from a district court order granting a preliminary injunction based on the plaintiffs' claim that an Ohio law, referred to herein as H.B. 214, is facially unconstitutional and, therefore, unenforceable in any respect. Because we conclude that the plaintiffs have failed to demonstrate a likelihood of success on that claim, we REVERSE the district court's imposition of the preliminary injunction.

# I.

The plaintiffs are four medical service providers and one doctor who provide abortions in Ohio.[1]  For all practical purposes, the defendant is the State of Ohio, represented here by the Ohio Attorney General and Solicitor General (hereinafter "Ohio" or "State").[2]  The plaintiffs sued, raising a pre-enactment challenge to H.B. 214 (the "Antidiscrimination Law"), which prohibits a doctor from performing an abortion with the knowledge that the woman's reason for aborting her pregnancy is that her fetus has Down syndrome and she does not want a child with Down syndrome.  The plaintiffs sought a declaratory judgment that H.B. 214 is facially unconstitutional and an injunction to stop the State from implementing or enforcing it.  The district court held that the right established by *Roe v. Wade*, 410 U.S. 113 (1973), that a woman may intentionally abort her pregnancy, is *absolute* prior to viability and, finding the plaintiffs likely to succeed on the merits of their claim, imposed a preliminary injunction.  *Preterm-Cleveland v. Himes*, 294 F. Supp. 3d 746 (S.D. Ohio 2018).  The State appealed and a panel affirmed.  *Preterm-Cleveland v. Himes*, 940 F.3d 318 (6th Cir. 2019).  The full court granted en banc rehearing and vacated the panel opinion.  *Preterm-Cleveland v. Himes*, 944 F.3d 630 (6th Cir. 2019) (en banc).

The State claims that the district court erred by deciding the case solely on the proposition that the right to an abortion before viability is absolute and, therefore, H.B. 214 is necessarily, categorically, or *per se* invalid, without further analysis.  The State argues that we must decide the validity of H.B. 214 using the "undue burden test" and that H.B. 214 survives that test because it imposes no substantial obstacle on a woman's right to an abortion and furthers three legitimate interests.  The plaintiffs continue to insist that H.B. 214 is a "ban" on abortions and that Supreme Court precedent absolutely and unequivocally forbids any such ban before viability.  The plaintiffs also argue that, even if the "undue burden test" applies, H.B. 214

---

[1]By name, the plaintiffs are Preterm-Cleveland, Planned Parenthood Southwest Ohio Region, Women's Medical Group Professional Corporation, Planned Parenthood Greater Ohio, and Roslyn Kade, M.D.

[2]By designated title, the named defendants are the Director of the Ohio Department of Health, the Secretary and the Supervising Member of the State Medical Board, and four county prosecutors, all in their official capacities.

is invalid because it imposes a complete (and therefore substantial) obstacle to a woman's ability to obtain an abortion.

## II.

In plain terms, H.B. 214 prohibits a doctor from performing an abortion if that doctor knows that the woman's reason for having the abortion is that she does not want a child with Down syndrome. Specifically, as codified in the Ohio statute, H.B. 214 provides in pertinent part:

> No person shall purposely perform or induce or attempt to perform or induce an abortion on a pregnant woman if the person has knowledge that the pregnant woman is seeking the abortion, in whole or in part, because of any of the following:
>
> (1) A test result indicating Down syndrome in an unborn child;
>
> (2) A prenatal diagnosis of Down syndrome in an unborn child;
>
> (3) Any other reason to believe that an unborn child has Down syndrome.

O.R.C. § 2919.10(B). A violation of this provision has severe consequences: it is a fourth-degree felony punishable by up to 18 months in prison, §§ 2919.10(C) & 2929.14(A)(4); it requires the State Medical Board to revoke the doctor's license, § 2919.10(D); and it subjects the doctor to civil liability for compensatory and exemplary damages, § 2919.10(E). The woman seeking the abortion is not legally complicit in the violation and is not subject to penalty. § 2919.10(F). The doctor must attest in writing, to the Department of Health, that he or she was not aware that fetal Down syndrome was a reason for the woman's decision. § 2919.101(A); § 3701.79(C)(7).

## A.

The State asserts that H.B. 214 promotes three interrelated interests. First, it protects the Down syndrome community—both born and unborn—from what the State perceives as discriminatory abortions, namely Down-syndrome-selective abortions. The State produced evidence that, in the United States and abroad, fetuses with Down syndrome are disproportionally targeted for abortions, explaining that: "Down syndrome is a significant reason for women to terminate their pregnancies, with between 61% and 91% choosing abortion when [it] is discovered on a prenatal test." *See also Box v. Planned Parenthood of Ind. & Ky., Inc.*,

139 S. Ct. 1780, 1790-91 (2019) (Thomas, J., concurring) (discussing the high abortion rate for children diagnosed with Down syndrome in the United States and Western Europe).   By prohibiting doctors from knowingly and deliberately eliminating fetuses because of their Down syndrome, the State intended to send "an unambiguous moral message to the citizens of Ohio that Down syndrome children, whether born or unborn, are equal in dignity and value to the rest of us." [3]

Second, the State asserts that H.B. 214 defends families from coercive healthcare practices that encourage Down-syndrome-selective abortions.   Empirical reports from parents of children with Down syndrome attest that their doctors explicitly encouraged abortion or emphasized the challenges of raising children with Down syndrome.   There are those who openly advocate for Down-syndrome-selective abortions.   *See*, *e.g.*, David A. Savitz, *How Far Can Prenatal Screening Go in Preventing Birth Defects*, 152 J. of Pediatrics 3, 3 (2008) (arguing that "selective pregnancy terminations and reduced birth prevalence [of Down syndrome is] a desirable and attainable goal").   Certain countries have nearly eliminated their Down syndrome populations through selective abortions; for example, "few countries have come as close to eradicating Down syndrome births as Iceland," and the "[t]he Netherlands has singled out Down syndrome as the primary target of it[s] national [prenatal] screening program."   Academic literature confirms such practices within the United States medical community, including examples of health professionals who gave families "inaccurate and overly negative information," perceivably "intended to coerce a woman into a decision to terminate her pregnancy if the fetus is diagnosed with Down syndrome."   Therefore, the State has justifiably expressed a "documented concern that the information provided by medical professionals during prenatal counseling may often be subtly biased towards encouraging the uptake of screening, testing, and subsequent selective abortion."

Third, the State asserts that H.B. 214 protects the integrity and ethics of the medical profession by preventing doctors from becoming witting participants in Down-syndrome-selective abortions.   The intent is that H.B. 214 will highlight the important medical distinction

---

[3]Eleven states have enacted similar laws against selective abortions.   *See* Brief of Amicus Curiae Indiana, Kentucky and 16 Other States, at page 1 (filed Jan. 21, 2020).

between care and indifference and will uphold the public trust in the medical community.  As the State argues here, "[a]n industry associated with the view that some lives are worth more than others is not likely to earn or retain the public's trust."

These three interests have a common denominator that is both revealing and important: each is concerned with the doctor's *knowing* participation in a woman's decision to abort her pregnancy because she does not want a child with Down syndrome.  It is that knowing participation in such Down-syndrome-selective abortions that is the wrong that H.B. 214 aims to right.  Thus, H.B. 214 allows doctors to perform such abortions when they do not know that Down syndrome is the reason, without undermining H.B. 214's specific purposes or objectives.

## B.

According to the plaintiffs, women seeking Down-syndrome-selective abortions typically contact abortion clinics only after undergoing extensive testing and counseling with a high-risk obstetrician-gynecologist (OB/GYN) or maternal-fetal medicine specialist, or with a genetic counselor.[4]  In the ordinary course, the doctor who will perform the abortion may or may not learn of the fetal-Down-syndrome diagnosis.  For example, according to the plaintiffs, women "sometimes bring their medical records with them to their appointment," and those records might contain information about the fetal diagnosis.  Or the clinic might "request medical records for these patients from their regular [OB/GYN] or maternal-fetal medicine . . . physician."  Or a referring doctor might forward a patient's medical records to the clinic; wherein the referral is "usually . . . indicated in the patient's chart" at the clinic.

Either way, knowledge of the diagnosis is not knowledge of the reason.  None of the clinics or doctors requires women to give their reason for having the abortion.  Certainly not every woman offers one.  A woman might disclose her reason when she calls the clinic to make an appointment; or she might discuss it with the clinic staff during the informed-consent appointment, which occurs at least 24 hours before the procedure; or she might even volunteer it

---

[4]The plaintiffs produced a declaration from Dr. Justin Lappen, a maternal-fetal specialist who performs abortions at Preterm-Cleveland's abortion clinic, as well as other declarations indicating that women typically consult with maternal-fetal specialists and genetic counselors who are not affiliated with the plaintiffs' clinics.  The point is that maternal-fetal specialists and genetic counselors are not necessarily affiliated with the plaintiffs' clinics.

to the doctor who will perform the abortion. But no one contends that the woman's reason is "medically relevant" to the procedure, and the plaintiffs' expert candidly stated that it is not.

### III.

This is an appeal of a preliminary injunction in which the district court found a likelihood that H.B. 214 is an impermissible infringement on women's "unfettered right to choose whether to terminate, or continue, a pregnancy pre-viability," and therefore enjoined the defendants from implementing or enforcing H.B. 214. *Preterm-Cleveland*, 294 F. Supp. 3d at 758.

In assessing and deciding a motion for a preliminary injunction, trial courts balance four factors: (1) the likelihood that the moving party will succeed on the merits; (2) whether the moving party will suffer irreparable injury in the interim without the injunction; (3) whether the injunction will cause substantial harm to others; and (4) whether the injunction will serve the public interest. *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc). "These four factors are not prerequisites that must be met, but interrelated considerations that must be balanced." *Concerned Pastors for Soc. Action v. Khouri*, 844 F.3d 546, 548-49 (6th Cir. 2016) (quotation marks and citation omitted). "When a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor." *Schimmel*, 751 F.3d at 430 (quotation marks and citations omitted).

In an appeal from the grant of a preliminary injunction, we review de novo, as a question of law, the district court's determination that the moving party is likely to succeed on the merits. *Id.* We review for an abuse of discretion the district court's determination that the factors weigh in favor of granting the injunction. *Id.* In this appeal, however, because we find the likelihood-of-success factor determinative, we need not consider the balance of other factors.

### IV.

The plaintiffs based their action for a declaratory judgment and a preliminary injunction on their claim that the right to an abortion prior to fetal viability is absolute and, therefore,

H.B. 214 violates it *per se*.  The district court decided the action and imposed the injunction by holding that the plaintiffs were likely to succeed on the merits of that claim.

But as a legal proposition, that claim contains three flaws.  One, the right to an abortion, even before viability, is not absolute.  Two, viability is not germane to this analysis or decision. And three, the "right" actually implicated or affected here is not the woman's right merely to obtain an abortion.  The plaintiffs cannot succeed on a claim framed in this way.

### A.

The right to an abortion before viability is *not* absolute.  The "[S]tate may regulate abortion *before viability* as long as it does not impose an undue burden on a woman's right to terminate her pregnancy."  *Women's Med. Prof'l Corp. v. Taft*, 353 F.3d 436, 443 (6th Cir. 2003) (quotation marks omitted, emphasis added); *Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 193 (6th Cir. 1997) ("States therefore can regulate abortion pre-viability as long as such regulation does not constitute an undue burden on a woman's right to choose to have an abortion.").  Even when we expressly characterized a regulation as a "ban," a "total ban," and an "outright ban," we still applied the undue-burden test.  *Planned Parenthood Sw. Ohio Region v. DeWine*, 696 F.3d 490, 513-14 (6th Cir. 2012); *id.* at 508 (Moore, J., dissenting) (characterizing the "ban").

In *Roe*, 410 U.S. at 153, the Supreme Court said, "we do not agree" with the contention "that the woman's right is absolute and that she is entitled to terminate her pregnancy at whatever time, in whatever way, and for whatever reason she alone chooses."  In *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 876 (1992) (plurality), the lead opinion corrected the mistaken view of *Roe* that saw any or all pre-viability "attempts to influence a woman's decision . . . as unwarranted," saying that such an absolute rule was "incompatible with the recognition that there is a substantial state interest in potential life throughout pregnancy."  And, in *Gonzales v. Carhart*, 550 U.S. 124, 146-47 (2007) (upholding an abortion regulation that applied "both previability and postviability"), the Court reemphasized that "*Casey* rejected . . . the interpretation of *Roe* that considered all previability regulations of abortion unwarranted."

In the Court's most recent abortion case, *June Medical Services LLC v. Russo*, 591 U.S. --, 140 S. Ct. 2103 (2020), the plurality opinion contains a fleeting reference to viability at the very end: "Since *Casey*, we have repeatedly reiterated that the plaintiff's burden in a challenge to an abortion regulation is to show that the regulation's purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.* at 2133 (plurality) (quotation marks, editorial marks, and citations omitted).  The opinion does not refer to viability at all in its discussion of the legal standards.  *See id.* at 2120.  The concurring opinion alludes to viability twice but without any suggestion that it alters the test.  *Id.* at 2135 & 2139 n.3 (Roberts, C.J., concurring in the judgment).  Both opinions appear to accept that the universal standard for abortion cases is the undue-burden test, without caveat for a separate or subsidiary absolute rule.

Simply put, there is no absolute or *per se* right to an abortion based on the stage of the pregnancy.  The district court erred by so holding, and the plaintiffs cannot succeed on that proposition standing alone or show any likelihood that they could do so.

## B.

The legal construct of "viability" is not determinative in, or even germane to, this analysis and decision.  The difference between pre- and post-viability does not change the purpose, legitimacy, or weight of the three interests the State proffers here.  Nor are the effects of the burdens here any different at any point during the pregnancy.  In the Supreme Court's abortion jurisprudence, "viability" is a concept that originated in *Roe* to answer the State's argument that its interest in defending the life of the fetus justified its ban on abortion.  The Court held that, because "the word 'person,' as used in the Fourteenth Amendment, does not include the unborn," *Roe*, 410 U.S. at 158, the State had no interest in defending the life of a *non*person, but:

> With respect to the State's important and legitimate interest in *potential* life, the 'compelling'[5] point is at viability.  This is so because the fetus then presumably has the capability of meaningful life outside the mother's womb.
>
> State regulation protective of fetal life after viability thus has both logical and biological justifications.  If the State is interested in protecting fetal life after

---

[5]Because *Roe*, 410 U.S. at 155, applied "strict scrutiny," the standard was a "compelling" state interest.

viability, it may go so far as to proscribe abortion during that period, except when it is necessary to preserve the life or health of the mother.

*Id.* at 163-64 (emphasis added; paragraph break inserted).

In this case, Ohio does not rely on its interest in protecting potential fetal life as support for H.B. 214, at least not expressly. Instead, Ohio relies on its interests in: (1) protecting the Down syndrome community from the stigma it suffers from the practice of Down-syndrome-selective abortions; (2) protecting women whose fetuses have Down syndrome from coercion by doctors who espouse and advocate the abortion of all such fetuses; and (3) protecting the integrity and ethics of the medical profession by preventing doctors from enabling such targeted abortions. Neither the intent, effect, validity, nor importance of any of these interests turns on the viability of the fetus. The strength of these interests is the same throughout pregnancy, from the first day to the last. Put another way, if these interests would support H.B. 214 after viability, then they support it equally before viability because none of them depends on a distinction between whether a fetus is a person or a nonperson. The plaintiffs' emphasis on pre-viability is misplaced.

## C.

And the issue here is not really about a woman's right or ability merely to obtain an abortion. Even under the full force of H.B. 214, a woman in Ohio who does not want a child with Down syndrome may lawfully obtain an abortion solely for that reason. H.B. 214 does not prohibit her from choosing or obtaining an abortion for that, or any other, reason. It bars a doctor from aborting a pregnancy when that doctor *knows* the woman's specific reason and that her reason is: the forthcoming child will have Down syndrome and, because of that, she does not want it.

If the law said that a woman may not obtain an abortion because the forthcoming child would have Down syndrome, then this would be a different case. Going one step further, if the law said that a doctor may not perform an abortion because the forthcoming child would have Down syndrome, that too would be a different case. But H.B. 214 does not say either thing.

This leads back to the question of: What *does* H.B. 214 do?

### D.

The named plaintiffs are abortion providers, acting as proxies for the true parties in interest: women who would have an abortion but for H.B. 214. It is a very specific subset of women. It is a woman (1) who is pregnant with a child whom she has good reason to believe has Down syndrome, (2) who does not want a child with Down syndrome and, therefore, wants to abort her pregnancy for that reason, and (3) who wants her abortion performed by a doctor who knows that is her reason. So, what "right" does this particular woman possess that H.B. 214 would infringe? Or considered more concretely: *What does H.B.214 prevent this woman from doing?*

The plaintiffs, the district court, and the dissent authored by Judge Donald all claim that H.B. 214 prevents this woman from having an abortion. Period. That absolute view certainly eases the analysis, as is made evident in the dissent, which is an hammer-on-anvil pounding of that theme. But we cannot agree with that. As already explained, even under the full force of H.B. 214, any woman who does not want a child with Down syndrome may lawfully obtain an abortion solely for that reason. Because Judge Donald's dissent is predicated on the premise that H.B. 214 categorically bans the woman's access to abortion, this puts us in an irreconcilable disagreement on the meaning and effect of H.B. 214, such that—as each side sees it—we are considering H.B. 214 as two differently worded laws. And we cannot read H.B. 214 that way.

In his separate dissent, Chief Judge Cole claims that H.B. 214 prevents this woman from exercising her right, protected by the Free Speech Clause of the First Amendment, to tell her Down-syndrome-selective reason to the doctor who would perform her abortion. While we certainly understand the plaintiffs to be arguing that H.B. 214 burdens their ability to share their Down-syndrome-selective reason with the doctor who would perform the abortion, the plaintiffs did not raise any First Amendment Free Speech claim. The plaintiffs raised only a substantive-due-process claim based on the right to an abortion established in *Roe*. Chief Judge Cole's First Amendment Free Speech argument was not before the district court or the panel, nor was it argued in this en banc appeal. We have not heard the State's side of this argument. In fact, we have not even heard the plaintiffs' views on this issue. This is not properly before us.

In our view, the effect of H.B. 214 on this woman is to deny her the doctor of her choosing when, and only when, that doctor of her choosing is a doctor who knows that her reason for the abortion is because she does not want a child with Down syndrome.  By preventing the doctor from joining the woman as a knowing accomplice to her Down-syndrome-selective decision making, H.B. 214 prevents this woman from making the doctor a knowing participant (accomplice) in her decision to abort her pregnancy because her fetus has Down syndrome.  As limitations or prohibitions go, this is specific and narrow.  The result is that the "right" at issue would be the woman's right to a specific doctor (one with knowledge of her specific Down-syndrome-selective reason for the abortion).  One would be hard pressed to find that right established anywhere.  *See Roe*, 410 U.S. at 153 (denying the contention "that the woman's right is absolute and that she is entitled to terminate her pregnancy at whatever time, in whatever way, and for whatever reason she alone chooses"); *cf. DeWine*, 696 F.3d at 514-15 ("Importantly, the Supreme Court has not articulated any rule that would suggest that the right to choose abortion encompasses the right to choose a particular abortion method.").  More to the point, if there is an argument to be made that there exists such a constitutional right, the plaintiffs have not made it.

Regardless, the plaintiffs did not in their complaint or their ensuing arguments state their claim as a right to a specific doctor.  The plaintiffs' claim is that, for this particular woman (who wants or needs her abortion to be performed by a doctor who knows her Down-syndrome-selective reason), H.B. 214 would cause her to forgo the abortion and, instead, have her baby.

In deciding the truth of this claim, the question becomes whether the burden that H.B. 214 imposes on this woman's choosing or obtaining the abortion is "undue."  *See DeWine*, 696 F.3d at 507 ("If the only available abortion method is so undesirable as to make the woman choose to have no abortion at all, the undue-burden framework remains the appropriate remedy for addressing that concern.").  The Supreme Court has given us a particular test to answer this question.

## V.

Since *Roe*, which struck down an outright prohibition on abortion, most abortion cases concern laws that impede or obstruct a woman's ability to obtain an abortion.  *See June Med. Servs.*, 140 S. Ct. at 2112 (plurality); *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2300 (2016); *Casey*, 505 U.S. at 844.  A second, slightly different class of abortion cases concerns laws that do not affect a woman's ability to obtain an abortion, but instead regulate the method of abortion, meaning that they prohibit a doctor from performing one type of abortion but permit other types.  *See Gonzales*, 550 U.S. at 140-43; *Stenberg v. Carhart*, 530 U.S. 914, 921-22 (2000).  This case concerns a law directed at neither a woman's ability to obtain an abortion nor the method of abortion.  Instead, as just explained, it prohibits a doctor from aborting a pregnancy if the doctor knows that the woman's purpose is to preclude the birth of a child who will have Down syndrome, but it permits that same abortion if the doctor does not know.  Thus, from the plaintiffs' perspective, it regulates (via the doctor) the *reason* behind the woman's decision.

The Court has created two unique tests that are specific to abortion cases.  The first is the "undue burden test," in which a law concerning abortion will survive a challenge if it (1) furthers a legitimate or valid state interest,[6] and (2) does not have either the purpose or effect of creating a "substantial obstacle" to the woman's ability to obtain an abortion.  *June Med. Servs.*, 140 S. Ct. at 2120 (Breyer, J., for the plurality); *id.* at 2135 (Roberts, C.J., concurring in the judgment); *Whole Woman's Health*, 136 S. Ct. at 2309; *Gonzales*, 550 U.S. at 146; *Casey*, 505 U.S. at 878 (plurality).  The other unique test used for abortion cases is the "large fraction test," which applies when the plaintiff makes a "facial" constitutional challenge to the law, such as the plaintiffs made here.  Under that test, the law is invalid in all cases, without exception ("on its face"), if it poses an "undue burden" in a "large fraction" of relevant cases, even if it would not

---

[6]It appears that in this context the Court has used the words "legitimate" and "valid" interchangeably.  *See Gonzales*, 550 U.S. at 146 ("whether the Act furthers the legitimate interest of the Government"); *id.* at 158 (where the State acts "in furtherance of its legitimate interests"); *June Med. Servs.*, 140 S. Ct. at 2120 (Breyer, J., for the plurality) ("furthering a valid state interest" (editorial marks omitted) (quoting *Whole Woman's Health*, 136 S. Ct. at 2309, quoting *Casey*, 505 U.S. at 877)); *id.* at *2138 (Roberts, C.J., concurring) (describing "the threshold requirement that the State have a 'legitimate purpose'" (quoting *Casey*, 505 U.S. at 878)).

pose an undue burden in some (small fraction of) cases. *See Whole Woman's Health*, 136 S. Ct. at 2309, 2313.

## A.

The "undue burden test" holds that if a law creates a "substantial obstacle" to a woman's ability to obtain an abortion, then it poses an undue burden on her protected right, is invalid, and must be struck down. *Id.* at 2309. So, the crux of that test is whether the law creates a "substantial obstacle"—a question more easily asked than answered because the Court has suggested differing ways of identifying a "substantial obstacle." Most recently, in *June Medical*, the Court split sharply on this issue, with the four-member plurality ("*June Medical* plurality") asserting a sliding-scale balancing test in which a regulation poses a "substantial obstacle" whenever its burden exceeds its benefit, *June Med. Servs.*, 140 S. Ct. at 2120, and the Chief Justice, concurring in the judgment only ("*June Medical* concurrence"), asserting a binary test in which a regulation poses a "substantial obstacle" only when the burden is objectively "substantial," regardless of any benefit, *id.* at 2138.[7] In *Gonzales*, 550 U.S. at 164-67, which concerned laws that regulate the "method of abortion," the Court used a slightly different test that emphasized the State's interests, limited the doctors' interest, and used "reasonable alternatives" to show the absence of a substantial obstacle.

After oral argument in this appeal, a panel deciding a separate appeal published an opinion in which we explained that "[b]ecause no opinion in *June Medical Services* garnered a majority," we faced "the 'vexing task' of deciding which opinion controls." *EMW Women's Surgical Center, P.S.C. v. Friedlander*, 978 F.3d 418, 431 (6th Cir. 2020) (reh'g en banc denied Dec. 31, 2020) (citation omitted). We applied *Marks v. United States*, 430 U.S. 188, 193 (1977), to determine that the *June Medical* concurrence was the narrowest opinion and, therefore, the governing law. *EMW*, 978 F.3d at 432-33. That was *EMW*'s holding and this is its test:

---

[7]The *June Medical* plurality and *Whole Woman's Health* opinions are effectively the same, at least for present purposes. *See June Med. Servs.*, 140 S. Ct. at 2133 (plurality) ("This case is similar to, nearly identical with, *Whole Woman's Health*[ a]nd the law must consequently reach a similar conclusion."). Citation and reference to the *June Medical* plurality in this analysis, as a stand-in for *Whole Woman's Health*, is done to keep it on par with the *June Medical* concurrence. This opinion could have, alternatively, referred to *Whole Woman's Health* and omitted reference to the *June Medical* plurality without changing anything but the names and citations.

> Under the Chief Justice's controlling opinion [in *June Medical*], a law regulating abortion is valid if it satisfies two requirements.

> First, it must be reasonably related to a legitimate state interest. Because we are to apply the traditional rule of deference to the state's medical and scientific judgments, this requirement is met whenever a state has a rational basis to use its regulatory power.

> Second, the law must not have the effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus.

> Under the law of our circuit, a woman faces a substantial obstacle when she is deterred from procuring an abortion as surely as if the government has outlawed abortion in all cases. Even if a law regulating abortion is unconstitutional in some applications, the law remains facially valid so long as it does not impose an undue burden in a large fraction of the cases in which the regulation is relevant.

*Id.* at 433-34 (quotation marks, editorial marks, and citations omitted; paragraph breaks inserted). Because the test articulated in *EMW* is the controlling law of our Circuit, we apply it here.

## B.

Before proceeding, we can briefly recap the State's view of H.B. 214's benefits and articulate the plaintiffs' view of its burdens. Ohio asserts that H.B. 214 furthers three valid and legitimate interests by protecting: (1) the Down syndrome community from the practice of Down-syndrome-selective abortions and the stigma associated with it; (2) pregnant women and their families from coercion by doctors who advocate the abortion of Down-syndrome-afflicted fetuses; and (3) the integrity and ethics of the medical profession by preventing doctors from becoming witting participants in Down-syndrome-selective abortions. *See* Section II.A, *supra*. These are legitimate interests. *See Gonzales*, 550 U.S. at 157; *Washington v. Glucksberg*, 521 U.S. 702, 732 (1997) ("The State's interest here goes beyond protecting the vulnerable from coercion; it extends to protecting disabled and terminally ill people from prejudice, negative and inaccurate stereotypes, and 'societal indifference.'" (citation omitted)). The common theme of these interests is the doctor's *knowing* participation in the Down-syndrome stigmatic decision making.

The plaintiffs assert that H.B. 214 burdens the right to an unencumbered abortion. In our careful review of the plaintiffs' briefing, we have identified as many as five articulable burdens that, the plaintiffs argue, H.B. 214 will impose on a woman: (1) it will prevent her from having a

full, open, and honest conversation with the doctor who will perform her abortion by forcing her to withhold this specific reason for the abortion; (2) it may cause, encourage, or influence her to adjust or misrepresent her reason for the abortion; (3) it may cause her to conceal her medical history, if that history contains a pre-natal diagnosis or other significant indicators of fetal Down syndrome; (4) it may necessitate that she engage in "doctor shopping" to find a doctor who is unaware of her reason for having the abortion; and (5) it may cause her to forgo the educational, counseling, or assistance programs offered to women with a Down-syndrome fetus.

While the plaintiffs might not have been so explicit or precise in proffering each of these burdens—and they certainly did not enumerate these burdens in this way—neither were they vague or unclear in presenting the substance of their claims. Without delving into the substantiality or weight of these proposed burdens, we find that even if the second, third, and fifth items on the above list would be cognizable burdens standing alone, they add little to the analysis here because—as a practical matter—they are necessarily included in the first and fourth items.

The second burden on the list—i.e., that H.B. 214 may cause or encourage a woman to reconsider or adjust her reason for having the abortion—is one of H.B. 214's fundamental objectives. *Cf. Gonzales*, 550 U.S. at 160 ("It is a reasonable inference that a necessary effect of the regulation and the knowledge it conveys will be to encourage some women to carry the infant to full term, thus reducing the absolute number of late-term abortions."). As the State argues in its briefing, the plaintiffs "provide no sound reason to believe that women who want Down-syndrome selective abortions will continue to reveal their motives, or that doctors will otherwise continue to learn those motives, once [H.B. 214] is in effect." Moreover, it is questionable whether a woman would willingly announce that motive if she recognized that doing so was hurtful to many in the Down syndrome community. To the extent that H.B. 214 might influence a woman to misrepresent her reason, that would be her personal choice. Regardless, as a practical matter, any burden the woman feels from withholding this reason from the doctor who will perform her abortion is included in the first item on the list. The possibility that a woman, when speaking with the doctor who would perform her abortion, might decide to change her

reason (or lie about her reason) on sober second thought is not a separate burden on a woman's ability to choose or obtain an abortion.

The third and fifth burdens on the list—i.e., that H.B. 214 may force her to conceal her medical history or forgo Down-syndrome-related counseling or assistance programs for fear that this might reveal her Down-syndrome-selective reason to the doctor—do not arise from H.B. 214. The law prohibits a doctor from performing an abortion if (1) the woman knows or reasonably believes the fetus has Down syndrome; *and* (2) she wants an abortion because of that Down syndrome; *and* (3) the doctor knows that is her reason. *See* O.R.C. § 2919.10(B). We must credit all three requirements. Certainly, a test result or prenatal diagnosis in her medical record would be direct evidence of the first element and her participation in Down-syndrome counseling or assistance programs would be comparable circumstantial evidence. But proving element one does not automatically prove elements two or three; the woman's knowledge that her fetus has Down syndrome is not a *per se* reason for wanting the abortion. As the plaintiffs themselves have stressed in this case, women seek abortions for a variety of reasons, including health, family, financial, or other personal reasons. Therefore, these do not appear to be cognizable burdens.

Even in circumstances in which both the doctor and the woman know of the fetal-Down-syndrome diagnosis, for the doctor to have the *actual knowledge* necessary under H.B. 214, the woman must somehow reveal to that doctor her otherwise private opinion that (a) she does not want a child with Down syndrome and (b) that is why she is having the abortion. Consequently, to the extent that H.B. 241 might cause a woman to withhold her medical history or bypass Down-syndrome counseling or assistance programs for fear of revealing her reason to the doctor who would perform her abortion (as part of her full and open conversation with that particular doctor), these "burdens" are subsumed by the first item on the list.

Therefore, in conducting the analysis that follows, we rely on the plaintiffs' first and fourth asserted burdens: H.B. 214 will prevent a full, open, and honest conversation with the doctor who will perform her abortion; and H.B. 214 may force a woman seeking an abortion to engage in "doctor shopping" to find a doctor who is unaware of her reason for seeking the abortion.

**C.**

The plaintiffs argue that H.B. 214 imposes a categorical ban on a subset of pre-viability abortions. But, as shown, H.B. 214 is not a ban. Even under the full force of H.B. 214, a woman in Ohio who does not want a child with Down syndrome may lawfully obtain an abortion. H.B. 214 does not prohibit her from choosing or obtaining an abortion for that, or any other, reason. To the extent that H.B. 214 amounts to a prohibition, it prohibits a doctor from aborting a pregnancy when that doctor *knows* the woman's particular reason, and that the reason is that (a) she knows or has reason to know that the forthcoming child will have Down syndrome and (b), at least in part because of that, she does not want it. The district court erred by granting a preliminary injunction on the ground that H.B. 214 *eradicated* the woman's right to an abortion.

H.B. 214 advances the State's legitimate interests and will not prevent a large fraction of the women it affects from obtaining abortions. As mentioned, H.B. 214 furthers three valid and legitimate interests by protecting: (1) the Down syndrome community from the stigma associated with the practice of Down-syndrome-selective abortions, (2) pregnant women and their families from coercion by doctors who advocate abortion of Down-syndrome-afflicted fetuses, and (3) the integrity and ethics of the medical profession by preventing doctors from becoming witting participants in Down-syndrome-selective abortions. These are legitimate interests. *See Gonzales*, 550 U.S. at 157; *Washington*, 521 U.S. at 732. Together, these three interests focus on a doctor's *knowing* participation in a decision to abort a pregnancy because the forthcoming child would have Down syndrome, and H.B. 214's overall objective is to prevent that conduct. H.B. 214 is reasonably related to Ohio's legitimate interests. *See EMW*, 978 F.3d at 433.

Next, we ask whether the law has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion. *See id.* at 434. The burdens here are that H.B. 214 will (1) prevent a full, open, and honest conversation with the doctor who will perform the abortion by forcing the woman to withhold this reason for the abortion and (2) require her to engage in "doctor shopping" to find a doctor who is unaware of her reason for having the abortion.

Thus, we consider whether these burdens would likely prevent a significant number of women from obtaining an abortion. *See id*. Given that laws that merely increase costs, create

potential delays, necessitate judicial bypass, or require the dissemination of truthful, non-misleading information are *not* substantial obstacles, *see June Medical* concurrence, 140 S.Ct. at 2136-37, then neither is a law that merely prevents a doctor from acting on a statement or opinion from a patient that is—as the plaintiffs' expert put it—not "medically relevant." The plaintiffs have not shown, nor even genuinely argued, that this act by this woman (expressing this personal and otherwise private opinion to the doctor who will perform her abortion) is necessary to either her choice to have the abortion or the doctor's ability to perform it. Failing that, they have not shown that the withholding of this opinion or reason is any more burdensome than additional delay, cost, or travel. Would any woman who is otherwise set on having an abortion choose not to have that abortion (and instead have the baby) solely because she could not have the abortion performed by the specific doctor to whom she desires to reveal (or has revealed) that her reason for the abortion is that she does not want a child with Down syndrome? Taking the next step, would a significant number of such women do so?[8] We think the answer to both questions is clearly no, but more importantly, the plaintiffs have certainly made no such showing.

What happens if the woman accidentally, defiantly, or without an understanding of the law reveals that reason to the doctor? In that case, to comply with H.B. 214, the doctor must disqualify him- or herself from performing that abortion. The woman must then secure a different doctor who is unaware that is her reason, possibly through a referral by the first doctor. Certainly, even with a referral, this could take some time, it would likely cost some additional money, and it might force her to travel farther than she would have had to otherwise. But, without something more, the Court has already determined that these types of burdens do not rise to the level of an objectively substantial obstacle. *See id.* at 2136–37; *Casey*, 505 U.S. at 886 (finding that delays of "much more than a day" and "travel [of] long distances" were not a "substantial obstacle"); *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 605 (6th Cir. 2006) ("While closing the Dayton clinic may be burdensome for some of its potential patients, the fact

---

[8]To put it in fraction-like terminology: The denominator would be those women who (without H.B. 214) would be set on having an abortion because they believe the child has Down syndrome. *See* O.R.C. § 2919.10(B). The numerator would be the number of those women who (now aware of H.B. 214) would be unwilling to have an abortion because they cannot have it performed by a doctor who knows the reason. Or, emphasizing the plaintiffs' contention, because they cannot share that reason with that particular doctor.

that these women may have to travel farther to obtain an abortion does not constitute a substantial obstacle.").

Ultimately, the question is whether these burdens will have the effect of precluding a woman from choosing or obtaining an abortion. The evidence demonstrates that they will not. In the plaintiffs' proffered evidence, Chrisse France, Preterm-Cleveland's Executive Director, states via affidavit that Preterm-Cleveland "will have no choice" but to refuse to provide abortions to women who have reason to believe their child has Down syndrome. She does not explain, however, why Preterm-Cleveland would not be able to provide abortions to such women if the doctor were unaware of their specific motive. Drs. Lappen and Kade express the same view. None of the plaintiffs' declarants, however, says that the doctor would be unable to perform an abortion if the doctor were unaware that the woman has this motive. Dr. Lappen's affidavit effectively admits that women affected by H.B. 214 could still obtain abortions simply by not disclosing this motive to that specific doctor, stating: "I am concerned [that] H.B. 214 will encourage women who have had Down syndrome testing and decide to proceed with an abortion to hide the test results from the physician and staff who will provide the abortion." These declarants claim they would advise such women to seek an abortion in another state, but none explains why the provider would not be able to refer such women to another doctor in Ohio who would be unaware of the woman's motive. There is at this point no basis to conclude that the plaintiffs are likely to succeed in showing that H.B. 214 will impose an undue burden. *See EMW*, 978 F.3d at 433-34.

The plaintiffs argue that "knowledge" is defined so broadly under Ohio law that, by incorporating a knowledge requirement, H.B. 214 imposes a duty on abortion providers to proactively investigate a woman's reasons for wanting an abortion before performing one. That is, if a doctor knows of a Down-syndrome diagnosis, say the plaintiffs, Ohio law requires that the doctor inquire into the woman's reasons for having the abortion. The plaintiffs are right that "knowledge" is defined broadly. *See* O.R.C. § 2901.22. But Ohio's broad definition of knowledge does not alter the reality that the woman remains in control of who knows, and who does not know, the reason for her abortion. And the record simply does not support the notion that a large number of doctors would independently learn of the reason such that it would place a

substantial obstacle in the path of most women seeking abortions. *See Casey*, 505 U.S. at 895. Ohio's knowledge requirement does not amount to an undue burden.

The plaintiffs' argument regarding the lack of a health exception also fails. They argue that H.B. 214 is unconstitutional because it has no life or health exception for a woman whose fetus has Down syndrome and who will also need an abortion to protect her own life or health. The district court did not address this issue, and it has largely been an afterthought so far in this litigation. But the rules are clear. "[T]he essential holding of *Roe* forbids a State to interfere with a woman's choice to undergo an abortion procedure if continuing her pregnancy would constitute a threat to her health." *Casey*, 505 U.S. at 880. This requirement applies both before and after viability. *Stenberg*, 530 U.S. at 930. But the Court has also said that facial attacks are not the proper procedure for challenging the lack of a health exception: "the proper means to consider exceptions is by as-applied challenge." *Gonzales*, 550 U.S. at 167. An as-applied challenge "is the proper manner to protect the health of the woman if it can be shown that in discrete and well-defined instances" her health or life is at risk. *Id.* "In an as-applied challenge the nature of the medical risk can be better quantified and balanced than in a facial attack." *Id.* As can the legal risks.[9] It is neither a court's "obligation nor within [its] traditional institutional role to resolve questions of constitutionality with respect to each potential situation that might develop." *Id.* at 168. The plaintiffs' facial challenge to the lack of a health exception is improper.

All told, the plaintiffs have not shown—and have shown no likelihood that they could prove—that H.B. 214 will impose an undue burden in a large fraction of cases in which it is relevant. *EMW*, 978 F.3d at 434; *June Medical* concurrence, 140 S. Ct. at 2138.

---

[9]The Ohio Supreme Court has explained "in part causation" as focusing on "the actual or true motive" of the actor. *See State Empl. Relations Bd. v. Adena Local Sch. Dist. Bd. of Educ.*, 613 N.E.2d 605, 615 (Ohio 1993).

### D.

In *Planned Parenthood of Indiana and Kentucky, Inc. v. Commissioner of Indiana State Department of Health* ("*PPINK*"), 888 F.3d 300, 303 (7th Cir. 2018),[10] the Seventh Circuit considered an Indiana law that would prohibit a doctor from performing an abortion when that doctor knows that the woman is aborting the pregnancy because she does not want a child that she knows, from the fetal diagnosis, will be a certain gender, race, color, national origin, or ancestry, or will have Down syndrome or some other genetically inherited physical or mental disability. As with H.B. 214 in the present case, the Indiana law did not directly prohibit the woman from having an abortion for those reasons; it prohibited a doctor from aborting a pregnancy when that doctor *knows* the woman's reason and that reason is that she does not want the forthcoming child because it will have one of those genetic characteristics. Read the same way that we read H.B. 214, the Indiana law does not prohibit the woman from deciding based on race, gender, or disability; it forbids the doctor who would perform her abortion from effectuating that reason.

But the *PPINK* opinion construed the Indiana law differently. Apparently presupposing the doctor's actual knowledge of the woman's reason, *PPINK* declared the law invalid because it "prohibit[s] abortions prior to viability if the abortion is sought for a particular purpose," which is "far greater than a substantial obstacle; [it is an] absolute prohibition." *Id.* at 306. That is, *PPINK* construed the law as saying that, regardless of whether the woman ever revealed or the doctor actually knew her reason, the law prohibited her from obtaining an abortion because she had adopted—in the privacy of her own conscience—one of the enumerated impermissible reasons: "Nothing in the Fourteenth Amendment or Supreme Court precedent allows the State to invade this [woman's personal] privacy realm to examine the underlying basis for [her] decision to terminate her pregnancy prior to viability." *Id.* at 307. *PPINK* also said that, prior to viability, the undue-burden test only applied to laws "calculated to *inform* the women's free choice, *not hinder it*," *id.* at 306 (citation omitted); laws that "*prohibit* any woman from making the ultimate

---

[10]The Supreme Court reversed this case in part, but on other grounds. *Box*, 139 S. Ct. at 1782 ("Our opinion . . . expresses no view on the merits of . . . whether Indiana may prohibit the knowing provision of sex-, race-, and disability-selective abortions by abortion providers.").

decision to terminate her pregnancy *before viability*" are absolutely forbidden, *id*. at 305 (citation omitted); *id*. at 311 (Manion, J., concurring in part and dissenting in part) ("But the fact remains that *Casey* has plainly established an absolute right to have an abortion before viability. The joint opinion says that *nothing* can stand between a woman and her choice of abortion before viability.").

The opening paragraph of this subsection, *supra*, explains why the Indiana law was not a prohibition but instead was a burden subject to the undue-burden test. This is consistent with the Supreme Court's recent cases that universally analyze abortion laws using the undue-burden test. Certainly, the Court did not construe *Gonzales*'s prohibition on "intact D&E" as an absolutely forbidden "prohibition" under a theory that the State may not impose such restrictions before viability or because that law *hindered* rather than *informed* the woman's choice. Similarly, the admitting-privileges requirements in *Whole Woman's Health* and *June Medical* did not inform the woman's choice but the Court nonetheless applied the undue-burden test. Moreover, for the same reasons presented in Section IV of this opinion, the right to abortion, even before viability, is not absolute, viability is not germane to the analysis of this law, and the right at issue is not even the right to obtain an abortion. For these reasons, we must respectfully disagree with *PPINK*.

## VI.

As we said in the forgoing section, the undue-burden test as articulated by the Chief Justice in his *June Medical* concurrence is the controlling law of the Sixth Circuit and nothing in this section alters or diminishes that statement in any way. However, because the *June Medical* plurality pressed an alternative undue-burden test, because the unusual nature of H.B. 214 might arguably fit an alternative case (*Gonzales*), and because the large-fraction test has proven difficult in practice, those few of us who join this section thought it worthwhile to show that H.B. 214 would not pose an undue burden under any test that the Court could conceivably apply.

We recognize that this section is little more than a separate concurrence and, being dicta, creates no controlling law. *See Richmond Health Facilities v. Nichols*, 811 F.3d 192, 201 n.8 (6th Cir. 2016) (quoting Black's Law Dictionary, 10th ed. 2014, for the definition of dicta). But

the fact that dicta is not binding, "does not mean that the dicta is incorrect." *Kelly Servs., Inc. v. Creative Harbor, LLC*, 846 F.3d 857, 875 (6th Cir. 2017) (quotation marks and citations omitted). Going one step further, the point is that even if the Supreme Court were to overrule *EMW*, 978 F.3d at 433-34, we would not find it necessary to reconsider the constitutionality of H.B. 214.

## A.

The *June Medical* plurality stated the undue-burden test in the usual way: a law is invalid if it has "the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion." *June Med. Servs.*, 140 S. Ct. at 2120 (plurality) (quotation marks and citation omitted). But when deciding the substantial-obstacle question, it said that courts must consider the burdens and benefits "together" by "weigh[ing] the asserted benefits of the law against the burdens it imposed on abortion access" and finding a "substantial obstacle" whenever "the balance tip[s]" towards the burdens, regardless of the objective severity or substantiality of the burdens. *Id.* (quotation marks and citation omitted).

The *June Medical* plurality determined that the principal burden posed by the admitting-privileges requirement was that it would force certain doctors and clinics out of business, leading to a "drastic reduction in the number and geographic distribution of abortion providers." *Id.* at 2122 (quoting the lower court); 2129. It also stated four associated, lesser burdens: longer waiting times, increased crowding, increased risk of complications during the procedure due to the delays, and increased driving distances. *Id.* at 2130 (quotation marks and citations omitted). It then turned its attention "to the law's asserted benefits," *id.*, and determined that the admitting-privileges requirement did not further the legitimate interest in protecting women's health and welfare, *id.* at 2131-32, so it "offer[ed] no significant health-related benefits," *id.* at 2132. Therefore, the *June Medical* plurality concluded that, because the burdens were substantial and the benefits were insignificant (virtually nil), the law imposed an undue burden. *Id.*

Turning back to the present case, the same two burdens continue to apply. H.B. 214 prevents a woman from having a full and open conversation with her doctor, so that she can have her abortion performed by a doctor who knows that she does not want a child with Down

syndrome and is having the abortion for that reason. And should she reveal this information to the preferred doctor anyway, it would force her to secure a different doctor who is unaware that that is her reason. As already shown, these are not substantial burdens. Even so, the question is whether these burdens would nonetheless outweigh the law's asserted benefits. They would not.

H.B. 214 furthers three legitimate state interests. The first is the protection of the Down syndrome community from the stigma associated with the practice of Down-syndrome-selective abortions. The State produced evidence that, in the United States, two thirds of the pregnancies with a fetal diagnosis of Down syndrome are aborted—the percentages are much higher in some other countries—making it one of the traits most commonly targeted for abortion. The State explains that, when unborn children exhibiting a certain trait are targeted for abortion, that sends a message to people living with that trait that they are not as valuable as others. Even though H.B. 214 does not prohibit Down-syndrome-selective abortions and might not actually reduce the incidence of such abortions, by prohibiting doctors from knowingly participating in this practice, it sends a resounding message condemning the practice of selective abortions.

The State's second interest is in protecting pregnant women and their families from coercion by doctors who advocate abortion of Down-syndrome-afflicted fetuses. Because some in the medical community believe that Down syndrome can and should be eradicated through a systemic abortion program, a woman with a fetal diagnosis of Down syndrome might face pressure from the doctor to abort that pregnancy. Based on the limited record here, if we accept that there are *some* doctors willing to exert such pressure, then H.B. 214 certainly furthers this interest.

The third interest is in protecting the integrity and ethics of the medical profession by preventing doctors from becoming knowing participants in Down-syndrome-selective abortions. By involving the doctor in her personal decision to abort her pregnancy because the forthcoming child would be born with Down syndrome, the woman places the doctor in a position of conflicted medical, legal, and ethical duties. Ordinarily, under basic medical ethics, doctors are expected to respond to a diagnosis of Down syndrome with care and healing. In this situation, however, those doctors who would do so are instead being asked to act directly against the

physical life of the fetus based solely on the fact that the forthcoming child would have Down syndrome.

H.B. 214 furthers each of these legitimate interests, thereby producing the benefits the State intended. Given the minor burdens imposed by H.B. 214, any of these benefits alone would be enough to tip the balance away from a "substantial obstacle" and towards an incidental and acceptable burden. Under the *June Medical* plurality's balancing, the three together are more than enough to overcome the burdens and uphold H.B. 214.

## B.

In *Gonzales*, the Court considered a challenge to a federal law that banned one method of partial-birth abortion ("intact D&E") while permitting alternative methods ("standard D&E" or pre-abortion fetal demise). *Gonzales*, 550 U.S. at 150-54. The Court applied the undue-burden test, asserting that the law would be invalid "if its purpose or effect [were] to place a substantial obstacle in the path of a woman seeking an abortion." *Id*. at 156 (citation omitted). The State asserted two interests: protecting the "dignity of human life," *id.* at 157, and "protecting the integrity and ethics of the medical profession," *id.* (citation omitted). The Court held that both were "legitimate interests" and that the law furthered those interests. *Id.* at 158. The plaintiff doctors and clinics asserted two burdens imposed by the unavailability of "intact D&E": it would subject women to significant health risks and, to a lesser extent, would be inconvenient for the doctors. *Id.* The Court acknowledged that the law would indeed be invalid "if it subjected women to significant health risks," *id*. at 161 (citation omitted; quotation and editorial marks omitted), but—finding the claims about the health risks scientifically disputed—the Court held that such "medical uncertainty" was insufficient to invalidate the law, *id*. at 164.

Going one step further, the Court upheld the law's ban on "intact D&E" because acceptable alternatives were readily available, emphasizing that the law "allows, among other means, a commonly used and generally accepted method [i.e., standard D&E], so it does not construct a substantial obstacle to the abortion right." *Id*. at 165. "Physicians are not entitled to ignore regulations that direct them to use reasonable alternative procedures. The law need not give abortion doctors unfettered choice in the course of their medical practice, nor should it

elevate their status above other physicians in the medical community." *Id.* at 163. In closing, the Court rejected the idea that "mere convenience" would "suffice to displace" other standard and available options. *Id.* at 166. In sum, this part of the test concerned the alternatives to the restrictions.

Here, considered from the plaintiffs' perspective, H.B. 214 prevents a woman from informing the doctor who will perform her abortion that she does not want a child with Down syndrome and is having the abortion for that reason. To be sure, H.B. 214 does not do so expressly. By its plain terms it merely prohibits the doctor from knowingly acting to further that reasoning. But, the plaintiffs claim, the effect is to deter the woman from sharing her beliefs and motive with that doctor. The plaintiffs assert that her compliance with H.B. 214 will impose two burdens on such a woman: it will prevent her from having a full, open, and honest conversation with the doctor who will perform her abortion; and it may force her to engage in "doctor shopping" to find a doctor who is unaware of her reason for seeking the abortion.

Under the first burden, the woman cannot have a full, open, and honest conversation (A) with the abortion doctor (B) about the reason for the abortion. That is, she cannot have both A and B together. Under the analysis in *Gonzales*, we would consider reasonable alternatives. An alternative here gives that woman A and B separately. That is, she can have a full, open, and honest conversation with the doctor who will perform her abortion *about anything else*, including every other aspect of the procedure or even any other (non-Down-syndrome-based) reason for her having the abortion. And she can have a full, open, and honest conversation about her Down-syndrome-based opinions and reason for the abortion with *any other person*, including her family practitioner, obstetrician-gynecologist (OB/GYN), maternal-fetal medicine (MFM) specialist, genetic counselor, therapist, social worker, minister, friend, neighbor, and family members. This is a reasonable alternative that necessarily defeats any possibility of a substantial obstacle.

The other asserted burden would arise if she had to go "doctor shopping" for a doctor who was unaware of her reason for the abortion. Obviously, this is a little convoluted, because, if the first doctor never learned of her Down-syndrome-based reason, then they could proceed with the abortion regardless of her reason. This burden would only arise if the doctor learned of

her Down-syndrome-based reason, forcing that doctor to refuse to perform the abortion, in order to comply with H.B. 214. The woman would then need to secure another doctor to perform the abortion, one who does not know her opinions and reason. While proceeding to a second doctor might cause a delay or incur some travel, the Court has established that those are not necessarily substantial obstacles. We can infer that, under this approach, the alternatives are presumptively reasonable.

In *Gonzales*, 550 U.S. at 164, the prohibition on "intact D&E" was permissible because a woman could still obtain an abortion through an acceptable alternative method. Here, the prohibition on a doctor's acting with certain knowledge (i.e., *knows* that the woman is having the abortion because she does not want a child with Down syndrome) is permissible because the woman can obtain an abortion through an acceptable alternative approach. If we were to track the *Gonzales* analysis here, H.B. 214 would survive on a "reasonable alternatives" basis.

### C.

Finally, a word about the "large fraction test," which the Court uses for facial challenges to abortion laws. The large-fraction test holds that if a law imposes an undue burden in a "large fraction" of cases in which it is "relevant"—meaning for a large fraction of "those women for whom the [law] is an actual rather than an irrelevant restriction"—then the law is invalid and must be struck down, even if it would not pose an undue burden in some (small fraction of) cases. *June Med. Servs.*, 140 S. Ct. at 2132-33 (plurality) (emphasizing that this is not "not an 'every woman' standard"); *Whole Woman's Health*, 136 S. Ct. at 2320; *see also Gonzales*, 550 U.S. at 167-68.

The obvious enigma is that the women (putative plaintiffs) under consideration in this case might fall into a "small fraction" of cases for which H.B. 214 poses no undue burden, but H.B. 214 could still be invalid on its face and struck down entirely if it were to pose an undue burden on a large fraction of all of the relevant women in Ohio. The Court, however, has not been clear about how to define the numerator and denominator for the fraction, about what qualifies as a fraction that is "large," or about whether it is a percentage or a fractional number possibly larger than one. *See, e.g., June Med. Servs. L.L.C. v. Gee*, 905 F.3d 787, 813-14 (5th

Cir. 2018), *rev'd by June Med. Servs.*, 140 S. Ct. at 2103; *A Woman's Choice-E. Side Women's Clinic v. Newman*, 305 F.3d 684, 699 (7th Cir. 2002) (Coffey, J., concurring) ("The *Casey* plurality did not explain, and thus we refuse to peer into the dark abyss of speculation in an attempt to determine at precisely what point a fractional part of a group becomes an impermissibly 'large fraction' and a statute becomes unduly burdensome."). Certainly, no courts have claimed that it is easy to apply. *See, e.g.*, *Planned Parenthood of Ark. & E. Okla. v. Jegley*, 864 F.3d 953, 957-60 (8th Cir. 2017); *Cincinnati Women's Servs., Inc. v. Taft*, 468 F.3d 361, 370, 373-74 (6th Cir. 2006). And the Supreme Court has been forthcoming about its own difficulties with applying it. *See, e.g.*, *June Med. Servs.*, 140 S. Ct. at 2176 (Gorsuch, J., dissenting) (exclaiming that "this circular test is unlike anything we apply to facial challenges anywhere else"); *Whole Woman's Health*, 136 S. Ct. at 2343 n.11 (Alito, J., dissenting, joined by Roberts, C.J., and Thomas, J.) ("I must confess that I do not understand this [application of this test]."); *Gonzales*, 550 U.S. at 188 n.10 (Ginsburg, J., dissenting, joined by Stevens, Souter, Breyer, JJ.) ("There is, in short, no fraction because the numerator and denominator are the same. . . . Perhaps for this reason, in mandating safeguards for women's health, we have never before invoked the 'large fraction' test.").

Although our precedent includes mathematical applications, *see Taft*, 468 F.3d at 372-73 (holding that 12.5% is not a large fraction), our commonplace approach has been to treat the large-fraction test as "more conceptual than mathematical," *id*. at 374; *see also Baird*, 438 F.3d at 606; *Voinovich*, 130 F.3d at 193-97. That is consistent with the Supreme Court's first application of the test upon its creation in *Casey*, 505 U.S. at 892-95, where the Court did not conduct a mathematical determination of the fraction but relied "on expert testimony, empirical studies, and common sense," *id*. at 925 (Blackmun, J., concurring in part, and dissenting in part).

Under this common sense or conceptual approach, we can conservatively accept that H.B. 214 is relevant to any woman who knows that her fetus likely has Down syndrome, wants to abort the pregnancy because she does not want that child with Down syndrome, and wants the abortion performed by a doctor who knows that is her reason for having the abortion. As demonstrated, causing any such woman to forgo this one specific doctor is not a substantial obstacle on her right to choose or obtain an abortion. Correspondingly, requiring a doctor who

has learned that reason to disqualify him- or herself from performing the abortion on that woman, and thereby necessitate that she secure a different doctor, is not a substantial obstacle on the woman's ability to choose or obtain an abortion. Therefore, H.B. 214 does not create a substantial obstacle to a woman's ability to choose or obtain an abortion in any case, much less in a large fraction of relevant cases.

## VII.

We hold that the restrictions imposed, or burdens created, by H.B. 214 do not create a substantial obstacle to a woman's ability to choose or obtain an abortion. Moreover, those restrictions are reasonably related to, and further, Ohio's legitimate interests. Therefore, H.B. 214 is valid in all conceivable cases and the plaintiffs cannot succeed on the merits of their claim.

For the foregoing reasons, we REVERSE the order of the district court granting the preliminary injunction that was requested by the plaintiffs.

––––––––––––––––––

## CONCURRENCE

––––––––––––––––––

SUTTON, Circuit Judge, concurring. I join Judge Batchelder's opinion in full and offer a dictum or two.

Abortion contests of this sort are not going away. And we should be grateful—or at least appreciate what the quandary says about our country. Complete elimination of the debate in one direction—that only the public, never the woman, has a say in the matter—shortchanges some interests. Complete elimination of the debate in the other direction—that only the woman, never the public, has a say in the matter—shortchanges other interests. A healthy society should have free rein to navigate between these poles. A mark of a healthy society, it might even be said, is that it remains relentlessly ill at ease about the ethical, moral, medical, liberty, and faith-based considerations that inform these debates.

Which brings us to questions presented over and over and over again: How to set the balance between competing perspectives? Who decides where to draw the line? In 1973, the federal courts assumed most of the line-drawing power in the area, barring most state limitations on first-trimester abortions. *See Roe v. Wade*, 410 U.S. 113 (1973). In 1992, the federal courts eliminated the bright-line of *Roe* and replaced it with a less categorical approach. The Fourteenth Amendment's Due Process Clause, the Court said, prohibits a government from placing an "undue burden" on a woman's right to procure an abortion of a nonviable fetus. *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 874 (1992) (plurality).

What have been the effects of this centralization of power? Has it left the competing sides to the debate content or more fearful of what's next? Has judicial authority over the issue been healthy for the federal courts? More than all that, has it worked? Has our jurisprudence facilitated more compromise and thus more settled law?

Today's case, it seems to me, is Exhibit A in a proof that federal judicial authority over the issue has not been good for the federal courts or for increased stability over this difficult area

of law.  How did it happen that an anti-eugenics law is not the kind of law that reasonable people could compromise over in the context of broader debates about abortion policy?

For my part, I do not find this case difficult as a matter of federal constitutional law.  The United States Supreme Court has never considered an anti-eugenics statute before.  Nothing in its abortion decisions indicates that a State may not ban doctors from knowingly performing an abortion premised on the undesirability of the disability, sex, or race of the fetus.  The question is not whether the ban counts as an undue burden.  The question is whether the undue burden test applies at all.  I see no reason that it does.  "[W]e don't read precedents like statutes," *Herr v. U.S. Forest Serv.*, 803 F.3d 809, 819 (6th Cir. 2015), least of all constitutional precedents. *Casey*, like all judicial opinions, resolved only "the situations presented for decision," and the Court has never considered the validity of an anti-eugenics statute.  *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 917 F.3d 532, 536 (7th Cir. 2018) (Easterbrook, J., dissenting from the denial of rehearing en banc).  We should "not impute to the Justices decisions they have not made about problems they have not faced."  *Id.*

Even if the undue burden framework applies to this case, I fail to see how it is an undue burden to prohibit expectant mothers from telling the doctor performing the abortion the reason for their decision:  a Down syndrome diagnosis.  The Ohio law makes the decision a private one—and leaves it there, perhaps just where it should be left.  At the same time, it prevents the medical profession in particular and society in general from knowingly casting aspersions on individuals with Down syndrome—or, worst of all, celebrating the number of Down syndrome births averted.  Ohio is free to reject the policy approach of some European countries to the issue.  David A. Savitz, *How Far Can Prenatal Screening Go in Preventing Birth Defects?*, 152 J. of Pediatrics 3, 3–4 (2008); *see also* Janet L. Dolgin & Lois L. Shepherd, Bioethics and the Law 210 (4th ed. 2018).  More to the legal point at hand, the Due Process Clause of the United States Constitution does not take a stand on this social policy debate.  Ohio does not have to be Iceland.

The National Constitution permits States to convey their interest in the dignity of all human beings in all manner of ways.  Most basic of all, a State may seek to avoid the stigma that

comes with publicly acknowledged discrimination against the born and the unborn based on disability, sex, and race.

The Pennsylvania law at issue in *Casey*, notably, included an anti-eugenics provision, one that banned abortions based on sex selection. 18 Pa. Cons. Stat. Ann. § 3204(c). If the mother's physician performed such an abortion, the physician had performed an "[un]necessary" abortion and had committed a "felony of the third degree." *Id.* § 3204(c)–(d). Ohio's law, H.B. 214, likewise says a physician who knowingly performs an abortion due to a Down syndrome diagnosis has committed a felony of the fourth degree. O.R.C. §§ 2919.10(C); 2929.14(A)(4). The sex selection provision in *Casey* went unchallenged, *see* Lynne Marie Kohm, *Sex Selection Abortion and the Boomerang Effect of A Woman's Right to Choose: A Paradox of the Skeptics*, 4 Wm. & Mary J. Women & L. 91, 119 n.124 (1997), and thus remains unresolved. Unless, that is, the claimants somehow won the challenge without making it. The Supreme Court's silence on the matter means that the Court has never rendered States "powerless to prevent abortions designed to choose the sex, race, and other attributes of children." *See Planned Parenthood of Ind. & Ky.*, 917 F.3d at 536 (Easterbrook, J., dissenting from the denial of rehearing en banc). That's why the validity of a law like Ohio's "remains an open question." *Box v. Planned Parenthood of Ind. & Ky., Inc.*, 139 S. Ct. 1780, 1792 (2019) (Thomas, J., concurring).

Assuming still more judicial responsibility over so much abortion policy comes with terrain-altering costs to the judiciary. An independent judiciary has always been crucial to America's constitutional order. But a politicized judiciary cannot be an independent judiciary. The more the judicial branch enumerates our country's policies in areas of unenumerated liberty rights over which the people have legitimate disagreements, the more it becomes a new source of power—an allocation of responsibility that comes with the worst features of gerrymandering: a warping of democracy and a perceived manipulation of the decision-making process. Any effort to insulate such power from the political fray is not likely to last long or end well. Far better, in my view, to give States like Ohio more latitude, not less, to weigh and decide complex questions about abortion policy.

At the outset, I said that debates about abortion policy will not go away. That's not quite true. Every time the federal courts leave an issue of abortion policy to local decision-making,

they create the possibility for compromise at the local level.  The topic of today's abortion regulation may not lend itself to a national compromise, but it does lend itself to local ones, which often are more stable, less political, more fair, sometimes most lasting.

A long-ago example from Ohio, quaint to modern ears at many levels, illustrates the point.  For the first half of the twentieth century, Ohio prohibited the public transportation of school children to religious schools, O.R.C. § 3327.01; *Honohan v. Holt*, 244 N.E.2d 537, 539 (Ohio Ct. Com. Pl. 1968), and the use of contraception by unmarried couples, O.R.C. § 2905.34 (1963 Supp.); *City of Toledo v. Kohlhofer*, 122 N.E.2d 20, 23 (Ohio Ct. App. 1954).  But that changed in the spring and summer of 1965, when bills repealing both bans passed with wide margins.  131 Journal of the Senate, 116th General Assembly of Ohio, 728 (June 28, 1965) (parochial busing:  24 yea – 6 nay); 131 Journal of the House of Representatives, 116th General Assembly of Ohio, 1809–1810 (July 29, 1965) (parochial busing:  86 yea – 45 nay); 131 Journal of the House of Representatives, 116th General Assembly of Ohio, 486–87 (April 13, 1965) (contraceptive bill: 116 yea – 10 nay); 131 Journal of the Senate, 116th General Assembly of Ohio, 698 (June 23, 1965) (contraceptive bill:  26 yea – 3 nay).

Compromise between competing interest groups appears to have been the key.  On one side, "it was the Catholics who pressed hardest for the [school busing] bill's passage and nursed it through the legislature."  William Fulwider, *Discrimination Ban in Busing Law Studied*, The Columbus Dispatch 22 (September 5, 1965); *Honohan*, 244 N.E. 2d at 545 (dissent).  On the other side, it was the lack of opposition by "sectarian groups" that enabled the contraception bill to "continue its progress through the legislature."  Ned Stout, *Bill Would Legalize Birth Control Advice*, The Columbus Dispatch 16B (March 24, 1965).  When the federal courts let local political processes play out, Ohioans ended up with a little give and a little take that satisfied supporters of open access to contraceptives and religious-school busing alike.  The Ohio compromise over these issues in the 1960s was not a compromise for every State, and it did not turn on a principle that the U.S. Constitution had created at the time.  *Compare Griswold v. Connecticut*, 381 U.S. 479, 485–86 (1965) (establishing that a constitutional right to privacy protects a married couple's decision to use contraceptives), *with Eisenstadt v. Baird*, 405 U.S.

438, 453 (1972) (extending the right to unmarried individuals).  But it likely led the two sides of the debate to trust each other when new conflicts arose.

Keep in mind what this compromise did and did not mean.  It did not require the competing camps to agree that the other side was right; it just required them to stop opposing the competing position with every ounce of political energy they could muster.

Local lessons can be national lessons.  The more the federal courts do when it comes to abortion policy, and the longer they do it, the less reason there is for compromise at the local level.  That has not been good for the federal courts or for obtaining more stable law over an issue unlikely to go away anytime soon.

————————————

## CONCURRENCE

————————————

GRIFFIN, Circuit Judge, concurring.

I join the majority opinion. I write separately to emphasize Ohio's compelling state interest in prohibiting its physicians from knowingly engaging in the practice of eugenics. In this regard, I echo the conclusion reached by Judge Batchelder in her panel dissent:

> In *Box v. Planned Parenthood of Indiana and Kentucky, Inc.*, 139 S. Ct. 1780 (2019), Justice Thomas explained how Indiana's law "and other laws like it promote a State's compelling interest in preventing abortion from becoming a tool of modern-day eugenics," *id.* at 1783 (Thomas, J., concurring). The same goes for Ohio's law H.B. 214 before us today.

*Preterm-Cleveland v. Himes*, 940 F.3d 318, 325 (6th Cir. 2019) (Batchelder, J., dissenting), *vacated*, 944 F.3d 630 (6th Cir. 2019) (en banc).

Many think that eugenics ended with the horrors of the Holocaust. Unfortunately, it did not. The philosophy and the pure evil that motivated Hitler and Nazi Germany to murder millions of innocent lives continues today. Eugenics was the root of the Holocaust and is a motivation for many of the selective abortions that occur today.

Coined in 1883 by British statistician Francis Galton, "eugenics" is "the science of improving stock through all influences that tend in however remote a degree to give to the more suitable races or strains of blood a better chance of prevailing speedily over the less suitable than they otherwise would have." *Box*, 139 S. Ct. at 1784 (2019) (Thomas, J., concurring) (internal quotation marks omitted). "[B]y promoting reproduction between people with desirable qualities and inhibiting reproduction of the unfit," the theory goes, "man could improve society by doing providently, quickly, and kindly what Nature does blindly, slowly, and ruthlessly." *Id.* (alterations and internal quotation marks omitted).

By the 1920s and 1930s, eugenics became a popular movement in Europe and the United States. The "science" of "eugenics was taught at 376 [American] universities and colleges,"

including Harvard.  *Id.* at 1785.  As Judge Sutton has explained, "[m]any leading figures of the day—Theodore Roosevelt, John D. Rockefeller, Mrs. Mary Harriman, David Starr Jordan (a biologist and the first president of Stanford University), to name some—were fervent eugenicists, putting their money, their power, their time, and their research behind the effort." Jeffrey S. Sutton, *51 Imperfect Solutions: States And The Making of American Constitutional Law*, 87 (2018).  Additionally, for a time, Planned Parenthood's founder—Margaret Sanger— was sympathetic to some aspects of the eugenics movement,[1] which included supporting the Supreme Court's infamous *Buck v. Bell* decision.  274 U.S. 200 (1927).[2]

In *Buck v. Bell*, the Supreme Court rejected a Fourteenth Amendment Due Process and Equal Protection challenge to Virginia's involuntary sterilization law.  *Id.* at 205–06.  In upholding the forced sterilization of plaintiff Carrie Buck, the Supreme Court accepted and sanctioned the inhumane, discriminatory, and misguided principles of eugenics codified by the Commonwealth of Virginia:

> The attack is not upon the procedure but upon the substantive law.  It seems to be contended that in no circumstances could such an order be justified.  It certainly is contended that the order cannot be justified upon the existing grounds.  The judgment finds the facts that have been recited and that Carrie Buck 'is the probable potential parent of socially inadequate offspring, likewise afflicted, that she may be sexually sterilized without detriment to her general health and that her welfare and that of society will be promoted by her sterilization,' and thereupon makes the order.  In view of the general declarations of the Legislature and the specific findings of the Court obviously we cannot say as matter of law that the grounds do not exist, and if they exist they justify the result.  We have seen more than once that the public welfare may call upon the best citizens for their lives.  It would be strange if it could not call upon those who already sap the strength of the State for these lesser sacrifices, often not felt to be such by those concerned, in order to prevent our being swamped with incompetence.  It is better for all the

---

[1] Planned Parenthood, *Margaret Sanger – Our Founder* 7–8 (June 2016), *available at* https://www.plannedparenthood.org/uploads/filer_public/b5/d4/b5d47c32-89f2-45d9-b28c-243cb85f3f55/sanger_ fact_sheet_oct_2016.pdf; Planned Parenthood, *Opposition Claims About Margaret Sanger* 3–4 (Oct. 2016), *available at* https://www.plannedparenthood.org/uploads/filer_public/37/fd/37fdc7b6-de5f-4d22-8c05- 9568268e92d8/sanger_opposition_claims_fact_sheet_2016.pdf.

[2] Planned Parenthood recently "denounce[d] [Sanger's] endorsement of . . . *Buck v. Bell* . . . as well as her involvement with the American eugenics movement and her adherence to some of its principles and values." *Margaret Sanger – Our Founder* 8; *Opposition Claims About Margaret Sanger* 4 ("Planned Parenthood acknowledges [that Sanger's views on eugenics had] . . . major flaws . . . and . . . believe[s] that they are wrong.").

> world, if instead of waiting to execute degenerate offspring for crime, or to let them starve for their imbecility, society can prevent those who are manifestly unfit from continuing their kind. The principle that sustains compulsory vaccination is broad enough to cover cutting the Fallopian tubes. *Jacobson v. Massachusetts*, 197 U. S. 11, 25 S. Ct. 358, 49 L. Ed. 643, 3 Ann. Cas. 765 [(1905)]. Three generations of imbeciles are enough.

*Id.* at 207.

Following Nazi Germany's horrific implementation of eugenics to its natural conclusion, the eugenics movement lost its popularity. *See Sutton*, *supra*, at 120. Tragically, however, the practice continues today with modern-day abortions. Specifically, the selective abortion of unborn babies who are deemed "unfit" or "undesirable" is becoming increasingly common. Consider the abortion practices in Asia and India as detailed by Justice Thomas:

> In Asia, widespread sex-selective abortions have led to as many as 160 million "missing" women—more than the entire female population of the United States. See M. Hvistendahl, Unnatural Selection: Choosing Boys Over Girls, and the Consequences of a World Full of Men 5–6 (2011); see also Kalantry, How To Fix India's Sex-Selection Problem, N. Y. Times, Int'l ed., July 28, 2017, p. 9 ("Over the course of several decades, 300,000 to 700,000 female fetuses were selectively aborted in India each year. Today there are about 50 million more men than women in the country").

*Box*, 139 S. Ct. at 1791. Moreover, "[i]n Iceland, the abortion rate for children diagnosed with Down syndrome in utero approaches 100%"; and other European countries also have shockingly high rates. *Id.* at 1790.

In her panel dissent, Judge Batchelder correctly concluded that "Ohio enacted the Antidiscrimination Law, H.B. 214, to counteract . . . eugenicist practices concerning the prenatal Down Syndrome population." *Preterm-Cleveland*, 940 F.3d at 326 (Batchelder, J., dissenting). Ohio's anti-eugenicist goals align with our now-enlightened national policy of protecting and respecting people with disabilities. *See generally* Americans with Disabilities Act of 1990, Pub. L. No. 101-336, 104 Stat. 327; Individuals with Disabilities Education Improvement Act of 2004, Pub. L. No 108-446, 118 Stat. 2647.

Today's en banc majority opinion persuasively holds that the Ohio statute does not prevent women from undergoing abortions; rather, it prohibits state-regulated physicians from

knowingly carrying out abortions for eugenic reasons.  Specifically, the law prohibits Ohio doctors from performing an abortion when the doctor knows one or more of the pregnant woman's reasons for "seeking the abortion, in whole or in part, [is] because" the unborn child has or might have Down syndrome.  O.R.C. § 2919.10(B).  Thus, it promotes Ohio's compelling state interest of proscribing complicity by its physicians in the discriminatory and misguided practice of eugenics.

As Justice Thomas stated in *Box*, "[w]hatever else might be said about *Casey*, it did not decide whether the Constitution requires States to allow eugenic abortions."  139 S. Ct. at 1792. "I would apply that reasoning here to uphold Ohio H.B. 214."  *Preterm-Cleveland*, 940 F.3d at 326 (Batchelder, J., dissenting).

---

### CONCURRENCE

---

JOHN K. BUSH, Circuit Judge, concurring. As the majority explains, H.B. 214 does not impose an undue burden on those who choose to have an abortion because of a fetal-Down-syndrome diagnosis. It does not ban such abortions. The majority says that a ban would be a different case, and that is correct insofar as a ban would require different analysis. But the result would be the same. I write separately to explain why that result would be consistent with the Supreme Court's abortion precedents and the Fourteenth Amendment's original meaning.[1]

When facing a federal constitutional issue not previously decided in our circuit, our responsibility as intermediate appellate judges is clear. We should first ask whether a holding of the Supreme Court has "direct application in a case." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989). If so, the inquiry ends there. But when a case presents an issue of first impression that no holding of the Supreme Court can resolve, we must look to "[t]he ultimate touchstone of constitutionality": the Constitution itself. *Graves v. O'Keefe*, 306 U.S. 466, 491–92 (1939) (Frankfurter, J., concurring). The question whether "the Constitution requires states to allow eugenic abortions" is such an issue. *Box v. Planned Parenthood of Ind. & Ky., Inc.*, 139 S. Ct. 1780, 1792 (2019) (Thomas, J., concurring).

Prohibiting abortion based on a particular genetic condition furthers a wholly distinct interest—preventing discrimination—from the interests in unborn life and women's health that the Supreme Court developed the undue-burden standard to address. Like Judge Sutton, I see no reason why the undue-burden test applies to the type of law at issue here. So, in the absence of Supreme Court guidance, we should look to the original meaning of the Fourteenth Amendment to decide this case. That meaning is clear: the Fourteenth Amendment's Due Process Clause, as originally understood, does not prohibit laws that protect unborn life with Down syndrome. The

---

[1]This is no academic exercise. The Seventh and Eighth Circuits have held similar laws to be bans and found that they are unconstitutional when viewed in that light. *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 888 F.3d 300, 312 (7th Cir. 2018), *rev'd in part on other grounds sub nom. Box v. Planned Parenthood of Ind. & Ky., Inc.*, 139 S. Ct. 1780 (2019); *Little Rock Fam. Plan. v. Rutledge*, 984 F.3d 682, 690 (8th Cir. 2021). I write to disagree with their analysis.

two tests that the Supreme Court often applies in substantive due process cases—history-and-tradition analysis and interest balancing—accord with that conclusion.

## I.

To interpret the Constitution, we look to its original meaning. Originalism "follows inexorably" from our commitment to a written Constitution. Randy Barnett, *An Originalism for Nonoriginalists*, 45 Loy. Univ. L. Rev. 611, 636 (1999). The natural reading of a legal document, constitution or not, presupposes a fixed meaning of the words in the document at the time they were communicated. Lawrence Solum, *The Fixation Thesis: The Role of Historical Fact in Original Meaning*, 91 Notre Dame L. Rev. 1, 1–2 (2015). Although works of literature and other creative endeavors may be interpreted to have multiple meanings that are fluid over time, that is not the way we read legal texts. *See* Richard Kay, *Adherence to Original Intentions in Constitutional Adjudication: Three Objections and Responses*, 82 Nw. L. Rev. 226, 238–39 (1988). Laws communicate unchanging directives so that people can rely on them and order their lives accordingly. Originalism applies that understanding to the Constitution.

Applying the Constitution's fixed meaning is the only way to respect "the consent of the governed with which the actions of the governors must be squared." Edwin Meese III, *The Law of the Constitution*, 61 Tul. L. Rev. 979, 986 (1986). If the Constitution's meaning changes according to the whims of unelected judges, then it becomes a thoroughly anti-democratic document. Instead of the People having control over the constitutional amendment process under Article V, such power devolves to the judiciary. That dangerous result allows courts to make constitutional changes that the People have declined to adopt. Even if a change in constitutional meaning accords with the majority of popular opinion, that condition does not warrant judicial intervention to "amend" the Constitution through interpretation according to that popular will. After all, a democratic society "does not, by and large, need constitutional guarantees to ensure that its laws will reflect 'current values.' Elections take care of that quite well." Antonin Scalia, *Originalism: The Lesser Evil*, 57 U. Cin. L. Rev. 849, 862 (1989). Instead, we need a constitution passed through supermajoritarian processes to protect enduring

values so that the fleeting passions of temporary majorities, whether in the electorate or on the courts, cannot alter the rights and structures that We the People enshrined as our highest law.[2]

With these principles in mind, how do we balance our role as lower court judges with our duty to apply the Constitution's original meaning? First, of course, if a holding of the Supreme Court directly applies to a case, we follow it. *Rodriguez*, 490 U.S. at 484. In so doing, we cannot apply a "cramped reading" of the precedent that would "functionally overrule" it. *Thompson v. Marietta Educ. Ass'n*, 972 F.3d 809, 814 (6th Cir. 2020). Instead, we must apply precedent "neither narrowly nor liberally—only faithfully." *United States v. Johnson*, 921 F.3d 991, 1001 (11th Cir. 2019) (en banc).

But "only *holdings* are binding, not *dicta*." *Wright v. Spaulding*, 939 F.3d 695, 700 (6th Cir. 2019). The holding of a case includes only the propositions that are necessarily decided to support the judgment based on the facts of that case. *Id.* at 701. All else is dictum. *See id.* ("[A] conclusion that does *nothing* to determine the outcome is dictum and has no binding force.").[3] As Chief Justice Marshall explained, "It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision." *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399 (1821).

_____

[2]Recent scholarship has also shown persuasively that originalism is our current law. *See* William Baude, *Is Originalism Our Law?*, 115 Colum. L. Rev. 2349, 2408 (2015) (answering the titular question in the affirmative); Stephen Sachs, *Originalism as a Theory of Legal Change*, 38 Harv. J. L. & Pub. Pol'y 817, 837–38 (2015) (noting that "courts and officials labor mightily to avoid anything that smacks of open rebellion against the text or its original meaning, however understood"). Perhaps for that reason, originalism is the only mode of interpretation that the Supreme Court has specifically endorsed. *See, e.g.*, *Ramos v. Louisiana*, 140 S. Ct. 1390, 1395–97 (2020); *Bucklew v. Precythe*, 139 S. Ct. 1112, 1122 (2019); *Crawford v. Washington*, 541 U.S. 36, 60–61 (2004).

[3]One dissent cites my above reasoning to contend that it renders Part V.A of the majority, where the opinion states the correct formulation of the undue burden test, dicta. Moore dissent at 60. Of course, our decisions often "gratuitously recite standards of law that are not in dispute and have no effect on the judgment," such as when noting standards of review or, as here, the test that applies to a statute that would be constitutional under any available test. *See* Leval, *infra*, at 1267. *EMW Women's Surgical Center, P.S.C. v. Friedlander* already answered the question that *June Medical Services v. Russo* raised about the correct formulation of the undue burden standard. 978 F.3d 418, 431 (6th Cir. 2020). That that determination is not necessary to my decision here does not change *EMW*'s status as the law of our circuit. Ironically, though, three of my colleagues choose not to join Part VI—leaving it a plurality—which means that the determination of the correct test is necessary to the holding that a majority of judges join. *See* Kethledge concurrence.

When no holding of the Supreme Court can decide a question, as in the case before us, our duty to "interpret the Constitution in light of its text, structure, and original understanding" takes precedence. *See NLRB v. Noel Canning*, 573 U.S. 513, 573 (2014) (Scalia, J., concurring in the judgment); *see also* Pierre Leval, *Judging Under the Constitution: Dicta About Dicta*, 81 N.Y.U. L. Rev. 1249, 1274 (2006) ("The Supreme Court's dicta are not law. The issues so addressed remain unadjudicated. When an inferior court has such an issue before it, it *may not* treat the Supreme Court's dictum as dispositive." (emphasis added)).**4** And if it is dubious whether a precedent "is correct as an original matter," we should "tread carefully before extending" it. *Garza v. Idaho*, 139 S. Ct. 738, 756 (2019) (Thomas, J., dissenting); *see also* Josh Blackman, *Originalism and Stare Decisis in the Lower Courts*, 13 N.Y.U. J. L. & Liberty 44, 51 (2019) ("[A] judge should only extend a Supreme Court precedent if the original meaning of the Constitution can support that extension."). In such a case, "the rule of law may dictate confining the precedent, rather than extending it further." *NLRB v. Int'l Ass'n of Bridge Iron Workers, Local 229*, 974 F.3d 1106, 1117 (9th Cir. 2020) (Bumatay, J., dissenting from denial of rehearing en banc); *see also Texas v. Rettig*, No. 18-10545, slip op. at 18 (5th Cir. Apr. 9, 2021) (Ho, J., dissenting from denial of rehearing en banc) ("[I]f we are forced to choose between upholding the Constitution and extending precedent in direct conflict with the Constitution, the choice should be clear.").

---

**4**I recognize that a panel of our Court has said that "[l]ower courts are 'obligated to follow Supreme Court dicta, particularly where there is not substantial reason for disregarding it, such as age or subsequent statements undermining its rationale.'" *ACLU of Ky. v. McCreary County*, 607 F.3d 439, 447 (6th Cir. 2010) (quoting *United States v. Marlow*, 278 F.3d 581, 588 n.7 (6th Cir. 2002)). But the *McCreary County* panel's statement about dicta is dictum itself. We are not bound by dicta of Sixth Circuit panels, *Wright*, 939 F.3d at 700, or dicta of the Supreme Court—and for good reason, as jurists and scholars have explained. *See, e.g.*, *Torres v. Madrid*, No. 19-292, 4 (U.S. Mar. 25, 2021) (Gorsuch, J., dissenting) ("[W]hatever utility it may have, dicta cannot bind future courts."); *CIGNA Corp. v. Amara*, 563 U.S. 421, 449 (2011) (Scalia, J., concurring in the judgment) ("The Court's discussion of the relief available under § 502(a)(3) and *Mertens* is purely dicta, binding upon neither us nor the District Court. The District Court need not read any of it."); *Grutter v. Bollinger*, 288 F.3d 732, 787 (6th Cir. 2002) (en banc) (Boggs, J., dissenting) ("More fundamentally, the holding/dicta distinction demands that we consider binding only that which was necessary to resolve the question before the [Supreme] Court . . . . Any speculation regarding the circumstances under which race could be used was little more than an advisory opinion."), *aff'd* 539 U.S. 306 (2003); *Grutter*, 288 F.3d at 746 n.9 (treating Supreme Court dicta as only persuasive authority).

II.

In this case, no Supreme Court holding addresses the question presented. *See Box*, 139 S. Ct. 1780, 1782 (2019) (per curiam) (denying certiorari on the question whether states can exclude a fetal diagnosis of Down syndrome from the permissible reasons to seek an abortion). In particular, the Supreme Court has not held that the undue-burden standard should apply to a law that regulates eugenic abortions.[5]  There is good reason to conclude that the Court would not apply that standard to evaluate the compelling state interest at issue here—the eradication of discrimination.

That anti-discrimination interest has not been addressed in prior Supreme Court abortion cases. In *Gonzales*, *Stenberg*, and *Casey*, the Court considered the balance between the state's interest in unborn life and a woman's right to an abortion. *Gonzales v. Carhart*, 550 U.S. 124, 146 (2007); *Stenberg v. Carhart*, 530 U.S. 914, 930 (2000); *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 877–88 (1992) (plurality opinion).  And in *June Medical* and *Whole Woman's Health*, the Court addressed the balance between the state's interest in protecting women's health and a woman's right to an abortion.  *June Med. Servs., L.L.C. v. Russo*, 140 S. Ct. 2103, 2135 (2020) (Roberts, C.J., concurring in the judgment); *Whole Woman's Health v. Hellerstadt*, 136 S. Ct. 2292, 2310 (2016).  In both contexts, the Court dealt only with the states' "legitimate interests" in "potential life" and women's health. *Hellerstadt*, 136 S. Ct. at 2309–10; *Casey*, 505 U.S. at 877–88.  The Court did not consider states' wholly separate interest in eliminating discrimination as a reason for an abortion.  Thus, the undue-burden standard that the Supreme Court has applied in abortion cases dealing with the interests in unborn life and women's health does not necessarily apply here.  In fact, the law at issue in *Casey* had an anti-eugenics provision that banned sex-selective abortion.  The litigants there began their brief by making clear that they were not challenging that provision.  *Box*, 139 S. Ct. at 1792 (Thomas, J.,

---

[5]The primary dissent disputes the label eugenic abortion, arguing that eugenics requires a collective and concerted effort to change humanity's genetic composition.  Donald Dissent at 100–01.  But just as a private decision that is not motivated by animus is still labeled discriminatory if its effect falls more heavily on a protected class, a private choice that contributes to the elimination of a disfavored genetic trait can be fairly called eugenic because it accomplishes eugenic ends.  *Cf. Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 545–46 (2015) (holding that the Fair Housing Act's prohibition on discrimination encompasses disparate-impact claims).

concurring). That provision remains in force and unchallenged to this day. 18 Pa. Cons. Stat. § 3204(c). So although the *Casey* plurality commented that it had disposed of any other "valid state interest" that could be presented, *see Casey*, 505 U.S. at 877, that statement was simply dictum offered in a case where the anti-discrimination interest was not at issue.

The undue-burden standard that the Court created to address those interests should not extend to this context. That standard creates an unyielding prohibition on any law that poses a substantial obstacle to the decision to have a pre-viability abortion. Its prohibition flows logically from the Court's determination that a state's interests in potential life and maternal health can never justify imposing such a burden. In those contexts, where the Supreme Court has analyzed the interests and found them wanting, applying a "pure effects test" is appropriate. *See Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health (PPINK)*, 888 F.3d 300, 312 (7th Cir. 2018) (Manion, J., concurring in part and dissenting in part) (acknowledging that "*Casey*'s 'undue burden' standard is not a means-ends test, but a pure effects test"), *rev'd in part sub nom. Box*, 139 S. Ct. 1780 (2019). The balance of interests has already been determined; all that remains is to determine the burden on the woman's abortion right.

But the Court has never ruled on states' "compelling interest in preventing abortion from becoming a tool of modern day eugenics." *Box*, 139 S. Ct. at 1783 (Thomas, J., concurring); *see also PPINK*, 888 F.3d at 311 (Manion, J., concurring in part and dissenting in part) ("Surely, Indiana has a compelling interest in attempting to prevent this type of private eugenics."). That interest is especially important in light of this country's ignoble history with eugenics. *See Buck v. Bell*, 274 U.S. 200 (1927); Jeffrey Sutton, *51 Imperfect Solutions: States and the Making of American Constitutional Law* 87 (2018).

The antidiscrimination interest, as applied to eugenic abortions, stands apart from the states' interest in each "potential life." *See Casey*, 505 U.S. at 870. Since the Fourteenth Amendment enshrined equality as a fundamental constitutional value, our society has made an affirmative commitment to eradicating discrimination. *See, e.g.*, 42 U.S.C. § 12101 (Americans with Disabilities Act); 42 U.S.C. § 2000e (Title VII of the Civil Rights Act); Ohio Stat. § 4112.02 (forbidding discrimination on the basis of disability, sex, race, and other

characteristics). And the Supreme Court has recognized that such antidiscrimination laws serve "compelling state interests of the highest order." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984). A law passed to end the "odious view that some lives are worth more than others" and ensure that people with Down syndrome are not eliminated in America, as they nearly have been in other countries,[6] would fit squarely within that venerable tradition. *PPINK*, 888 F.3d at 315 (Manion, J., concurring in part and dissenting in part). Accordingly, a state's interest in passing such a law would be wholly distinct from its "important and legitimate interest in protecting the potentiality of human life." *Casey*, 505 U.S. at 871 (quoting *Roe v. Wade*, 410 U.S. 113, 162 (1973)). A eugenic-abortion ban would therefore present a question to which no holding of the Supreme Court has "direct application," *Rodriguez*, 490 U.S. at 484, because the Court has not considered the antidiscrimination interest in its prior abortion cases.

III.

In light of the Supreme Court's silence on that issue, we must look to the Constitution's original meaning. And it is clear that there is no bar in the text of the Fourteenth Amendment, as it was understood at its ratification, to the legislative protection of unborn life with Down syndrome. Applied here, the central question for original meaning should be, "[w]hat did the average Joe (or Josephine)" from the ratification generation "understand the words" of the Fourteenth Amendment to mean? *Turner v. United States*, 885 F.3d 949, 957 (6th Cir. 2018) (Bush, J., concurring dubitante), *cert. denied*, 139 S. Ct. 2740 (2019). No such average person would have understood the operative phrase—"nor shall any State deprive any person of life, liberty, or property, without due process of law," U.S. Const. amend. XIV—to create a right to abort a fetus based on its genetic characteristics. New technology that increases knowledge about fetal genetics does not alter the Fourteenth Amendment's original meaning; it merely creates new challenges for legislation in this area.

Professors Michael McConnell and Nathan Chapman have ably elucidated the original meaning of the Fourteenth Amendment's Due Process Clause. Nathan Chapman & Michael

---

[6]*See* Dave Maclean, "Iceland Close to Becoming First Country Where No Down's Syndrome Children Are Born," *The Independent* (Aug. 16, 2017), https://www.independent.co.uk/life-style/health-and-families/iceland-downs-syndrome-no-children-born-first-country-world-screening-a7895996.html.

McConnell, *Due Process as Separation of Powers*, 121 Yale L. J. 1672 (2012).  As they explain, the Due Process Clause requires each branch of government to "operate in a distinctive manner" if it seeks to deprive a person of life, liberty, or property.  *Id.* at 1781.  But "[n]o significant court decision, legal argument, or commentary prior to the adoption of the Fourteenth Amendment . . . so much as hinted that due process embodies the principle that certain natural liberties are inviolate against any laws."  *Id.* at 1679–80.[7]  As such, "courts prior to the adoption of the Fourteenth Amendment did not treat rights other than those enumerated in positive constitutional law as impervious to prospective and general" legislation.  *Id.* at 1680.  Based on that original meaning, the generation that ratified the Fourteenth Amendment would not have understood it to limit a legislature's authority to prohibit eugenic abortions.

Specific evidence in that regard comes from the very state where this case arose.  In February of 1867, a committee of the same Ohio state senators who had voted to ratify the Fourteenth Amendment just one month earlier issued a state Senate report advocating for amendments that would strengthen Ohio's abortion prohibition in light of an "alarming and increasing frequency" of abortions.  1867 Ohio Senate Journal App'x 233.  The report proclaimed that "the willful killing of a human being, at any stage of its existence, is murder." *Id.* at 234.  And that view was by no means an outlier: there is evidence from many states that the ratification generation did not understand the Fourteenth Amendment to bar abortion restrictions. *See, e.g., Casey*, 505 U.S. at 952–53 (Rehnquist, C.J., concurring in part and dissenting in part) (demonstrating that a clear majority of states restricted abortion in the Fourteenth Amendment ratification generation).  That evidence reinforces the clear showing that the Fourteenth Amendment's original meaning allows a state to prohibit eugenic abortions.

That history also raises serious questions as to the correctness of the Supreme Court's abortion jurisprudence more generally as a matter of the Constitution's original meaning.  *See, e.g., Gonzales*, 550 U.S. at 169 (Thomas, J., concurring); *Stenberg*, 530 U.S. at 956 (Scalia, J.,

---

[7]*See also* Ilan Wurman, *The Second Founding: An Introduction to the Fourteenth Amendment* 9 (2020) (concluding that McConnell and Chapman's analysis is correct); Randy Barnett & Evan Bernick, *No Arbitrary Power: An Originalist Theory of the Due Process of Law*, 60 Wm. & Mary L. Rev. 1599, 1631–32, 1645–46 (2019) (agreeing with McConnell and Chapman, with the additional theory that Due Process may have also allowed for challenges to legislation that had no "constitutionally proper end"); John Harrison, *Substantive Due Process and the Constitutional Text*, 83 Va. L. Rev. 493, 558 (1997).

dissenting); *Casey*, 505 U.S. at 952–53 (1992) (Rehnquist, J., concurring in part and dissenting in part).  As lower court judges, we should be reluctant to extend that jurisprudence further in the absence of a Supreme Court holding that directs us to do so.

IV.

This case should begin and end with the Constitution's text.  But it is also worth noting that here, original meaning is entirely consistent with the Supreme Court's two primary approaches to cases involving substantive due process.  First, applying history-and-tradition analysis demonstrates that no fundamental right to eugenic abortion exists.  And second, a ban on eugenic abortion would pass even strict scrutiny under the interest-balancing framework.

A.  HISTORY AND TRADITION

When analyzing the scope of fundamental rights, the Supreme Court has instructed that we must determine whether a right is, "objectively, 'deeply rooted in this Nation's history and tradition.'"  *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (quoting *Moore v. City of E. Cleveland*, 431 U.S. 494, 503 (1977) (plurality opinion)); *see also Town of Greece v. Galloway*, 572 U.S. 565, 578–79 (2014) (interpreting the scope of the Establishment Clause based on our "history and tradition").  Despite our country's dark dalliance with the eugenics movement, private individuals preventing the birth of life based on that life's genetic characteristics is not deeply rooted in our history and tradition.  Mandatory sterilization laws did not come about until 1907, half a century after the Fourteenth Amendment's ratification.  *See* Sutton, *supra*, at 89.  And even after that point, the eugenics movement failed to attain the degree of consensus necessary to deeply root a practice in our history and tradition.  *Id.* at 125–27; *cf. Town of Greece*, 572 U.S. at 578–79 (discussing the history of legislative prayer dating back to the founding).

Of course, compelled sterilization differs from the private choice to seek a eugenic abortion.  But the compelled sterilization movement represented a national reckoning over the propriety of eugenics.  And that reckoning ended with states' "across-the-board enactment of legislation that protected the disabled from discrimination in general."  Sutton, *supra*, at 126.  That the nation rightly chose to protect those with disabilities rather than discriminate against

them shows that a state may eliminate discriminatory intent as a permissible reason to seek an abortion. And it shows that in the modern recurrence of that debate, where some argue that expectant mothers should determine for their child that a life with Down syndrome is not worth living,[8] states can enshrine into law the value of lives with Down syndrome.

## B. INTEREST BALANCING

If we apply the interest-balancing framework that the Supreme Court often employs in fundamental rights cases, a ban on eugenic abortion would pass even strict scrutiny.[9] To survive strict scrutiny, a law must be "narrowly tailored to serve a compelling interest." *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 444 (2015).

As to the compelling-interest prong, the Supreme Court has found a number of interests compelling, from preserving confidence in judicial integrity, *id.*, to attaining a diverse collegiate student body, *Grutter v. Bollinger*, 539 U.S. 306, 328 (2003), to eradicating discrimination, *Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984). A state's interest in preventing private eugenics plainly fits among those compelling interests. *See Box*, 139 S. Ct. at 1783 (Thomas, J., concurring).

As to the narrow-tailoring prong, to be narrowly tailored, a law must be the least restrictive means of accomplishing the legislature's compelling interest. *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 813 (2000). A law need not be "perfectly tailored" so long as it is closely fitted to advancing the state's interest. *Williams-Yulee*, 575 U.S. at 454 (quoting *Burson v. Freeman*, 504 U.S. 191, 209 (1992) (plurality opinion)). Our analysis in *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.* is instructive. 884 F.3d 560 (6th Cir. 2018), *aff'd on other grounds sub nom. Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). There, in addressing

---

[8]*See* John Bingham, *Richard Dawkins: 'Immoral' to Allow Down's Syndrome Babies to Be Born*, The Telegraph, Aug. 20, 2014, https://www.theguardian.com/science/2014/aug/21/richard-dawkins-immoral-not-to-abort-a-downs-syndrome-foetus.

[9]Because a eugenic-abortion ban passes strict scrutiny, it is unnecessary to address the appropriate level of scrutiny to apply to such a statute. But it bears noting that in *Casey*, the plurality seemed to reject the notion that strict scrutiny applies in abortion cases. *See* 505 U.S. at 871. If the Court continues to apply interest balancing to determine the scope of the abortion right, then we may need to determine the appropriate level of scrutiny in a future, closer case.

a business's claim under the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1, we held that a total prohibition on discrimination "is itself the least restrictive way to further EEOC's interest in eradicating discrimination based on sex stereotypes from the workplace." *Id.* at 594–95.[10]  A similar conclusion would hold for a eugenic-abortion ban.  A prohibition on eugenic abortions would be the least restrictive way to further states' compelling interest in eradicating them.  For that reason, a eugenic-abortion ban would be narrowly tailored to further a state's compelling interest in preventing eugenic abortions.

V.

The primary dissent appears to assume that H.B. 214's ethical foundation renders the law unconstitutional.  Donald Dissent at 83 & n.1.  That assumption is mistaken.  Like most—if not all—of our criminal laws, H.B. 214 does have its foundation in society's moral judgments about right and wrong.  *See* Mary Cheh, *Constitutional Limits on Using Civil Remedies to Achieve Criminal Law Objectives: Understanding and Transcending the Civil-Criminal Law Distinction*, 42 Hastings L. J. 1325, 1353 (1991).  But that does not make it unconstitutional.

The primary dissent draws its argument to the contrary from the dissent in *Gonzales v. Carhart*.  *See* Donald Dissent at 1–2 & n.1.  But the majority in *Gonzales* made clear that "ethical and moral concerns" can justify a law.  550 U.S. at 158.  Indeed, even in the alleged absence of a victim, our laws can and do enact ethical values as part of the criminal law.  *See, e.g.*, *Glucksberg*, 521 U.S. at 706–07 (assisted suicide); Ohio Stat. § 2907.24(A)(1) (prostitution).

Furthermore, the People often enact laws based on moral judgment regarding motive for conduct.  From Blackstone's *Commentaries on the Laws of England* to modern criminal codes, the law has been that in many circumstances a wrongful purpose can make an otherwise lawful act unlawful.  4 William Blackstone, Commentaries *20–21 ("[T]o make a complete crime cognizable by human laws, there must be both will and an act."); Ohio Stat. § 2901.20 (declaring void any supposed criminal offense without a specified mental culpability).  That is especially

---

[10]Harris Funeral Homes did not seek certiorari on the RFRA question, so our opinion was the final word on that issue.  *See Bostock*, 140 S. Ct. at 1754.

true in the disability context where, for example, businesses' employment decisions may be unlawful when they are made with a discriminatory purpose. *See, e.g.*, *EEOC v. Wal-Mart Stores East LP*, 436 F. Supp. 3d 1190, 1192 (E.D. Wis. 2020) (applying the Americans with Disabilities Act to the firing of a woman with Down syndrome). And the importance of motive can apply to even our most fundamental rights. That is why the Supreme Court has held that even the First Amendment right to freedom of speech, the abridgement of which receives the strictest scrutiny, cannot stand if the speaker abuses that right to defame, incite violence, or commit fraud, among other limitations. *See United States v. Stevens*, 559 U.S. 460, 468–69 (2010). The abortion right is not immune from the principle that motive can, and often does, matter.

## VI.

James Madison explained more than two centuries ago that in the United States "the people, not the government, possess the absolute sovereignty." James Madison, "The Report of 1800," *Founders Online*, National Archives, https://founders.archives.gov/documents/Madison/01-17-02-0202. That is why we must decide these questions based on the text of the Constitution—we do not have the power to adopt, enact, or implement law, or to second guess the People's choices. It is for the People, not the courts, to make the difficult moral decisions that legislation entails.

This case presents one of the most difficult moral questions society faces. As the *Casey* plurality acknowledged, "Men and women of good conscience can disagree, and we suppose some always shall disagree, about the profound moral and spiritual implications of terminating a pregnancy, even in its earliest stage." 505 U.S. at 850. Here, add to that difficulty the weight of making that moral and spiritual choice on the basis of a certain trait the unborn life has. It is a question on which persons have disagreed.

Some, for example, contend that women have an affirmative duty to abort an unborn life with Down syndrome. *See* Bingham, *supra*. Others adopt the view that it should be left to each woman to decide whether a fetal diagnosis of Down syndrome necessitates an abortion. *See* Ruth Marcus, "The Silenced Majority of Women Who Would Abort a Fetus

with Down Syndrome," *The Washington Post* (Mar. 16, 2018), https://www.washingtonpost.com/opinions/the-silenced-majority-of-women-who-would-abort-a-fetus-with-down-syndrome/2018/03/16/6590579e-293d-11e8-874b-d517e912f125_story.html. Still others subscribe to the principle that no decision to terminate unborn life can be justified because of Down syndrome. The people of Ohio chose to enact a modest version of that principle into law by prohibiting doctors' knowing performance of abortions motivated by a Down-syndrome diagnosis.

They had good reasons to do so. Parents, family, and friends of persons with Down syndrome find ample reason to celebrate their differences. To be sure, the condition comes with challenges. But people with Down syndrome still live fulfilling lives. According to one survey, a full 99% of individuals with Down syndrome reported being happy with their lives, and 97% liked who they were. Brian G. Skotko, Susan Levine, & Richard Goldstein, *Self-Perceptions from People with Down Syndrome*, 155 Am. J. Med. Genetics Part A 2360, 2360 (2011). What's more, they enrich the lives of those around them—79% of parents of children with Down syndrome felt that "their outlook on life was more positive because of their child," and 88% of people whose siblings have Down Syndrome felt that they were better people for their sibling's presence in their life. *PPINK*, 888 F.3d at 316 (Manion, J., concurring in part and dissenting in part). The people of Ohio were entitled to enact into law their considered judgment that those with Down syndrome are worth protecting.

The Constitution says nothing about whether a state may enact legislation to protect unborn life with Down syndrome. It leaves to the People—through their elected representatives, not unelected judges—the freedom to provide that protection.

No. 18-3329                 *Preterm-Cleveland v. McCloud*                 Page 53

_____

### CONCURRING IN PART AND IN THE JUDGMENT

_____

KETHLEDGE, Circuit Judge, concurring in part and concurring in the judgment. I choose not to join Part V-B of the court's opinion for two reasons: first, the plaintiffs did not argue the case in terms of "five burdens"; and second, I think the ground covered in Part V-B is covered well enough elsewhere in the opinion. I also choose not to join Part VI of the court's opinion simply because the court is right that Part VI is dictum: under *EMW Women's Surgical Center, P.S.C. v. Friedlander*, 978 F.3d 418, 433 (6th Cir. 2020), the law of our circuit already is that the Chief Justice's opinion from *June Medical Services LLC v. Russo*, 140 S. Ct. 2103 (2020), is the controlling opinion from that case. Thus, every member of the en banc majority agrees that *EMW* sets forth the applicable test here and that H.B. 214 passes it. (Third-order speculation in one of the dissents—to the effect that I think H.B. 214 would be unconstitutional under some other test—is mistaken.) Finally, I respectfully disagree with the Seventh Circuit's decision in *Planned Parenthood of Indiana and Kentucky, Inc. v. Commissioner of Indiana State Department of Health*, 888 F.3d 300 (7th Cir. 2018), simply because the statute there, like the one here, was not a ban on abortion.

––––––––––––––––

## DISSENT

––––––––––––––––

COLE, Chief Judge, dissenting.  H.B. 214 is undoubtedly an abortion restriction.  But the majority insists that the issue is not really about a woman's right to an abortion—reasoning that because the law bans only *knowingly* performing certain abortions, H.B. 214 merely restricts the information and opinions a woman may share with her doctor.  But the majority's attempt to sidestep one constitutional problem only lands it in another.   Judge Donald's dissent demonstrates that the law cannot pass muster as an abortion restriction; I write separately to explain why turning it into a speech restriction does not save it.

It is canonical that the government may not "regulate speech in ways that favor some viewpoints or ideas at the expense of others."  *Matal v. Tam*, 137 S. Ct. 1744, 1757 (2017) (quoting *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993)).  Such laws are presumptively unconstitutional.  *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019).  Yet H.B. 214 (at least as the majority characterizes it) does just that.

The lead opinion begins by redefining Ohio's interest.  It explains that H.B. 214, entitled "Prohibit abortion if unborn has or may have Down Syndrome," "does not prohibit Down-syndrome-selective abortions and might not actually reduce the incidence of such abortions." Instead, the opinion recasts H.B. 214 as an anti-discrimination law, fundamentally concerned with limiting discriminatory conversations about Down-syndrome-selective abortions.  It reasons that the law does not burden a woman's right to an abortion, but simply deters women from sharing their discriminatory goals with their doctors, thereby protecting the Down syndrome community, the medical profession, and even the women themselves.  Requiring women to lie or stay silent about their motivations, the lead opinion explains, "is one of H.B. 214's fundamental objectives."  But this state-interest shell game doesn't get the majority very far.

That's because laws that target discriminatory speech are also unconstitutional.  *See, e.g.*, *Iancu*, 139 S. Ct. at 2299; *Tam*, 137 S. Ct. at 1763; *Lamb's Chapel*, 508 U.S. at 394; *see also Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First

Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.").  Ohio may believe that requesting an abortion due to a fetal diagnosis of Down syndrome is offensive and discriminatory.  But the state may not ban speech for being offensive or even discriminatory.  "Speech that demeans on the basis of race, ethnicity, gender, religion, age, disability, or any other similar ground is hateful; but the proudest boast of our free speech jurisprudence is that we protect the freedom to express 'the thought that we hate.'"  *Tam*, 137 S. Ct. at 1764 (quoting *United States v. Schwimmer*, 279 U.S. 644, 655 (1929)).

In its haste to reconcile the law with a woman's right to an abortion, the majority turns H.B. 214 into a don't ask, don't tell law.  So long as doctors don't ask and women don't tell, the majority reassures us that women remain free to exercise their constitutional rights.  Because states cannot force citizens to trade one constitutional right for another, I respectfully dissent.

––––––––––––––––––

**DISSENT**

––––––––––––––––––

KAREN NELSON MOORE, Circuit Judge, dissenting.  I join the dissents of Judges Cole, Clay, Gibbons, and Donald, and need not say more about *why* the majority is wrong.  I write separately to punctuate *how* the lead opinion's and the concurrences' reasoning is self-devouring and logically untenable.  The majority's questionable elevation of the concurrence in *June Medical Services L. L. C. v. Russo*, — U.S. —, 140 S. Ct. 2103 (2020), and the outcome of this case are buoyed by the manipulation of three superficially neutral concepts:  law of the circuit, dicta, and precedent.  First, the majority warps the law-of-the-circuit doctrine to avoid a conclusion that it believes is wrong—that dictum in a Supreme Court concurrence is precedential.  Second, the lead opinion's own definition of dicta renders nonbinding the majority's choice and application of the *June Medical* concurrence.  Third, a triumvirate of concurrences reveals a view of precedent and history that combined with the majority opinion render any effort to secure the right to an abortion dead on arrival in this court.  Because the majority and the concurring opinions are simply analytically unsustainable assaults on reproductive freedom, I dissent.

## I.

The Supreme Court's and this Circuit's recent abortion decisions need no lengthy overture.  As we deliberated the constitutionality of H.B. 214, Ohio's reason-based abortion ban, the Supreme Court struck down a Louisiana abortion regulation in *June Medical*.  *June Medical* lacks a majority opinion.  The Court's judgment emerged from a four-Justice plurality and a solo concurrence by Chief Justice Roberts.  The *June Medical* plurality restated the Court's determination in *Whole Woman's Health v. Hellerstedt*, — U.S. —, 136 S. Ct. 2292 (2016), that the undue-burden standard from *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), involves balancing an abortion regulation's benefits with the burdens that it imposes on abortion access.  *See June Medical*, 140 S. Ct. at 2112 (plurality opinion).  Chief Justice Roberts, however, stated in dicta that courts should not examine an abortion regulation's

benefits when determining whether the law poses a substantial obstacle to women seeking an abortion. *Id.* at 2139 (Roberts, C.J., concurring). In *EMW Women's Surgical Center*, *P.S.C. v. Friedlander*, 978 F.3d 418 (6th Cir. 2020), a divided panel of this court examined *June Medical*'s fractured opinions. Citing the narrowest-grounds rule from *Marks v. United States*, 430 U.S. 188 (1977), the *EMW* panel majority reasoned that the Chief Justice's concurrence is the narrower of the *June Medical* opinions and should thus control in its entirety. *See EMW*, 978 F.3d at 433.

In this case now before us, the majority provides a block quote from *EMW* (but deleting all quotation marks and citations) that itself restates the *June Medical* concurrence. Batchelder Op. at 14–15 (quoting *EMW*, 978 F.3d at 433–34). The majority concludes without explanation: "[b]ecause the test articulated in *EMW* is the controlling law of our Circuit, we apply it here." *Id.* at 15; *see also* Kethledge Concurring Op. at 53 ("[U]nder *EMW* . . . , the law of our circuit already is that the Chief Justice's opinion from *June Medical* . . . is the controlling opinion from that case."); Bush Concurring Op. at 42 n.3 (acknowledging "*EMW*'s status as the law of our circuit.").

The majority misunderstands the sole reason that it provides for adopting the *June Medical* concurrence. Under the law-of-the-circuit doctrine, a *panel* of this court may not overrule a previous panel's decision unless the Supreme Court issues an intervening decision or our en banc court overrules the previous decision. *See Meeks v. Ill. Cent. Gulf R.R.*, 738 F.2d 748, 751 (6th Cir. 1984); *see also United States v. Johnson*, 413 F. App'x 783, 784 (6th Cir. 2011). We are in an en banc proceeding; we are not controlled by *EMW*, a panel decision. In other words, the majority insinuates that our hands are tied by a panel decision that we can, and should,[1] overrule.

---

[1] The majority's decision that the *June Medical* concurrence controls is wrong for the thoughtful reasons found in Judge Clay's dissents here and in *EMW* and as explained in the Seventh Circuit's recent decision in *Planned Parenthood of Ind. & Ky., Inc. v. Box*, — F.3d —, No. 17-2428, 2021 WL 940125 (7th Cir. Mar. 12, 2021). In short, neither *Marks* nor accepted practice "allow[s] dicta in a non-majority opinion to overrule an otherwise binding precedent." *Id.* at *1. But, again, I focus here not on the merits of the majority's decision, *see* Cole Dissenting Op.; Clay Dissenting Op.; Gibbons Dissenting Op.; Donald Dissenting Op., but on the majority's flawed process.

So why hide the ball and assert that the en banc court is bound by a divided panel in *EMW*?  Or, at least, why not address and adopt *EMW*'s lengthy reasoning in full?  I suspect that the majority wishes to avoid the morass of *Marks*.  The *Marks* rule, admittedly, is as confusing as it is difficult to apply.  *See* Richard M. Re, *Beyond the* Marks *Rule*, 132 HARV. L. REV. 1942, 1976–93 (2019) (explaining four versions of the *Marks* rule).  Judges and academics have spilled ink and felled forests over *Marks* generally and *June Medical* specifically.  *See, e.g.*, *id.* at 1997 (asserting that any interpretation of *Marks* defies "logic, prudence, or tradition"); *United States v. Duvall*, 740 F.3d 604, 604, 607, 618 (D.C. Cir. 2013) (debating which opinion controls in the Court's 4-1-4 decision in *Freeman v. United States*, 564 U.S. 522 (2011)); Marc Spindelman, *Embracing* Casey*:* June Medical Services L.L.C. v. Russo *and the Constitutionality of Reason-Based Abortion Bans*, 109 GEO. L. J. ONLINE 115, 136–38 (2020) (explaining that reason-based abortion bans like H.B. 214 would be held unconstitutional under the *June Medical* concurrence).  The Seventh Circuit recently supplied a lengthy, thoughtful exposition of *Marks* in concluding that the *June Medical* plurality controls.  *See Planned Parenthood of Ind. & Ky., Inc. v. Box*, — F.3d —, No. 17-2428, 2021 WL 940125, at *1 (7th Cir. Mar. 12, 2021).  Here, the majority offers no analysis.  A legal doctrine's complexity does not license abdicating our obligation to clarify complicated subjects, counsel future courts, and comfort readers that fairness guided our decision.  *See* Pierre N. Leval, *Judging Under the Constitution:  Dicta About Dicta*, 81 N.Y.U. L. REV. 1249, 1253 (2006).  We ought not coronate Chief Justice Roberts's concurrence with zero explanation—in an en banc proceeding no less.

The majority's refusal to explain its adoption of the *June Medical* concurrence as binding law cannot be shrugged off as a seemingly misplaced snafu.  Members of this court have repeatedly skirted the law-of-the-circuit doctrine when they are confronted with precedent with which they disagree.  Their rationale?  That they may ignore binding precedent of previous Sixth Circuit panels when it is not "clear that the court considered the issue and consciously reached a conclusion about it."  *Wright v. Spaulding*, 939 F.3d 695, 702 (6th Cir. 2019).  Those who eagerly wielded the conscious-consideration argument to ignore unexplained panel determinations, *see, e.g.*, *id.* at 705, *United States v. Lucido*, 612 F.3d 871, 876 (6th Cir. 2010), should likewise behold that the majority here has "no[t] appli[ed] [] the judicial mind to th[e]

question" of which *June Medical* opinion controls, "so there [i]s no decision about it[,]" *Wright*, 939 F.3d at 704 (internal quotation marks and citation omitted).

But a close read of *EMW* reveals why the majority here will neither consciously consider *Marks*'s application to *June Medical* nor adopt *EMW*'s reasoning.  As the *EMW* majority admitted, the Chief Justice's "general standard for how to apply the undue burden test" in *June Medical* was "well-considered dictum."  *EMW*, 978 F.3d at 436.  So the *June Medical* concurrence's substantial-obstacle test is precedential *only* if we conclude that "well-considered" dicta in a standalone Supreme Court concurrence are binding.  The *EMW* majority acknowledged and admitted as much, concluding that we must "adhere to *both* the *holding* of the narrowest concurring opinion *and* its *well-considered dictum* setting forth a general standard for how to apply the doctrine at issue."  *Id.* (emphases added).  Indeed, the *EMW* majority bolstered its conclusion by highlighting several apparent examples of the Supreme Court's and this court's deeming dicta in Supreme Court majorities and dicta in pluralities and concurrences from fractured Supreme Court decisions to be precedential.  *See id.* at 434–36 (citing *Marks*'s treatment of dicta in the plurality of *Memoirs v. Massachusetts*, 383 U.S. 413 (1966); the *Grutter v. Bollinger*, 288 F.3d 732 (6th Cir. 2002) (en banc), majority's treatment of dicta in Justice Powell's opinion in *Regents of Univ. of California v. Bakke*, 438 U.S. 265 (1978); and the proposition in *ACLU of Ky. v. McCreary County*, 607 F.3d 439 (6th Cir. 2010), that lower courts must follow dicta in a Supreme Court majority opinion).

So how does adopting the Chief Justice's dicta as binding put the majority in a pickle?  The answer:  every member of the majority here has expressed zero interest in adhering to dicta.  *See* Batchelder Op. at 23 ("We recognize that this section is little more than a separate concurrence and, being dicta, creates no controlling law."); Bush Concurring Op. at 43 & n.4 ("'The Supreme Court's dicta are not law' . . . . '[W]hatever utility it may have, dicta cannot bind future courts.'") (citations omitted, alteration in original); Kethledge Concurring Op. at 53 ("I also choose not to join Part VI of the court's opinion [i.e., the lead opinion of Judge Batchelder] simply because the court is right that Part VI is dictum[.]").  But consider what the majority is left with if it followed through with its belief that dicta are not binding.  The majority could adhere only to the Chief Justice's holding—that "[t]he result in [*June Medical*] is

No. 18-3329 *Preterm-Cleveland v. McCloud* Page 60

controlled by our decision four years ago invalidating a nearly identical Texas law"—i.e., *Whole Woman's Health*. *June Medical*, 140 S. Ct. at 2141–42 (Roberts, C.J., concurring). Therefore, "[t]here was no majority [in *June Medical*] to overrule *Whole Woman's Health*[.]" *Box*, 2021 WL 940125, at *8. "[S]o [*Whole Woman's Health*] stands as binding on lower courts unless and until a [Supreme] Court majority overrules it." *Id.*

We finally arrive at why the majority is reticent about *Marks*, *EMW*, and *June Medical*. Concluding that the *June Medical* concurrence controls necessarily enshrines logic that is unfathomable to at least some members of the majority—that dicta in a Supreme Court opinion, a single-Justice concurrence no less, binds this court. The majority has thus backed itself into a corner. Unless the majority concedes that it is bound by dicta in a solo Supreme Court opinion, the majority must conclude that only the *Whole Woman's Health* balancing test can be applied to abortion restrictions. The majority cannot escape its bind with its unconsidered and inapposite invocation of the law-of-the-circuit doctrine.

## II.

The lead opinion's and two of the concurrences' discussions of dicta also expose this decision's disjointed infrastructure. In Part VI, the lead opinion reiterates that the *June Medical* concurrence's undue-burden test controls, but the lead opinion then explains how H.B. 214 also survives two tests derived from *Whole Woman's Health* (as reiterated in the *June Medical* plurality) and *Gonzales v. Carhart*, 550 U.S. 124 (2007). *See* Batchelder Op. at 23–24. The lead opinion confesses, however, that its application of the *June Medical* plurality and *Gonzales* is "dicta" and "creates no controlling law[,]" *id.* at 23, citing Black's Law Dictionary's definition of dictum: "[a] judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential (although it may be considered persuasive)." *Richmond Health Facilities v. Nichols*, 811 F.3d 192, 201 n.8 (6th Cir. 2016) (quoting BLACK'S LAW DICTIONARY (10th ed. 2014)); *see also* Bush Concurring Op. at 42 ("[O]nly *holdings* are binding, not *dicta*. The holding of a case includes only the propositions that are necessarily decided to support the judgment based on the facts of that case. All else is dictum.") (internal quotation marks and citation omitted).

The lead opinion has defined the majority off a cliff.  By insisting that "H.B. 214 would not pose an undue burden under *any test* that the Court could conceivably apply[,]" Batchelder Op. at 23 (emphasis added), the lead opinion freely admits that *the majority did not need to choose* between the *June Medical* concurrence and the *June Medical* plurality.  Helpfully, Judge Bush concedes outright that the "determination" of "the correct formulation of the undue burden standard" "is not necessary to [his] decision here"—logic that likewise extends to the six judges who fully join the lead opinion.  Bush Concurring Op. at 42 n.3.  Because deciding which standard governs a review of H.B. 214 is unnecessary to the majority's outcome, the majority's choosing of the *June Medical* concurrence is not precedential by the lead opinion's own reasoning.  By the lead opinion's logic, a determination that the *June Medical* concurrence controls can be precedential in only one scenario—a majority that concludes that H.B. 214 survives Chief Justice Roberts's undue-burden test *but fails* every other cognizable legal standard.  As the Chief Justice himself put it:  "[I]f it is not necessary to decide more, it is necessary not to decide more[.]"  *BellSouth Telecomms., Inc. v. Farris*, 542 F.3d 499, 505 (6th Cir. 2008) (first alteration in original) (quoting *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment)).

Thus, the lead opinion has paddled the majority into a Scylla-and-Charybdis conundrum, and the majority must now choose what to sacrifice.  Will the majority concede that its elevation of the *June Medical* concurrence is not binding under its own definition of dicta?  Or will the majority rescue Chief Justice Roberts's concurrence by admitting that H.B. 214 would be unconstitutional under the *June Medical* plurality and *Gonzales*?[2]

It appears that the latter is simply not an option for the majority.  At least some of the six judges who joined the lead opinion in full seemingly would never concede that an abortion ban or regulation should be found unconstitutional under any fathomable test—here or in any other abortion case.  The language of the majority and some of the concurrences betrays the elephant in the courtroom:  some members of the judiciary do not believe that the right to abortion should

---

[2]As Judge Clay points out, the majority cannot solve its dicta problem by dropping Part VI from the lead opinion, addressing only the *June Medical* concurrence, or changing their definition of dicta.  Black's Law Dictionary captures everyone's understanding of dicta.  At bottom, the majority's choice of the *June Medical* concurrence is nonbinding because choosing between the *June Medical* opinions is unnecessary to their outcome. *See* Clay Dissenting Op. at 72–76.

exist. *See* Batchelder Op. at 8 ("[T]he 'right' actually implicated or affected here is not the woman's right merely to obtain an abortion."); Bush Concurring Op. at 40, 43, 48–50 (referring to "unborn life"; implying that *Roe v. Wade*, 410 U.S. 113 (1973), was incorrectly decided; and characterizing H.B. 214 as a "ban on eugenic abortion"); Sutton Concurring Op. at 32, 33 (referring to "unborn" and labeling H.B. 214 as an "anti-eugenics law"). Notwithstanding overtures about the "legitimate interests" of state legislatures, Batchelder Op. at 3, 15; "compromise[,]" Sutton Concurring Op. at 32, 35; and the will of "We the People[,]" Bush Concurring Op. at 42, legal standards do not dissuade some judges from giving the states free reign to curtail this fundamental right, *see* Batchelder Op. at 15–18 (arriving at opposite conclusion to that of district court about women's burdens despite clear-error standard of review); Sutton Concurring Op. at 33–35 (conveying that federal courts should not interfere with state legislatures' regulation of abortion).

The refusal of three members of the majority (Judges Kethledge, Larsen, and Nalbandian) to concur in Part VI does not rescue the majority from its dicta problem. Again, the majority's determination that the *June Medical* concurrence controls has binding force only if nine members of this court agree that H.B. 214 is constitutional under the *June Medical* concurrence *alone*. The trio's concurrence makes clear that *no* member of the majority believes that this is the case. *See* Kethledge Concurring Op. at 53 ("I choose not to join Part V-B of the court's opinion for two reasons: first, the plaintiffs did not argue the case in terms of 'five burdens'; and second, I think the ground covered in Part V-B is covered well enough elsewhere in the opinion. I also choose not to join Part VI of the court's opinion simply because the court is right that Part VI is dictum[.]").[3]

Put bluntly, I take no solace in pointing out that the majority has trapped itself in a maze of its own words. Unless all nine members of the majority are willing to admit openly that H.B. 214 would be unconstitutional both under the *June Medical* plurality and under *Gonzales*—and, as we know, they won't—the majority's conclusion that the *June Medical* concurrence controls is not precedential.

---

[3]Of course, Judges Kethledge, Larsen, and Nalbandian have deprived Parts V-B, V-D, and VI of the lead opinion of any majority status.

To sum up why this dicta debacle forces the majority to rely on its novel and erroneous idea that the panel decision in *EMW* controls the en banc court, I turn to a footnote in Judge Bush's concurrence.  Judge Bush writes:  "*EMW* . . . already answered the question that *June Medical* . . . raised about the correct formulation of the undue burden standard.  *That that determination is not necessary to my decision here does not change EMW's status as the law of our circuit.*"  Bush Concurring Op. at 42 n.3 (citation omitted, emphasis added).  Let's break down what this footnote reveals about the majority.  To the majority, dicta are not precedential.  Choosing between the *June Medical* opinions, as Judge Bush concedes, is unnecessary to the majority's outcome and is therefore dicta.  So to adopt *EMW*—which relies on the proposition that Supreme Court dicta are binding—would expose an extraordinary dicta hypocrisy.  Yet the majority desires the *June Medical* concurrence to control.  Why?  Because between the *June Medical* plurality and the *June Medical* concurrence, the concurrence "is the one that would strike down the fewest laws regulating abortion in future cases."  *EMW*, 978 F.3d at 432.  So the majority must find a way to adopt *EMW*'s outcome without embracing *EMW*'s dicta about Chief Justice Roberts's dicta.  The majority's get-out-of-dicta-free card?  The majority affects that *EMW* is the "controlling law of our Circuit" sans explanation.  This way, the majority can surreptitiously shackle us to dicta that conforms to the majority's viewpoint all the while portending that dicta is not binding.

## III.

Not only has this law-of-the-circuit-slash-dicta calamity rendered the majority's *choice* of the *June Medical* concurrence unbinding, but the majority's suspect *application* of Chief Justice Roberts's framework may also lack precedential force.

Judges Kethledge, Larsen, and Nalbandian's checkerboard concurrences demand an overview of the lead opinion's broad strokes.  In Part IV, the majority (incorrectly) concludes that the right to a previability abortion is not absolute and that H.B. 214 does not categorically prevent women from attaining a previable abortion.  *See* Batchelder Op. at 7–12.  Accordingly, the majority reasons, "the question becomes whether the burden that H.B. 214 imposes on this woman's choosing or obtaining the abortion is 'undue[,]'" *id.* at 12 (citation omitted), under the *June Medical* concurrence's substantial-obstacle framework, *id.* at 14–15.  In Part V-B, the lead

opinion explains that Ohio has three "legitimate interests" and "identifie[s] as many as five articulable burdens that, the plaintiffs argue, H.B. 214 will impose on a woman":

> (1) it will prevent her from having a full, open, and honest conversation with the doctor who will perform her abortion by forcing her to withhold this specific reason for the abortion; (2) it may cause, encourage, or influence her to adjust or misrepresent her reason for the abortion; (3) it may cause her to conceal her medical history, if that history contains a pre-natal diagnosis or other significant indicators of fetal Down syndrome; (4) it may necessitate that she engage in "doctor shopping" to find a doctor who is unaware of her reason for having the abortion; and (5) it may cause her to forgo the educational, counseling, or assistance programs offered to women with a Down-syndrome fetus.

*Id.* at 15–16. As Judge Donald explains, Donald Dissenting Op. at 92–94, the lead opinion questionably pooh-poohs as-labelled "burdens" two, three, and five as "add[ing] little to the analysis here," Batchelder Op. at 16. In Part V-C, the majority reiterates that "H.B. 214 is not a ban" and repeats verbatim Ohio's three "legitimate interests." Batchelder Op. at 18. The majority considers whether "*these* burdens"—i.e., so-called "burdens" one and four—"would likely prevent a significant number of women from obtaining an abortion." *Id.* (emphasis added). Citing the *June Medical* concurrence and *EMW*, the majority reasons that the two "burdens" are not undue. *See id.* at 18–20. Although Judges Kethledge, Larsen, and Nalbandian sign onto Part V-C, they do not join Part V-B in part because "the plaintiffs did not argue the case in terms of 'five burdens[.]'" Kethledge Concurring Op. at 53.

The partially concurring trio is correct that Plaintiffs did not argue "five burdens." The lead opinion did *not* pull these five burdens from a "careful review of the plaintiff's briefing[.]" Batchelder Op. at 15. Plaintiffs' in-the-alternative undue-burden argument merely restates their primary argument that H.B. 214 is per se unconstitutional. Plaintiffs argue only that a reason-based abortion prohibition is a substantial obstacle *because* it categorically prohibits abortions of previable fetuses. *See* Appellees' Br. at 28–30; Appellees' Suppl. Br. at 14–15. That's all that Plaintiffs argue.

So where did the lead opinion get these five "burdens" from? Plaintiffs' *supplemental brief* accuses five pages of *Ohio's supplemental brief* of putting forth an "incredible new argument" that maps onto four of the lead opinion's five burdens: "[1] patients can circumvent

the Ban's criminal prohibitions by avoiding open and honest conversations with their medical providers, [2] 'adjusting' their reasons for seeking an abortion, [3] concealing their medical history, and [4] doctor-shopping until they find a provider who is unaware of their reasons for seeking the abortion." Appellees' Suppl. Br. at 2 (citing Appellants' Suppl. Br. at 2–3, 17–18, 24).[4]   Looking closer at Plaintiffs' pincites, however, reveals that Plaintiffs may have exaggerated the extent to which Ohio was arguing that these four "burdens" exist.  *Compare id.* (citing Appellants' Suppl. Br. at 2–3, 17–18, 24), *with* Appellants' Suppl. Br. at 2–3, 17–18, 24. Notably, whiffs of some of these "burdens" emerge in some of the amicus briefs.  *See* Am. College of Obstetricians En Banc Amicus Br. at 3 (explaining how H.B. 214 undermines doctor-patient communication); California Panel Amicus Br. at 9 (same).

        To recap, Plaintiffs did not raise *any* of the five "burdens" that the lead opinion identifies in Part V-B or, consequently, the two of those five "burdens" that the majority assesses in Part V-C.  These "burdens" were distilled from a baffling Preterm-said-Ohio-said situation in the supplemental briefs or, perhaps, from the amici.  Plaintiffs' supplemental brief, moreover, specifically disavowed these exaggerated, unbriefed, new arguments.  Not one of these "burdens" can be characterized as "the plaintiffs' view of [H.B. 214's] burdens" or Plaintiffs' "asserted burdens[.]"  Batchelder Op. at 15, 17.[5]   Indeed, baroque language in the lead opinion implies that the six judges who signed onto Part V-B are aware—but seemingly do not care—

---

[4]Citing the same five pages in Ohio's supplemental brief, Plaintiffs' supplemental brief also attacks Ohio's "newfound assertion that the Ban's 'knowledge' requirement creates a safe harbor for physicians[,]" arguing that the named abortion providers "often learn when part of their patients' reasons for seeking an abortion relates to a Down syndrome diagnosis through the comprehensive patient education and counseling process they provide[.]" Appellees' Suppl. Br. at 7 (citing Appellants' Suppl. Br. 2–3, 17–18, 24).  Yet Plaintiffs do not argue here, or elsewhere, that H.B. 214 causes a woman to "forgo the educational, counseling, or assistance programs offered to women with a Down-syndrome fetus."  Batchelder Op. at 16.

[5]Oddly, the lead opinion does not address the harms to women that Plaintiffs *do* present.  Pointing to record evidence, Plaintiffs' brief argues that women seeking abortions who cannot travel out of state may be forced to carry a pregnancy to term against their will; that women may suffer physical and psychological harm; that women who are able to travel may suffer irreparable harm from unnecessary and harmful delays, that delayed medical treatment may cause pain and complications.  *See* Appellees' Br. at 40–41.  Plaintiffs set forth these harms in their argument that the named abortion providers will suffer irreparable harm in the absence of a preliminary injunction—an argument that is distinct from Plaintiffs' substantial-obstacle argument.  *See id.*  Indeed, the district court referred to these impositions in its irreparable-injury analysis.  *See Preterm-Cleveland v. Himes*, 294 F. Supp. 3d 746, 756 (S.D. Ohio 2018)).  Of course, the majority evaluates only the likelihood of Plaintiffs' success on the merits and not whether Plaintiffs will suffer irreparable injury from H.B. 214.  *See* Batchelder Op. at 7.  I merely point out that the majority ignores the only harms in Plaintiffs' filings that *could* be portrayed as "burdens" a la *Casey*.

that these straw-man "burdens" were not cultivated from the record.  *See* Batchelder Op. at 16 ("While the plaintiffs might not have been so explicit or precise in proffering each of these burdens—and they certainly did not enumerate these burdens in this way—neither were they vague or unclear in presenting the substance of their claims.").  The irony of the lead opinion's putting words into these abortion providers' mouths is not lost on me.  *Cf.* Cole Dissenting Op. at 54–55 (explaining how the majority has "turn[ed] [H.B. 214] into a speech restriction" and a "don't ask, don't tell law").

The lead opinion's misattribution of these "burdens" to Plaintiffs kneecaps the only leg that the majority has left to stand on.  How?  Let's return to Part V-C.  Part V-C contains the majority's application of the *June Medical* concurrence to so-labelled "burdens" one and four.  And, remember, that Part V-C is the only analysis of whether H.B. 214 is a substantial obstacle that all nine judges in the majority sign onto.  *See* Kethledge Concurring Op. at 53 (refusing to concur with Parts V-B, V-D, and VI).  So the majority's *June Medical* concurrence substantial-obstacle analysis boils down to this:  Plaintiffs have not shown that two "burdens" that Plaintiffs never raised are in fact burdens.  *See* Batchelder Op. at 18–20.[6]  Why is this a problem for the majority?  Because the majority did not have to invent *any* "burdens" to resolve this case.  The majority only *needed* to address the *one* undue-burden argument that Plaintiffs put forward—

> the "categorical" rule barring bans on abortion previability and the undue burden test are simply two ways of stating the same principle:  that any ban on previability abortions will always function as a complete and total obstacle to the affected women's ability to make the "ultimate decision" whether to terminate a pregnancy, and prior to viability no state interest is strong enough to support that ban.

Appellees' Br. at 30.  So the majority should have ended its analysis with Part IV—the majority's determination that H.B. 214 is not a ban.  That conclusion was enough to rule that Plaintiffs are unlikely to succeed on the merits of their claim.  Part V-C's application of the *June Medical* concurrence was totally unnecessary to the majority's determination that H.B. 214 is not a ban.  Part V-C is therefore dicta.

---

[6]Indeed, as Judge Kethledge hints, these made-up "burdens" plague the lead opinion from top-to-bottom, including the lead opinion's dicta about the *June Medical* plurality and *Gonzales*.  *See* Batchelder Op. at 24–25, 27–28 (applying *June Medical* plurality and applying *Gonzales* to "burdens" one and four); Kethledge Concurring Op. at 53 ("I think the ground covered in Part V-B is covered well enough elsewhere in the opinion.").

### IV.

I turn now from the logically untenable reasoning of the majority to a troubling revision of history found in a different trio of concurrences.

Judges Sutton and Bush protest that we should completely ignore the *Roe* and *Casey* line of cases because the Supreme Court has "never considered" a reason-based abortion ban. Sutton Concurring Op. at 32; *see also* Bush Concurring Op. at 44–46. Even if the Supreme Court has yet to rule on a law like H.B. 214, we are still well equipped to answer questions of constitutional law that implicate both substantive due process and equal protection—in abortion cases or otherwise. Insisting that we must ignore over a century of Fourteenth Amendment jurisprudence because H.B. 214 is a "problem[] [the Justices] have not faced[,]" Sutton Concurring Op. at 32 (citation omitted), lacks the "basic humility that recognizes today's legal issues are often not so different from the questions of yesterday and that we are not the first ones to try to answer them[,]" *June Medical*, 140 S. Ct. at 2134 (Roberts, C.J., concurring); *see also Quill Corp. v. N. Dakota By & Through Heitkamp*, 504 U.S. 298, 320–21 (1992) (Scalia, J., concurring in part) ("It seems to me important that we retain our ability—and, what comes to the same thing, that we maintain public confidence in our ability—sometimes to adopt new principles for the resolution of new issues without abandoning clear holdings of the past that those principles contradict.") (citation omitted).

This argument taken to its logical conclusion would put the federal courts out of business. Grafting legal principles to novel scenarios is the bread and butter of the American courts. And the courts have not shied away from cases in which multiple lines of constitutional case law collide. *See, e.g.*, *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972) (balancing states' interest in universal compulsory education against persons' right freely to exercise their religion); *Plyler v. Doe*, 457 U.S. 202, 220 (1982) (blending equal-protection and substantive-due-process principles to guarantee free public education to undocumented children); *Obergefell v. Hodges*, 576 U.S. 644, 675 (2015) ("[T]he right to marry is a fundamental right inherent in the liberty of the person, and under the Due Process and Equal Protection Clauses of the Fourteenth Amendment couples of the same-sex may not be deprived of that right and that liberty.").

No. 18-3329 *Preterm-Cleveland v. McCloud* Page 68

The revision of the Court's Fourteenth Amendment jurisprudence proposed by these dual concurrences is a Trojan Horse assault on stare decisis and, ergo, *Roe*. *Compare* Randy E. Barnett, *Trumping Precedent with Original Meaning: Not as Radical As It Sounds* 2–3 (Boston Univ. Sch. of L. Working Paper Series, Working Paper No. 05-08, 2005) (advocating for courts to reject and replace "mistake[s] [] entrenched by the doctrine of precedent" with the Constitution's "original public meaning"), *with* Bush Concurring Op. at 43 (same). The two concurrences rely on the absence of an on-point case about reason-based abortion bans so that they may avoid the one lodestar that has burned brightly for nearly forty years: under *Roe*, banning the abortion of a previable fetus is unconstitutional. *See* Donald Dissenting Op. at 83. Applying *Roe* to H.B. 214—an abortion ban—is straightforward. H.B. 214 bans a subset of women from aborting previable fetuses, so the law is unconstitutional. *See id.* at 84–92. Indeed, "I do not find this case difficult as a matter of federal constitutional law." Sutton Concurring Op. at 32.

It is ironic that the majority erases *Whole Woman's Health*, and the concurrences bemoan the apparent dearth of relevant precedent, while ignoring the Chief Justice's full-throated endorsement of stare decisis in *June Medical*. *Cf.* 140 S. Ct. at 2139 (Roberts, C.J., concurring) ("Under principles of *stare decisis*, I agree with the plurality that the determination in *Whole Woman's Health* that Texas's law imposed a substantial obstacle requires the same determination about Louisiana's law."). By "sugarcoating today's opinion" these two concurrences distract from how "[t]he majority overthrows a decision entrenched in this Nation's law . . . for over 40 years." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, — U.S. —, 138 S. Ct. 2448, 2501 (2018) (Kagan, J., dissenting). Nor can I overlook that Judge Bush proclaims that he need not follow Supreme Court dicta while elevating sundry dicta from solo concurrences and dissents in his own solo concurrence, which supplies a questionable originalist interpretation of the Constitution that forms *no* basis of the majority's holding. *See* Bush Concurring Op. at 44–48. Judge Bush dissolves a Supreme Court majority—*Whole Woman's Health*—to magnify an extremist view of the law found only in his solitary concurrence or in other single-judge opinions. Judge Bush's unsound approach to dicta and precedent advances the views of the few over the precedent of the many.

Judges Griffin's and Sutton's concurrences, moreover, demonstrate why one should be skeptical of judges as historians.  I need not repeat the thoughtful responses in the dissents of Judges Gibbons and Donald; it is perverse and deplorable to compare a woman's decision to seek an abortion to the Holocaust and forced sterilization, and mainstream historians have widely discredited Judge Griffin's erroneous recount of history.  Instead, I emphasize that judges should refrain from relying on unfounded historical commentaries.  Judge Griffin's "history" is just an opinion about opinions.  He fails to cite even *one* primary source—the scarlet letter of the dilettante historian.  *See* Tomiko Brown-Nagin, Linda Gordon & Kenneth W. Mack, *Historians in Court: A Roundtable*, THE AMERICAN HISTORIAN (last visited Mar. 18, 2021) (explaining how some judges eschew nuanced primary-source evidence for ideologically tinted briefs by "experts" that provide "unambiguous support for [judges'] positions" and "prior beliefs"); Stephen Whinston, *Can Lawyers and Judges Be Good Historians?:  A Critical Examination of the Siemens Slave-Labor Cases*, 20 BERKELEY J. INT'L L. 160, 174–75 (2002) ("A court simply cannot draw accurate conclusions about historical events without going to source materials. . . . And, when judges put pen to paper on historical subjects such as the Holocaust, they should write like historians, with full citation to historical sources.  Absent this type of analysis, a judge runs the risk not only of getting it wrong and thereby doing a disservice to the litigants, but also to the broader popular understanding of historical events.").  An overly simplified and grossly inaccurate depiction of this nation's reproductive freedom and eugenics movements should remind us that "the facts of history never come to us 'pure', since they do not and cannot exist in a pure form:  they are always refracted through the mind of the recorder."  E. H. CARR, WHAT IS HISTORY? 22 (2d ed. 1987).

Judge Sutton's too-tidy history of "compromise" should be read with a similarly skeptical eye.  Essentially, Judge Sutton's concurrence is an ode to states' rights.  He urges "the federal courts [to] leave an issue of abortion policy to local decision-making" in order to "create the possibility for compromise at the local level."  Sutton Concurring Op. at 33–34.  Citing two Columbus Dispatch articles from that year, Judge Sutton highlights an asserted "compromise" in "the spring and summer of 1965" between birth-control supporters and religious groups that he says resulted in the Ohio General Assembly's repealing the state's bans on the use of

contraception by unmarried couples and the public transportation of school children to religious schools. *Id.* at 34.[7]

H.B. 214 was no "compromise." The eighty-four legislators who voted for H.B. 214 also voted, with a handful of exceptions, for all twelve bills that restrict access to abortion from the Ohio General Assembly's previous two legislative sessions. *See* Certain Ohio State Representatives Panel Amicus Br. at 3–4. Yet Ohio has failed to support persons with Down syndrome who require affordable medical treatment; has not improved the state's developmental-disabilities waiver program; and does not adequately fund physical, occupational, and speech therapy. *See id.* at 13–14. Ohioans did not "end[] up with a little give and a little take" with H.B. 214, Sutton Concurring Op. at 34—this abortion ban took only from women and their abortion providers and gave only to the antiabortion wing of Ohio's General Assembly. Judge Sutton's demand that we leave the regulation of fundamental rights to local politics belies the history of Ohio's abortion laws and, more generally, the long history of state legislatures eroding civil rights and liberties in this country. It is simply wrong to ask marginalized persons to "compromise" their fundamental rights.

Judge Sutton also minimizes the effect of a blockbuster Supreme Court decision that was issued earlier in the summer of 1965—*Griswold v. Connecticut*, 381 U.S. 479 (1965). On June 7, 1965, the *Griswold* Court held that the Constitution guarantees the right of married couples to buy and use contraception without government interference. *See id.* at 485–86. Surely the Supreme Court's decision played *some* role in the Ohio Senate's voting to repeal the state's married- *and* unmarried-couples contraceptives ban on June 23, 1965—just *sixteen days* after *Griswold* was issued. *See Steinberg v. Brown*, 321 F. Supp. 741, 755 (N.D. Ohio 1970) (three-judge district court) (Green, J., dissenting) ("Subsequent to the *Griswold* ruling each of [Ohio's 'Offenses Against Chastity'] statutes was amended to delete the reference to contraceptive practices."); Steven M. Spencer, *The Birth Control Revolution*, THE SATURDAY EVENING POST (Jan. 15, 1966) ("Within days after the Supreme Court decision [in *Griswold*] the New York

---

[7]However, a review of relevant articles from the Columbus Dispatch shows no linkage between the repeals of the ban on contraceptives and the ban on religious-school busing. *See* Howard Thompson, *Birth Control Bill is Passed in Legislature*, COLUMBUS DISPATCH 7A (June 24, 1965); *Birth Control Measure Nearing Final Hurdle*, COLUMBUS DISPATCH 16 (May 11, 1965); Ned Stout, *Bill Would Legalize Birth Control Advice*, COLUMBUS DISPATCH 16B (Mar. 24, 1965). The assertion of such a linkage is total speculation.

legislature modified its 84-year-old 'Comstock law' to remove all restrictions on the dissemination of birth-control information and to permit sale of contraceptives to everyone over the age of 16. . . . *Ohio* and Minnesota joined New York in clearing away restrictions from their statutes.") (emphasis added).  To buoy a states-centric worldview, Judge Sutton erases the role of the federal courts as the stalwart guarantor of individuals' fundamental rights and liberties.

By positing that the Supreme Court's failure to address a law like H.B. 214 forces federal courts to bow to the states, two judges divert attention from the majority's violation of *Roe* and *Casey*.  Convincing the reader that a genocide is at bay and reframing this case as an issue of states' rights renders more palatable to some H.B. 214's suppression of women's ability to speak freely to their abortion providers.  The concurrences' alt-history rejection of precedent should fool no one:  stare decisis, *Roe*, and historical verity are at risk here.

## V.

Sadly, this is not the first time that our courts have contorted the Fourteenth and First Amendments to accommodate the anti-abortion movement at the expense of doctors' and women's ability to speak freely.  *See* Cole Dissenting Op. at 54–55; *see, e.g.*, *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 432 (6th Cir. 2019) (upholding mandatory-ultrasound law disclosure requirements over First Amendment challenges); *compare Harris v. McRae*, 448 U.S. 297, 326 (1980) (holding that the Hyde Amendment does not violate the First Amendment), *with Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, — U.S. —, 138 S. Ct. 2361, 2377 (2018) (concluding that a crisis pregnancy center notice requirement violates the First Amendment).  For now, I write only to highlight the transparent takeaway that emerges from our review of H.B. 214.  Three supposedly unbiased doctrines—the law of the circuit, dicta, and precedent—operate as "one-way ratchet[s]" when it comes to abortion.  *See Kennedy v. Louisiana*, 554 U.S. 407, 469 (2008) (Alito, J., dissenting).

For these reasons and the reasons expressed by Judges Cole, Clay, Gibbons, and Donald, I dissent.

No. 18-3329                    *Preterm-Cleveland v. McCloud*                    Page 72

_____

**DISSENT**

_____

CLAY, Circuit Judge, dissenting.  I concur in Chief Judge Cole, Judge Moore, Judge Gibbons, and Judge Donald's dissenting opinions, finding them correct and insightful in all respects.  I write separately, however, because, repeating the same mistake this Court made in dicta in *EMW Women's Surgical Center, P.S.C. v. Friedlander*, 978 F.3d 418 (6th Cir. 2020), the majority purports to overrule the Supreme Court's binding opinion in *Whole Woman's Health v. Hellerstedt*, — U.S. —, 136 S. Ct. 2292 (2016).  Because this mistake has enormous and terrible ramifications for the constitutional right to an abortion in our Circuit, I write to reiterate some of the points made in my *EMW* dissent.

## I.

In *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), the Supreme Court held that an abortion restriction violates the Due Process Clause if it places an "undue burden" on a woman's right to choose to terminate her pregnancy.  *Id.* at 878 (plurality opinion).  In *Whole Woman's Health*, the Supreme Court held that in deciding whether a law or regulation presents an undue burden on a person's right to have an abortion, "[t]he rule announced in *Casey* . . . requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer."  136 S. Ct. at 2309 (citing *Casey*, 505 U.S. at 887–898 (opinion of the Court); *id.* at 899–901 (plurality opinion)).  Less than a year ago, in *June Medical Services L.L.C. v. Russo*, — U.S. —, 140 S. Ct. 2103 (2020), a four Justice plurality of the Supreme Court reaffirmed that "courts must 'consider the burdens a law imposes on abortion access together with the benefits those laws confer.'"  *Id.* at 2120 (quoting *Whole Woman's Health*, 136 S. Ct. at 2324).

Although Chief Justice Roberts believed that *Whole Woman's Health* "was wrongly decided," he recognized that "the question in" *June Medical Services* was "not whether *Whole Woman's Health* was right or wrong, but whether to adhere to it in deciding the present case."  *Id.* at 2133 (Roberts, C.J., concurring).  Because the law at issue in *June Medical Services*

"impose[d] a burden on access to abortion just as severe as that imposed by the" law at issue in *Whole Woman's Health*, recognizing that the "legal doctrine of *stare decisis* requires us, absent special circumstances, to treat like cases alike," Chief Justice Roberts concurred in the judgment of the *June Medical Services* plurality.  *Id.* at 2134 (Roberts, C.J., concurring).

*Stare decisis* and the likeness between *Whole Woman's Health* and *June Medical Services* was the entire basis for the Chief Justice's concurrence.  *See id.* at 2141–42 (Roberts, C.J., concurring).  To be sure, Chief Justice Roberts also critiqued *Whole Woman's Health*.  *See id.* at 2135–39 (Roberts, C.J., concurring).  He disparaged *Whole Woman's Health*'s balancing test as unmoored from *Casey* and explained that, in his opinion, the benefits of laws are only relevant "in considering the threshold requirement that the State have a 'legitimate purpose' and that the law be 'reasonably related to that goal,'" and "[s]o long as that showing is made, the only question for a court is whether a law has the 'effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus.'"  *Id.* at 2138 (Roberts, C.J., concurring) (quoting *Casey*, 505 U.S. at 877–78 (plurality opinion); *id.* at 882 (joint opinion)).  Considering that he "joined the dissent in *Whole Woman's Health*" and explained in his *June Medical Services* concurrence that he "continue[d] to believe that the case was wrongly decided," this dicta was unsurprising.  *Id.* at 2133 (Roberts, C.J., concurring).

And dicta it was.  Chief Justice Roberts' critique of *Whole Woman's Health* did nothing "to contribute to the judgment."  *Wright v. Spaulding*, 939 F.3d 695, 701 (6th Cir. 2019).  Chief Justice Roberts' only contribution to the judgment in *June Medical Services* was his discussion of *stare decisis*.  In fact, had Chief Justice Roberts' critique of *Whole Woman's Health* been a holding, he would have dissented in *June Medical Services*.  After all, he dissented in *Whole Woman's Health* and explained that *June Medical Services* presented a "nearly identical" case.  *June Med. Servs.*, 140 S. Ct. at 2133, 2139, 2142 (Roberts, C.J., concurring).  Therefore, in addition to explicitly stating that "the question" in *June Medical Services* was "not whether *Whole Woman's Health* was right or wrong," *id.* at 2133 (Roberts, C.J., concurring); *see also Wright*, 939 F.3d at 702 (explaining that a holding requires the court to have "consciously reached a conclusion about" the issue), the fact that the Chief Justice concurred in the *June*

*Medical Services* judgment undisputedly establishes that his critique of *Whole Woman's Health* was pure dicta.

Nonetheless, in *EMW*, the panel majority interpreted the dicta in Chief Justice Roberts' *June Medical Services* concurrence in a way that the Chief Justice explicitly foreclosed: to overrule *Whole Woman's Health*'s balancing test. *See* 978 F.3d at 431–437. The basis for the *EMW* panel majority's erroneous decision was the Supreme Court's decision in *Marks v. United States*, 430 U.S. 188 (1977), which explained that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds.'" *Id.* at 193 (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976) (plurality opinion)). The *EMW* panel majority took the position that Chief Justice Roberts' concurrence in *June Medical Services* was narrower than the plurality opinion, and that his entire concurrence—including dicta—constitutes a controlling Supreme Court opinion.

However, there are a number of problems with *EMW*'s conclusion. First, *Marks* only applies when there is "no single rationale explaining the result [that] enjoys the assent of five Justices." *Id.* In *June Medical Services*, the plurality's rationale was that "[t]his case is similar to, nearly identical with, *Whole Woman's Health*. And the law must consequently reach a similar conclusion." *June Med. Servs.*, 140 S. Ct. at 2133. As explained above, the explicit rationale for Chief Justice Roberts' concurrence was: "*Stare decisis* instructs us to treat like cases alike. The result in this case is controlled by our decision four years ago [in *Whole Woman's Health*] invalidating a nearly identical Texas law." *Id.* at 2141–42 (Roberts, C.J., concurring). Therefore, because both the plurality and the Chief Justice's concurrence were based on the rationale that the result in *June Medical Services* was compelled by its similarity to *Whole Woman's Health*, the *Marks* rule is inapplicable.

Second, even assuming that *Marks* applies to *June Medical Services*, and that Chief Justice Roberts' concurrence was narrower than the plurality opinion, *but see United States v. Cundiff*, 555 F.3d 200, 209 (6th Cir. 2009) (explaining that the "'narrowest' opinion refers to . . . the concurring opinion that offers the least change to the law." (citations omitted)), dicta in the narrowest opinion by a single Supreme Court Justice are not binding precedent under *Marks*,

*see Planned Parenthood of Indiana & Kentucky, Inc. v. Box*, — F.3d —, No. 17-2428, 2021 WL 940125, at *1 (7th Cir. Mar. 12, 2021) (explaining that *Marks* "does not allow dicta in a non-majority opinion to overrule an otherwise binding precedent.").

In United *States v. Santos*, 553 U.S. 507 (2008), for example, Justice Scalia, writing for a four Justice plurality, explained that because Justice Stevens' concurring "opinion rests upon the narrower ground, the Court's holding is limited accordingly." *Id.* at 523 (citing *Marks*, 430 U.S. at 193). Justice Scalia, however, also explained that the controlling effect of Justice Stevens' opinion was limited to the "narrowness of his ground." *Id.* The "speculations" in the remainder of Justice Stevens' concurrence, according to Justice Scalia, "are the purest of dicta, and form no part of today's holding." *Id.* If Justice Stevens' dicta in the narrowest opinion concurring in the *Santos* judgment were not controlling, then Chief Justice Roberts' dicta in *June Medical Services*—dicta in conflict with binding Supreme Court precedent—cannot be considered controlling. As a plurality of the Supreme Court recently explained, "a single Justice writing only for himself" does not have "the authority to bind this Court to propositions it has already rejected." *Ramos v. Louisiana*, — U.S. —, 140 S. Ct. 1390, 1402 (2020).[1]

---

[1]In *EMW*, the panel majority mistakenly relied on our decision in *Grutter v. Bollinger*, 288 F.3d 732 (6th Cir. 2002), for the proposition that, under *Marks*, dicta in a Supreme Court concurring opinion are binding. *See* 978 F.3d at 435–36. However, prior to that mistaken approach taken in *EMW*, we had only held that dicta in a Supreme Court *majority opinion* are binding on this Court. *See ACLU of Ky. v. McCreary County*, 607 F.3d 439, 447–48 (6th Cir. 2010). As I explained in my *EMW* dissent, in *Grutter*, we only treated dicta from a Supreme Court concurring opinion as "persuasive authority." 978 F.3d at 457 (Clay, J., dissenting) (quoting *Grutter*, 288 F.3d at 746 n.9). Tellingly, although Judge Bush states that *EMW* is "the law of our circuit," he also rejects even the proposition that dicta in a Supreme Court majority opinion are binding. *See* Bush Concurring Op. at 3 n.3, 4 ("The Supreme Court's dicta are not law. The issues so addressed remain unadjudicated. When an inferior court has such an issue before it, it may not treat the Supreme Court's dictum as dispositive." (quoting Pierre Leval, *Judging Under the Constitution: Dicta About Dicta*, 81 N.Y.U. L. Rev. 1249, 1274 (2006))). And he even agrees with my *EMW* dissent that the *EMW* panel majority incorrectly interpreted *Grutter* to hold that dicta in a Supreme Court concurring opinion are binding. *Compare* Bush Dissenting Op. at 4 n.4 (correctly noting that in *Grutter* we only treated dicta from a Supreme Court concurring opinion as "persuasive authority."), *with EMW*, 978 F.3d at 457 (Clay, J., dissenting) ("*Grutter*, therefore, merely stands for the unremarkable proposition that, in the absence of controlling Supreme Court precedent, we may decide to adopt persuasive dicta from a Justice's concurrence."). As explained above, Chief Justice Roberts' critique of *Whole Woman's Health* was dicta. *See also EMW*, 978 F.3d at 436 (labeling this part of the Chief Justice's concurrence "well-considered dicta"); Bush Concurring Op. at 3 ("The holding of a case includes only the propositions that are necessarily decided to support the judgment based on the facts of that case." (citing *Wright*, 939 F.3d at 701)). Accordingly, Judge Bush's concurrence is logically incoherent. The only explanation for adopting *EMW* even while rejecting the reasoning underpinning *EMW* is that the concurrence's reasoning consists of a subterfuge with a single goal: vitiating the constitutional right to an abortion. *See generally* Moore Dissenting Op.

Third, as explained above, Chief Justice Roberts expressly disavowed the idea that his concurrence called *Whole Woman's Health* into question. *See June Med. Servs.*, 140 S. Ct. at 2133 (Roberts, C.J., concurring). It is a novel and unsupported proposition, indeed, that dicta in a Justice's solo concurrence can overturn binding Supreme Court precedent against the Justice's express contrary declaration.

Finally, the proposition that, under *Marks*, dicta in a single Justice's opinion constitutes binding precedent could lead to ludicrous results. As a plurality of the Supreme Court explained in *Ramos*, "[e]very occasion on which the [Supreme] Court is evenly split would present an opportunity for single Justices to overturn precedent to bind future majorities." 140 S. Ct. at 1403. As my dissenting opinion in *EMW* explained, under the *EMW* panel majority's approach to *Marks*, in his concurring opinion in *Santos*, Justice Stevens could have established the unconstitutionality of the death penalty by including his then-recently announced belief that the death penalty was unconstitutional. *See Baze v. Rees*, 553 U.S. 35, 86 (2008) (Stevens, J., concurring). Just as the death penalty would not have been rendered unconstitutional in my hypothetical, the dicta in Chief Justice Roberts' concurring opinion in *June Medical Services* did not overturn the binding precedent from *Whole Woman's Health*.

*Whole Woman's Health* is binding Supreme Court precedent. Contrary to the panel majority's opinion in *EMW*, Supreme Court precedent dictates that in deciding whether a law or regulation constitutes an undue burden, courts must "consider the burdens a law imposes on abortion access together with the benefits those laws confer.'" *Whole Woman's Health*, 136 S. Ct. at 2309; *accord June Med. Servs.*, 140 S. Ct. at 2120 (plurality opinion). This case presents the en banc Court with the opportunity to correct the mistaken approach taken in *EMW*. By simply stating that "the test articulated in *EMW* is the controlling law of our Circuit," and that Chief Justice Roberts' entire concurrence in *June Medical Services* is "governing law," the majority shirks its duty to conform this Circuit's law to that of the Supreme Court. Maj. Op. at 14–15; Lead Op. at 24.

## II.

Moreover, it is not so certain that "the test articulated in *EMW* is the controlling law of our Circuit." *Id.* at 15. As this Court recently explained, the "precedential value of *EMW*" is unclear because its conclusion that Chief Justice Roberts' dicta in *June Medical Services* is controlling might itself be dicta.[2] *Bristol Reg'l Women's Ctr., P.C. v. Slatery*, 988 F.3d 329, 337 (6th Cir. 2021); *see also EMW*, 978 F.3d at 454 n.2 (Clay, J., dissenting). And as the lead opinion explains, our dicta "creates no controlling law." Lead Op. at 23 (citing *Richmond Health Facilities v. Nichols*, 811 F.3d 192, 201 n.8 (6th Cir. 2016)).

"Where a panel of this court is faced with two different standards for addressing a particular issue, but choosing between them would not change the outcome of the case due to the nature of the underlying facts, the panel's choice between the two standards is dicta because it is not 'necessary to the determination of the issue on appeal.'" *Bristol*, 988 F.3d at 337 (quoting *United States v. Hardin*, 539 F.3d 404, 410–11, 413 (6th Cir. 2008)); *see also* Lead Op. at 23–24; Moore Dissenting Op. at 5–8. As I explained in dissent in *EMW*, the panel majority held that the plaintiff abortion facilities failed to show that the laws at issue "would cause them to be unable to provide abortions," the single burden asserted by the plaintiffs. *EMW*, 978 F.3d at 454 n.2 (Clay, J., dissenting); *see also id.* at 443. I further explained that "[i]f this was true, the requirement would not impose either a burden or an obstacle, and therefore would equally fail under the *Whole Woman's Health* balancing test." *Id.* (Clay, J., dissenting).

Under any conception of the undue burden standard—including *Casey*, *Whole Woman's Health*, and the dicta in Chief Justice Roberts' concurring opinion in *June Medical Services*—a law that does not place a burden on abortion access is constitutional. Therefore, in light of the *EMW* panel majority's determination that the plaintiffs failed to prove that the laws at issue burdened abortion access as alleged, the choice between standards made no difference to the outcome of the case. Accordingly, the *EMW* panel majority's adoption of the dicta in

---

[2]In a "decision [that] lacks a principled basis and tarnishes this court's reputation for impartiality and independence," because *Bristol* "fell to the wrong panel" and "concerns abortions," a majority of this Court recently "upend[ed] standard practice" and granted *initial* hearing of *Bristol* en banc. *Bristol Reg'l Women's Ctr., P.C. v. Slatery*, — F.3d —, No. 20-6267, 2021 WL 1326826, at *1, 2, 3 (6th Cir. Apr. 9, 2021) (Moore, J., dissenting from the grant of initial hearing en banc).

Chief Justice Roberts' concurring opinion in *June Medical Services* was itself dicta and does not constitute the law of our Circuit. *See Wright*, 939 F.3d at 700.

\*\*\*

     Hiding in the shadows of this case is the fact that a majority of this Court believes that there is no constitutional right to abortion access. But the Supreme Court has repeatedly and unequivocally affirmed that a woman has a constitutional right to an abortion. *See*, *e.g.*, *Roe v. Wade*, 410 U.S. 113, 154 (1973); *Casey*, 505 U.S. at 871 (plurality opinion); *Whole Woman's Health*, 136 S. Ct. at 2309; *June Med. Servs.*, 140 S. Ct. at 2120 (plurality opinion); *id.* at 2135 (Roberts, C.J., concurring). And it is the Supreme Court's "prerogative alone to overrule one of its precedents." *Bosse v. Oklahoma*, — U.S. —, 137 S. Ct. 1, 2 (2016) (quoting *United States v. Hatter*, 532 U.S. 557, 567 (2001)). No matter how strongly members of this Court feel that the Supreme Court's precedent on reproductive freedom is wrong, as lower court judges, we have no authority to contradict binding Supreme Court precedent.

     In its haste to eviscerate the constitutional right to an abortion, the *EMW* panel majority mistakenly concluded, against Chief Justice Roberts' express statements, that dicta from his solo concurring opinion in *June Medical Services* overruled binding Supreme Court precedent. Even though that conclusion was both wrong and dicta, the en banc majority's similar mission leads it to adopt, without discussion, and without the benefit of briefings from the parties, this same erroneous conclusion.[3] It is unfortunate that reproductive freedom is such a contested issue. But no matter how contested a woman's right to bodily autonomy is, there is no dispute that we are required to apply binding Supreme Court precedent. *Whole Women's Health* is precedent that this Court is bound to apply, and, for the reasons explained in Judge Donald's dissenting opinion, there is a substantial likelihood that H.B. 214 (in addition to being an unconstitutional pre-viability abortion ban) is unconstitutional under this precedent.

     I therefore dissent.

---

    [3]Beyond brief Rule 28(j) letters, neither the parties in *EMW* nor in this case have had the opportunity to present argument on the correct articulation of the undue burden standard post-*June Medical Services*.

————————————

**DISSENT**

————————————

JULIA SMITH GIBBONS, Circuit Judge, dissenting. I write separately to respond to Judge Griffin's concurring opinion. In his view, women who terminate their pregnancies due to a Down syndrome diagnosis and the doctors who care for them are modern-day eugenicists. This is an inapt comparison, one that ignores the many complex and very personal reasons that might lead a woman to seek an abortion.

But the American eugenics movement does share a goal of the majority view in this case: both seek to control a woman's reproductive decisions. Relying heavily on theories concocted by a nineteenth-century sociologist who suggested that promiscuous women augmented delinquency in society, eugenicists focused their sterilization efforts on women who bore children out of wedlock. Alfred L. Brophy & Elizabeth Troutman, *The Eugenics Movement in North Carolina*, 94 N.C. L. Rev. 1871, 1879 (2016); R. L. Dugdale, *"The Jukes" A Study in Crime, Pauperism, Disease, and Heredity* 18 (1877). Eugenicists called these women a "social evil" whose children were "handicapped in life" with minimized "chances of normal development." George Dearborn, *Book Review*, 13 J. of Abnormal Psych. 2, 135 (1918) (reviewing P. G. Kammerer, *The Unmarried Mother: A Study of Five Hundred Cases* (1918)). Eugenic campaigns also frequently targeted poor women because crowded living conditions were considered "fatal to habits of chastity." Dugdale, *supra*, at 13. State social workers sought sterilizations for women because the women were, variously, "determined to be promiscuous," a "sex problem" at school, "oversexed," and made "no effort to curb [their] sexual desires." Johanna Schoen, *Reassessing Eugenic Sterilization: The Case of North Carolina, in A Century of Eugenics in America* 152 (Paul A. Lombardo ed., 2011).

States facilitated sterilization through institutionalization, and the "defects" that could lead to imprisonment in a state facility included "sexual promiscuity," "syphilis," and "gonorrhea." R. Eugene Brown, *Eugenical Sterilization in North Carolina: Purpose, Statutory Provisions, Forms and Procedure* 31 (1938). Dr. Albert Priddy, the superintendent of the

Virginia Colony for Epileptics and Feebleminded who helped pass the state's sterilization law, believed that sterilization was the "only solution" for women whose "'sexual immorality' . . . rendered them 'wholly unfit for exercising the right of motherhood.'" Paul A. Lombardo, *Three Generations, No Imbeciles: New Light on* Buck v. Bell, 60 N.Y.U. L. Rev. 30, 36, 46–47 (1985).

To test the constitutionality of Virginia's sterilization laws, Priddy selected eighteen-year-old Carrie Buck, whom he described as a "moral delinquent" living a "life of immorality, prostitution, and untruthfulness; [who] had never been self-sustaining; and has had one illegitimate child." *Id.* at 49, 51. In truth, Carrie was committed to the Colony because she became pregnant as the result of rape. *Id.* at 53–54. Carrie was not unique; states often sterilized the victims of rape and incest, many of whom were teenage girls. Schoen, *supra*, at 152. Carrie and another 70,000 Americans were forcibly sterilized in the wake of the Supreme Court's decision in *Buck v. Bell*. *The Supreme Court Ruling That Led To 70,000 Forced Sterilizations*, NPR (Mar. 7, 2016), https://www.npr.org/sections/health-shots/2016/03/07/469478098/the-supreme-court-ruling-that-led-to-70-000-forced-sterilizations. Most sterilization victims were women, upwards of 85 percent in North Carolina, and women of color were particular targets. Brophy & Troutman, *supra*, at 1935–36.

Eugenics certainly lives on, as my colleague argues, but not in a woman's decisions about her reproductive health. The shadow of the eugenics movement materializes when the state wrests those decisions from her. The burden on choice is no less because the state's chosen method is to penalize her doctor. And, as Judge Donald's dissenting opinion so clearly explains, Supreme Court precedent does not permit the state to deny a woman access to abortion because the state disagrees with her reasoning.

---

### DISSENT

---

HELENE N. WHITE, Circuit Judge, dissenting. I concur in my colleagues' dissenting opinions, including their criticisms of the reasoning of the majority and concurring opinions and the misattribution and mischaracterization of Plaintiffs' arguments. I do not, however, fault the lead opinion for addressing, in dicta, arguments presented in the parties' supplemental briefs and by the amici. And I do not attribute beliefs or opinions to the authors that are not expressly stated or necessarily implied.

No. 18-3329                     *Preterm-Cleveland v. McCloud*                     Page 82

————————————

**DISSENT**

————————————

BERNICE BOUIE DONALD, Circuit Judge, dissenting.  At times edicts passed down from the Supreme Court are ambiguous.  This one is not: "Before viability, the State's interests are not strong enough to support a prohibition on abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure. . . . Regardless of whether exceptions are made for particular circumstances, a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability."  *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 846, 879 (1992) (plurality).  H.B. 214 does just that.  It prohibits certain abortions at any point during a woman's pregnancy—based solely on the *reason* the woman seeks the abortion—and it makes no exception for the mother's health.

Even alternatively considering H.B. 214 under the undue burden standard, Ohio argues the burden will be only to encourage "a little less candor" between a woman and her doctor; the majority similarly describes the law's effect as "merely caus[ing] a woman to withhold or keep secret her personal and private opinion" from her doctor.  I will call it what it is: the long-arm of the state—wielding the threat of a class-four felony—forcefully reaching into a profoundly intimate conversation between doctor and patient and telling the patient to be silent about her medical history or worse, purposefully lie about it.  With this law, Ohio intends to send an "unambiguous moral message" to Ohioans that children with Down syndrome, "whether born or unborn are equal in dignity and value to the rest of us[.]"  The majority adopts that purported interest—protecting the Down syndrome community from the stigma of a Down-syndrome-selective abortion—as a valid and legitimate state interest.  But reliance on these "moral concerns [. . .] dishonors our precedent."  *Gonzales v. Carhart*, 550 U.S. 124, 182 (2007) (Ginsburg, J., dissenting) (internal quotation marks, citation omitted).  When considering moral views which are "profound and deep" for some—as views on abortion certainly are—the power of the state may nonetheless "not be used 'to enforce these views on the whole society through operation of the criminal law.'"  *Id.* at 183 (quoting *Lawrence v. Texas*, 539 U.S. 558, 571

(2003)).[1]  When a law like H.B. 214 can be justified only to the extent it asks a woman to stay silent or lie to her doctor, that law stands upon a remarkably flimsy constitutional reed.  I dissent.

## I.

I begin with an initial question necessitated by several of my colleagues' concurrences: under what analytical and precedential framework do we consider H.B. 214?  Underlying several of those concurrences is the notion that *Roe v. Wade*, 410 U.S. 113 (1973), and *Planned Parenthood of Southeastern Pennsylvania v. Casey* carry no weight here because no Supreme Court case has a "direct application" to H.B. 214.  *See* Bush Concurring Op. at 40; Sutton Concurring Op. at 32-33.  As Judge Moore's dissent cogently explains, such an understanding of how precedent works is a dangerous affront to the proper role of the federal courts—an understanding that has implications far beyond the fundamental right to an abortion.  What is the courts' work if not the application of *old* cases to *new* scenarios with *new* facts? The basic task courts undertake is to take a rule from a prior case (like *Casey*) and apply it to a novel fact pattern (like H.B. 214).  Variations in the facts do not wipe the slate clean.

It is important to consider what these concurrences are doing.  Is *Casey* applicable only when considering waiting periods, spousal notice, and parental consent—the types of regulations reviewed in that case?  The logical implication of these concurrences is that the Supreme Court was wrong in its applications of *Casey* to types of abortions laws that were not identical to those considered in *Casey*.  The Supreme Court was wrong when it applied *Casey* to a partial-birth abortion ban.  *See Stenberg v. Carhart*, 530 U.S. 914, 923 (2000); *Gonzales*, 550 U.S. at 132. The Supreme Court was wrong when it applied *Casey* to admitting privileges laws.  *See Whole*

---

[1]Judge Bush responds that this dissent wrongly "assume[s] that H.B. 214's ethical foundation renders the law unconstitutional."  Bush Concurring Op. at 40.  He then lists several criminal prohibitions with purportedly ethical foundations—including assisted suicide and prostitution—as proof that criminal laws may reflect ethical choices.  *Id.* at 13.  I would note two things here.  *First*, the ethical foundation of H.B. 214 alone does not render the law unconstitutional.  Our binding precedent does.  *See infra*, Parts II and III.  *Second*, there is no fundamental right to assisted suicide. *See Washington v. Glucksberg*, 521 U.S. 702, 705-06 (1997).  There is no fundamental right to prostitution.  *See Erotic Serv. Provider Legal Educ. & Rsch. Project v. Gascon*, 880 F.3d 450, 456-67 (9th Cir. 2018) *amended by*, 881 F.3d 792 (9th Cir. 2018).  There is a fundamental right to an abortion.  *Roe*, 410 U.S. at 153. That distinction is critical, yet ignored.

No. 18-3329                 *Preterm-Cleveland v. McCloud*                 Page 84

*Woman's Health v. Hellerstedt*, -- U.S. --, 136 S. Ct. 2292 (2016); *June Med. Servs., LLC v. Russo*, --U.S.--, 140 S. Ct. 2103 (2020).[2]

Even more disconcerting is the idea that courts may act as precedential gatekeepers, refusing to apply well-settled precedent if the reviewing court finds it is "dubious whether precedent 'is correct as an original matter[.]'" Bush Concurring Op. at 43 (quoting *Garza v. Idaho*, --U.S.--, 139 S. Ct. 738, 756 (2019) (Thomas, J., dissenting)). Under this understanding (which, notably, is drawn from a dissent), the concurrence believes that courts may take a look at long-held precedent and determine that such precedent, no matter how many times the Supreme Court has affirmed (and reaffirmed) that precedent, is unworthy of honoring as settled law. What counts as sufficiently "dubious" such that the reviewing court's own view of what the law should be can preempt *stare decisis*? What is the standard?

Even if Justice Thomas's dissent were the law, the use of a quotation from his dissent is misleading to the extent this Court is not the Supreme Court. Justice Thomas wrote that when a precedent is dubious, both "we" and "the Court" should tread carefully before extending that precedent. *Id.* at 757, 759. No matter how capacious Justice Thomas's understanding is of "we," "we" surely does not include an intermediate appellate court. After all, this Court is "bound by the decisions of the Supreme Court" and is "obligated to defer to its lead regardless of our own inclinations." *Henderson v. Collins*, 262 F.3d 615, 623 (6th Cir. 2001). Because we are not in uncharted waters and because we are strictly bound by Supreme Court precedent, I turn to the application of that settled precedent to H.B. 214.

## II.

H.B. 214—which criminally punishes a doctor who performs an abortion knowing the woman seeks the abortion, even in part, due to a Down syndrome diagnosis—is an

---

[2]To the extent the concurrences are instead arguing that intermediate appellate courts can only apply Supreme Court cases with "direct application" to the case at hand (but that the Supreme Court is free to extend its *Casey* precedent to novel areas), then the argument here is largely the same. In the Supreme Court cases cited above, the Supreme Court took no issue with every intermediate appellate court applying the undue-burden analysis to the abortion laws at hand. *See, e.g.*, *Carhart v. Sternberg*, 192 F.3d 1142 (8th Cir. 1999) (applying undue-burden analysis to partial-birth abortion ban); *Carhart v. Gonzales*, 413 F.3d 791 (8th Cir. 2005) (same); *Whole Woman's Health v. Cole*, 790 F.3d 563 (5th Cir. 2015) (applying undue-burden analysis to admitting-privileges law); *June Medical Servs. L.L.C. v. Gee*, 905 F.3d 787 (5th Cir. 2018) (same).

No. 18-3329                    *Preterm-Cleveland v. McCloud*                    Page 85

unconstitutional ban on a woman's right to terminate her pregnancy before viability.  In 1992, the Supreme Court in *Casey* "reaffirmed 'the most central principle of *Roe v. Wade*'" which is "'a woman's right to terminate her pregnancy before viability.'"  *June Medical*, 140 S. Ct. at 2135 (Roberts, C.J., concurring) (quoting *Casey*, 505 U.S. at 871) (plurality opinion)).**3**  A state categorically may not prohibit pre-viability abortions.**4**  This case should end there because "[i]t has long been an established rule to abide by former precedents, where the same points come again in litigation; as well to keep the scale of justice even and steady, and not liable to waver with every new judge's opinion."  *Id.* at 2134 (internal quotations omitted).

To begin, there are two analytical distinctions when considering an abortion statute: (1) whether the statute is a ban or a regulation, and (2) whether the statute applies pre- or post-viability.  Before viability, a state may regulate abortion so long as the regulation does not impose an undue burden on a woman's right to choose to terminate her pregnancy.  *Northland Fam. Plan. Clinic, Inc. v. Cox*, 487 F.3d 323, 330 (6th Cir. 2007) (citing *Casey*, 505 U.S. at 879).  After viability, a state "may regulate and *even prohibit* abortion . . . 'except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.'"  *Id.* (quoting *Casey*, 505 U.S. at 879) (emphasis added).  The addition of "and even prohibit" when discussing post-viability statutes further clarifies that a state may not enact such prohibitions before viability.  The Supreme Court is clear that a state cannot ban abortion before viability: "Before viability, the State's interests are not strong enough to support a *prohibition* of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure . . . .  Regardless of whether exceptions are made for particular circumstances, a State may not

---

**3**One concurrence takes issue with federal courts engaging in "line-drawing."  Sutton Concurring Op. at 31 ("The more the federal courts do when it comes to abortion policy, and the longer they do it, the less reason there is for compromise at the local level.").  The argument rests on the assumption that federal courts should not impose their own policy views, lest local communities find themselves unwilling to compromise.  Yet two pages earlier, Judge Sutton makes his own policy judgment as it relates to H.B. 214, explaining that H.B. 214 makes the decision to tell a doctor the reason for her abortion "a private one—and leaves it there, perhaps just as it should be left."  *Id.* at 32.

**4**Ohio conflates this categorical rule with a categorical right to an abortion.  That argument is misguided, as these are not flipsides of the same coin.  As the Fifth Circuit recently summarized, a state may *regulate* abortion before viability, subject to the undue burden test, but a state may not *prohibit* any woman from obtaining an abortion pre-viability.  *See Jackson Women's Health Org. v. Dobbs*, 945 F.3d 265, 268 (5th Cir. 2019) ("States may *regulate* abortion procedures prior to viability so long as they do not impose an undue burden on the woman's right, but they may not ban abortions.") (emphasis in original).

*prohibit any* woman from making the ultimate decision to terminate her pregnancy before viability." *Casey*, 505 U.S. at 846, 879 (emphases added).

H.B. 214 is a pre-viability ban. It defies Supreme Court precedent that a state may not prohibit *any* woman from making the decision to terminate her pregnancy before viability. *Casey*, 505 U.S. at 879. Ohio and the majority ignore this unambiguous—and binding—precedent.[5] Ohio asserts that this is not actually a ban but instead is a regulation subject to the undue burden test because "[e]very woman affected by the law may abort any pregnancy at any point before viability for any reason except a Down syndrome diagnosis."[6] The "except" gives away the very point Ohio tries to refute: H.B. 214 *does* prohibit *some* abortions. Ohio would have us believe that such a ban is constitutionally acceptable, as long as the law does not affect *other* women with *other* reasons for seeking an abortion. In other words, "It does not ban many women, so it is not a ban." As eighteen constitutional law scholars point out in an amicus brief: "That is nonsense." A ban on *any* particular abortion is just that: a ban. It does not matter that not every abortion is banned; rather, it matters that the law bans any woman from choosing an abortion.[7] *Casey* makes clear that a "State may not prohibit *any* woman from making the

---

[5]Some courts consider pre-viability bans under the undue burden framework, finding that those bans are necessarily undue burdens. *See, e.g. Planned Parenthood of Ind. and Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 888 F.3d 300, 310-11 (7th Cir. 2018) (Manion, J., concurring in part) ("The nondiscrimination provisions have both the purpose *and* effect of *prohibiting* some women—those who want sex-, race-, or disability-selective abortions—from obtaining an abortion. Thus, they erect a substantial obstacle for those women.") (emphases in original). The outcome is the same, whether a court considers a prohibition as, by definition, an undue burden (given that it imposes a complete obstacle), or as a separate categorical rule.

Considering the specific language in *Casey*, however, I would treat the categorical rule against pre-viability bans as distinct from the undue-burden test. The *Casey* Court wrote that "[b]efore viability, the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure." *Casey*, 505 U.S. at 846 (emphases added). The Court later connected that "substantial obstacle" language with the undue-burden test, holding that "[a] finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.* at 877. Given the disjunctive "or," the Court seemingly understood prohibitions on abortion to lie outside the undue burden/substantial obstacle framework.

[6]The majority opinion agrees, asserting that "the right to an abortion, even before viability, is not absolute." This is true but misses the point. A categorical rule against pre-viability bans is different from a categorical right to a pre-viability abortion without state regulation. The former is required; the latter is not.

[7]To make the point clear, consider a state law that prohibits a fourteen-year-old from driving. That a sixteen-year-old can drive makes the state law no less of a ban on the fourteen-year-old. This analysis harkens back to *Roe*, where the Supreme Court considered a Texas law that banned all abortions except those performed to save the mother's life. *Roe*, 410 U.S. at 117-18. This carve-out for the mother's health did not change the fact that the law unconstitutionally banned some, if not all, women from aborting previable fetuses.

ultimate decision to terminate her pregnancy before viability." *Casey*, 505 U.S. at 879 (emphasis added). *Casey* does not hedge this; a state may not prohibit *any* woman from obtaining an abortion, not "any woman except those seeking an abortion for a prohibited reason."

Ohio's focus on whom the law does not affect is patently inconsistent with clear direction from the Supreme Court that "[l]egislation is measured for consistency with the Constitution by its impact on those whose conduct it affects. . . . The proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Casey*, 505 U.S. at 894. In *Casey*, the Commonwealth of Pennsylvania argued that its spousal notification requirement was valid because it "imposes almost no burden at all for the vast majority of women seeking abortions." *Id.* The Court flatly rejected that framework, explaining that "[t]he analysis does not end with the one percent of women upon whom the statute operates; it begins there." *Id.* Here, the relevant group—those upon whom H.B. 214 operates—is women seeking an abortion due to a Down syndrome diagnosis, and H.B. 214 prohibits them from making the choice. A woman seeking a pre-viability abortion because of a Down syndrome diagnosis is prohibited from getting an abortion, and that violates *Casey*.[8]

Ohio, at times, admits this. In its opening brief, it frames the issue before the Court as whether Ohio has "sufficiently important antidiscrimination interests to justify a narrow limitation that <u>bars</u> only those previability abortions arising from a Down-syndrome diagnosis." Appellant's Br. at 2 (emphasis added). In that same brief, Ohio describes the law as a "<u>bar</u> [on a] small subset of previability abortions" and as "<u>prohibit[ing]</u> an abortion provider from performing an abortion" if the provider knows the decision is due to a Down-syndrome diagnosis. *Id.* at 36, 1 (emphases added). In the very first paragraph of its response to Plaintiffs' motion for a temporary restraining order, Ohio described H.B. 214 as "a <u>prohibition</u> on doctors from performing abortions that target unborn children who are diagnosed with Down syndrome" and as "<u>preventing</u> abortions that target unborn children based on a disability." R. 25 (Response to TRO Mot. at 1) (PageID #111) (emphases added). Later in that response, Ohio plainly states

---

[8]No matter the dispute over whether the *June Medical* concurrence or plurality is controlling, the "most central principle" of *Roe* and *Casey*—"a woman's right to terminate her pregnancy before viability"—rings true under either approach. *June Med. Servs.*, 140 S. Ct. at 2135 (Roberts, C.J., concurring) (quoting *Casey*, 505 U.S. at 871).

No. 18-3329                    *Preterm-Cleveland v. McCloud*                    Page 88

that "[o]n its face, H.B. 214 prohibits abortions only when the reason for the abortion is based on a diagnosis of Down syndrome" and that the "prohibitions" in H.B. 214 would not apply in cases where a woman's health is endangered.[9]  *Id.* at 29 (PageID #139) (emphases added).  Then Ohio State Senator Frank LaRose wrote in support of the bill that it "would prohibit an abortion from being performed if the reason for terminating the pregnancy is because of a pre-natal diagnosis of Down syndrome."  Ohio State Representative Steve Huffman, then Chairman of the House Health Committee, wrote in support of H.B. 214 that "[t]he passage of this act . . . is a step closer towards ending discriminatory abortions based off a Down [s]yndrome diagnosis . . . This act resembles similar efforts in other states to prevent discriminatory abortions based off of genetic disorders."  Rep. Steve Huffman, *HB 214 supports right to life*, Sidney Daily News, (Dec. 20, 2017),  https://www.sidneydailynews.com/opinion/columns/91535/hb-214-supports-right-to-life. How many times must Ohio call H.B. 214 a ban before we decide it is a ban?

    The State later amended its language, now asserting that H.B. 214 "does not prohibit even a subset of abortions" but rather "prohibits doctors from knowingly performing" those abortions.  That argument is unpersuasive for two reasons.  *First*, in the subsequent sentence, Ohio contradicts that first sentence by explaining that "[e]very woman affected by the law may abort any pregnancy at any point before viability for any reason *except* a Down syndrome diagnosis."  Appellant's En Banc Br. at 16 (emphasis in original).  The "except" negates the first clause of that sentence, meaning that a woman seeking an abortion because of a Down syndrome diagnosis is prohibited from aborting her pregnancy before viability.  She falls into the "except" category, i.e., the prohibited category.  This, again, overlooks that the "proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant."  *Casey*, 505 U.S. at 894.

    *Second*, the argument that the law affects only doctors and not women is unsound.  In the same way that a criminal prohibition on selling drugs functionally prohibits one from choosing to purchase that drug, H.B. 214 prevents women from obtaining an abortion by criminalizing the doctor's ability to perform the abortion.  The criminalization of supply prohibits acquisition. True, Ohio added a provision providing immunity for women whose doctor performs the

---

[9]H.B. 214 includes no such exception for maternal health, as I discuss below.

abortion. *See* Ohio Rev. Code § 2919.10(F). To continue the analogy, this is akin to the state providing immunity to a drug purchaser while still criminalizing the sale of drugs. That makes the sale or purchase of drugs no less prohibited than if the statute contained no such immunity clause. Although H.B. 214 strategically avoids criminalizing the woman's choice or behavior, the criminalization of the doctor's conduct eliminates that very choice.

The majority, nonetheless, agrees with Ohio that the distinction between a statute affecting doctors and a statute affecting women renders this law constitutional. The majority goes as far as to say H.B. 214 does not even implicate a woman's right to an abortion because the law refers only to a doctor performing an abortion with knowledge, and thus says that H.B. 214 only "regulates (via the doctor) the *reason* behind the woman's decision." *See* Majority Op. at 13 (emphasis in original); *see also id.* ("This case concerns a law directed at neither a woman's ability to obtain an abortion nor the method of abortion."). Were we to pursue this line of reasoning—that a regulation that only *incidentally* affects a woman's right to choose, is constitutional because it does not *directly* regulate the woman, instead regulating some third-party—then nearly any abortion regulation (or ban) would survive. The admitting-privileges laws recently struck down in *Whole Woman's Health* and *June Medical* only indirectly affected women—directly affecting only the medical profession—so under the majority's reasoning, the Supreme Court was wrong for even considering those laws as implicating a woman's right to an abortion.[10]

In contrast to the majority, two of our sister circuits considering similar laws have concluded that a ban on a woman's reason for obtaining an abortion is flatly unconstitutional. The Seventh Circuit recently struck down a nearly identical law in Indiana because that law prohibited *some* women from making the choice to get a pre-viability abortion. *Planned Parenthood of Ind. and Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 888 F.3d 300, 304-07 (7th Cir. 2018) (hereinafter "*PPINK*"), *rev'd on other grounds, Box v. Planned Parenthood of*

---

[10]The majority makes this argument under the undue-burden framework. Under that framework, any regulation that "has the purpose *or effect*" of burdening a woman is invalid. *Casey*, 505 U.S. at 877 (emphasis added). Ohio seems to argue that only laws which have the *purpose* of burdening a woman may be held invalid under *Casey*, but that omits the "or effect" language from the analysis.

*Ind. & Ky., Inc.*, --U.S.--, 139 S. Ct. 1780 (2019).[11] The Indiana law criminalized a doctor performing an abortion if the doctor knows that the woman seeks the abortion "solely" because of the fetus's sex, Down syndrome diagnosis, disability, race, color, national origin, or ancestry. *Id.* at 303. The court held that the "non-discrimination provisions" were unconstitutional because they were "absolute prohibitions on abortions prior to viability which the Supreme Court has clearly held cannot be imposed by the State." *Id.* at 306 (citing *Casey*, 505 U.S. at 879). Judge Manion begrudgingly concurred in that holding, explaining that despite his disagreement with Supreme Court precedent, *Casey* clearly mandates that lower courts find prohibitions like Indiana's unconstitutional. *Id.* at 310-11.[12]

The Eighth Circuit recently came to the same conclusion in considering another Down syndrome-selective abortion statute. In that case, the relevant law in Arkansas, Act 619, prohibited a doctor from performing an abortion if the doctor knew the woman sought the abortion "solely on the basis" of a Down syndrome diagnosis. *Little Rock Fam. Plan. Servs. v. Rutledge*, 984 F.3d 682, 686 (8th Cir. 2021). The court—though noting that the binding *Casey* framework is "obviously subject to change in the future"—found Act 619 unconstitutional because "it is undisputed that Act 619 is a substantial obstacle; indeed, it is a complete prohibition of abortions based on the pregnant woman's reason for exercising her right to terminate her pregnancy before viability." *Id.* at 687, 690. This, the Eighth Circuit found, violates the "categorical" rule against pre-viability prohibitions and was therefore unconstitutional. *Id.* at 687 ("The Supreme Court has repeatedly stated that its pre-viability rule is categorical[.]") (citing *Casey*, 505 U.S. at 879; *Gonzales*, 550 U.S. at 146). The two concurring opinions urged the Supreme Court to revisit *Casey* and the viability standard, but nonetheless agreed with the majority that the pre-viability prohibition in Arkansas was

---

[11]Even outside of the Down-syndrome abortion context, courts agree that precedent forecloses any pre-viability prohibitions. *See, e.g.*, *MKB Mgmt. Corp. v. Stenehjem*, 795 F.3d 768, 773 (8th Cir. 2015) ("[W]e are bound by Supreme Court precedent holding that states may not prohibit pre-viability abortions[.]"); *Isaacson v. Horne*, 716 F.3d 1213, 1217 (9th Cir. 2013) ("A prohibition on the exercise of [the right to a pre-viability abortion] is *per se* unconstitutional. While the state may *regulate* the mode and manner of abortion prior to fetal viability, it may not *proscribe* a woman from electing abortion[.]") (emphasis in original).

[12]The Supreme Court reversed the Seventh Circuit on other grounds but "expresse[d] no view on the merits of . . . whether Indiana may prohibit the knowing provision of sex-, race-, and disability-selective abortions by abortion providers." *Box*, 139 S. Ct. at 1782.

unconstitutional under the current framework. *See id.* at 693 (Shepherd, J., concurring) ("[B]ecause we must apply the ill-fitting and unworkable viability standard to an act aimed at preventing eugenics-based abortions unless and until the Supreme Court dictates otherwise, I concur in the Court's opinion holding Act 619 unconstitutional."); *see also id.* at 694 (Erickson, J., concurring) (urging the Supreme Court to revisit *Casey* and noting "I deeply regret that precedent forecloses a balancing of the state's actual interest against the woman's right to choose in enacting Act 619"). *Casey* is binding on the Seventh Circuit. *Casey* is binding on the Eighth Circuit. Just the same, *Casey* is binding on this circuit.[13]

The majority asserts that *PPINK* was wrong in considering Indiana's law as a prohibition rather than a "burden subject to the undue-burden test."[14] This, the majority explains, is inconsistent with cases like *Gonzales*, which upheld a prohibition on a particular method of abortion under the undue burden standard. *Gonzales* is distinguishable. Prohibiting one particular *method* of abortion (while allowing a more common method to continue) still allows a woman to make the choice as to whether to terminate her pregnancy and is thus consistent with *Casey*; the woman is forbidden only from that particular method. The law there regulated the choice rather than prohibiting a woman from making the "ultimate decision." The criminalization of a *reason* for an abortion, however, is intrinsic to that particular woman: if she seeks the abortion, even in part, due to a Down syndrome diagnosis, she is flatly prohibited from making the ultimate decision as to whether to terminate her pregnancy. Prohibition on one particular method of abortion is different than a prohibition based on one's reason for seeking an abortion; the latter flatly violates *Casey*, as every other court to have considered this issue has held. *See PPINK*, 888 F.3d at 306; *Rutledge*, 984 F.3d at 690; *see also Bellotti v. Baird*, 443 U.S. 622, 654-55 (1979) (Stevens, J., concurring in the judgment) ("It is inherent in the right

---

[13]Indeed, H.B. 214 is even stricter than both Indiana's and Arkansas' laws because H.B. 214 provides for criminal liability if the reason is even *in part* a Down syndrome diagnosis, whereas the laws in those cases restricted the prohibitions to situations in which the prohibited characteristic was the *sole* reason for the abortion. *Compare* Ind. Code § 16-34-4-6(a) ("solely") *and* Ark. Code Ann. § 20-16-606 ("solely on the basis") *with* Ohio Rev. Code § 2919.10(B) ("in whole or in part").

[14]Though the majority here does not address *Rutledge*, the Eighth Circuit's analysis was identical to that of the Seventh Circuit, and, as such, the majority here would presumably make the same arguments against the validity of the Eighth Circuit's reasoning.

to make the abortion decision that the right may be exercised without public scrutiny and in defiance of the contrary opinion of the sovereign or other third parties.").[15]

In sum, H.B. 214 is a prohibition on pre-viability abortion because it prohibits *some* women from choosing to obtain an abortion before viability, which violates *Casey*'s unambiguous command that a state "may not prohibit *any* woman from making the ultimate decision to terminate her pregnancy before viability." *Casey*, 505 U.S. at 879 (emphasis added). Accordingly, I would find that Plaintiffs have shown a substantial likelihood of success on the merits and would thus affirm the district court's injunction.

## III.

Even considering H.B. 214 as a regulation rather than a prohibition—thus subjecting the law to the undue burden test, as the majority today does—I would nonetheless find a substantial likelihood that the law is unconstitutional. Regulations on pre-viability abortions which "'have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right' and are therefore 'constitutionally invalid.'" *June Med. Servs.*, 140 S. Ct. at 2112 (plurality opinion) (quoting *Whole Woman's Health*, 136 S. Ct. at 2299, 2309). The lead opinion[16] here lists the five burdens that H.B. 214 will supposedly impose upon women—burdens that Plaintiffs themselves did not raise.[17] Rather than considering each,

---

[15]*See* Marc Spindelman, *Embracing Casey: June Medical Services, L.L.C. v. Russo and the Constitutionality of Reason-Based Abortion Bans*, 109 Geo. L. J. Online 115, 124 (2020) ("Nothing in *Casey* or in any Supreme Court abortion decision since blesses reason-based abortions bans that—like Ohio's—make women's lawful access to abortion turn on having the right sorts of reasons in the state's policy views when they exercise their constitutionally protected rights."). Spindelman aptly notes that those who would uphold such reason-based abortion bans—as the majority does today—"must in principle stand ready to recognize and approve the operations of such a ban in the setting of other constitutionally protected rights. What if the state were to condition the exercise of other constitutional freedoms—say, the right to free speech, the right to marry, the right to shape a child's education—on a rights bearer's reasons for exercising his, her, or their choice?" *Id.* at 138. One might scoff at this slippery slope argument, but the hypotheticals are directly analogous. There is a fundamental right to marry. *Loving v. Virginia*, 388 U.S. 1, 12 (1967). Similarly, there is a fundamental right to privacy that "is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." *Roe*, 410 U.S. at 152. Is this majority prepared to uphold a law criminalizing an officiant who solemnizes a marriage if that marriage were undertaken for some reason the state deemed contrary to its imposed values?

[16]Three judges declined to join Part V-B, V-D, and VI of Judge Batchelder's majority opinion, thus rendering those parts as a "lead opinion" rather than a full majority opinion.

[17]To effectively critique the lead opinion's reasoning point-by-point, I follow that opinion here in considering these five supposed burdens, but it is important to note that the plaintiffs did not specify these five

however, the lead opinion quickly casts aside three of those burdens because they are either subsumed within the others or simply "do not arise from H.B. 214," thus refusing to even consider those alleged burdens under the undue burden framework.

*First*, the lead opinion refuses to consider the allegation that H.B. 214 may influence or alter a woman's reason for seeking an abortion because, as the majority notes, this "is one of H.B. 214's fundamental objectives" and because "it is questionable whether a woman would willingly announce that motive if she recognized that doing so was hurtful to many in the Down syndrome community." The lead opinion thus avoids considering whether the law is a burden by explaining that the alleged burden is the very thing that law seeks to overcome; I see no reason why the law's purported anti-discriminatory purpose permits a court to discard a potential burden before any constitutional analysis of that burden. A law's proffered interest cannot immunize that very law from a constitutional analysis of the alleged burden that law imposes by virtue of that interest.

*Second*, the lead opinion refuses to consider under the undue burden analysis whether H.B. 214 may cause a woman to conceal her medical records or history if either suggests a Down syndrome diagnosis or may cause a woman to forego education, counseling, or assistance programs offered to women with a fetal Down syndrome diagnosis. The lead opinion explains that the crime set forth in H.B. 214 has three elements: (1) that a woman knows or reasonably believes her fetus has Down syndrome, (2) that she wants an abortion because of that, and (3) that the doctor knows this is her reason. The lead opinion explains that a prenatal Down syndrome diagnosis is direct evidence only of the first element and "does not automatically prove elements two or three." So, the lead opinion believes, it is misguided to consider whether a woman might feel reluctant to share a Down syndrome diagnosis with her doctor because that

---

burdens. *See* Kethledge Concurring Op. at 53. The lead opinion seems to recognize this, explaining that Plaintiffs "certainly did not enumerate these burdens in this way." Majority Op. at 16. Plaintiffs' alternative argument under the undue burden standard merely reiterates that H.B. 214 is *per se* unconstitutional, as a reason-based prohibition amounts to an undue burden because it categorically prohibits abortions for certain women. The burden, in other words, is the categorical prohibition. As Judge Moore points out (Moore Dissenting Op. at 64-66), the lead opinion's five burdens appear to have been drawn from (1) the Plaintiffs' supplemental briefing in which the Plaintiffs describe *Ohio*'s characterization of the burdens, *see* Appellees' Suppl. Br. at 2 (citing Appellants' Suppl. Br. at 2, 3, 17-18, 24), and (2) from various amicus briefs. *See* Am. College of Obstetricians et al. En Banc Amicus Br. at 3 (noting that H.B. 214 would "threaten the patient-physician relationship").

revelation does not necessarily reveal all three elements of the crime. I, however, cannot state so confidently that a woman will not feel influenced to conceal a Down syndrome diagnosis because she thinks that revelation does not satisfy all three elements of a crime. When a doctor's liberty, medical license, and finances (and concomitantly, the woman's right to an abortion) are on the line, it is entirely plausible—if not likely—that a woman might feel reluctant to share her diagnosis or to undergo counseling that would implicitly reveal that diagnosis, particularly when several doctors stated in their affidavits that they would feel compelled to refuse to perform an abortion upon learning of a Down syndrome diagnosis. Few pregnant women will take refuge in the fact that the revelation would merely satisfy one element of a crime. I thus would not cast aside this purported burden as "not appear[ing] to be [a] cognizable burden[.]"

Having summarily dismissed three of the five alleged burdens as not worthy of consideration under the any undue burden test, the majority proceeds to analyze only two: (1) whether the law will prevent a woman from having a full and open conversation with her doctor, and (2) whether the law will encourage doctor shopping. The majority (and in some parts, the lead opinion) proceeds through various iterations of the undue burden analysis, considering the surviving two burdens under the *June Medical* concurrence, *Whole Woman's Health* and the *June Medical* plurality, and the framework established in *Gonzales*.

The majority considers the undue burden analysis as set forth in *June Medical* under both the plurality and the concurrence.[18] The plurality followed the framework of *Whole Woman's Health*, which "'[] weighed the asserted benefits' of the law 'against the burdens' it imposed on abortion access." *June Medical*, 140 S. Ct. at 2120 (plurality opinion) (quoting *Whole Woman's Health*, 136 S. Ct. at 2310). Citing stare decisis, Chief Justice Roberts' concurrence agreed with the plurality that Louisiana's law was unconstitutional under *Whole Woman's Health*. *See id.* at 2139 (Roberts, C.J., concurring). The Chief Justice, however, explained that *Casey*'s substantial-obstacle analysis does not require that courts consider an abortion regulation's benefits—only its burdens. *Id.*

---

[18]This dissent in no way concedes whether the *June Medical* concurrence or plurality is controlling in this Court. I defer to my colleagues' thorough discussions of that issue. Here, I simply follow the majority's approach in considering H.B. 214 under either standard, though I do note that the majority concedes its analysis of H.B. 214 under the *June Medical* plurality is dicta.

No. 18-3329                    *Preterm-Cleveland v. McCloud*                    Page 95

I would hold that H.B. 214 fails under *Whole Woman's Health* or the *June Medical* concurrence because H.B. 214 imposes an undue burden in that it places "a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey*, 505 U.S. at 877. At bottom, as the district court noted, the burden here is not merely substantial; it is "insurmountable." *Preterm-Cleveland v. Himes*, 294 F. Supp. 3d 746, 754 (S.D. Ohio 2018).[19] The fact that H.B. 214 does not directly burden women, instead criminalizing the *doctor's* conduct, does not immunize the law from undue burden scrutiny, as the undue burden standard "is a shorthand for the conclusion that a state regulation has the purpose *or effect* of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey*, 505 U.S. at 877 (emphasis added). Criminalization of a doctor's conduct very well may place a burden on a woman's choice. For example, the Supreme Court in *Stenberg v. Carhart* held that the abortion law there, which criminalized a particular procedure, imposed an undue burden because doctors subject to that law "must fear prosecution, conviction, and imprisonment." 530 U.S. 914, 945 (2000).

H.B. 214 is no different; doctors who know of a Down syndrome diagnosis—even if they do not *actually* know whether it led the woman to choose an abortion—will fear H.B. 214's class-four felony and loss of their medical license. This is because Ohio's definition of "knowledge" is not limited to actual knowledge, despite the majority's assertion that only actual knowledge implicates H.B. 214. Rather, under Ohio's criminal statute, a person "acts knowingly, regardless of purpose, when the person is aware that the person's conduct will *probably* cause a certain result or will *probably* be of a certain nature." Ohio Rev. Code Ann. § 2901.22(B) (emphasis added). This broad definition of knowledge counters Ohio's assertion that a doctor who thinks a patient *might* want an abortion because of a Down syndrome diagnosis does not implicate H.B. 214. H.B. 214 does precisely that. A woman with a prenatal Down syndrome diagnosis—a diagnosis which *might* be some part of the reason she seeks an abortion—may generate within her doctors the very fears of "prosecution, conviction, and

---

[19]It is for that reason that I would hold H.B. 214 unconstitutional in that it is a complete prohibition on some pre-viability abortions. *See supra*, Part II. It is also worth noting our standard of review here. We review factual findings under clear-error review. *Daunt v. Benson*, 596 F.3d 396, 406 (6th Cir. 2020). That standard is nowhere to be found in the majority's opinion.

imprisonment" that led the Supreme Court to invalidate the abortion law in *Sternberg*. 530 U.S. at 945. The majority considers H.B. 214 under its own conception of "knowledge" rather than considering the definition of knowledge provided in the Ohio penal code. Only one of those definitions would be relevant in the doctor's legal proceedings.

The probabilistic element of these inferences does not save H.B. 214 when Ohio's definition of knowledge encompasses such probabilities. Evidence from the lower court, cited in the majority's opinion, plainly shows that abortion providers will indeed feel reluctant (at best) to perform an abortion if they know of a Down syndrome diagnosis. Preterm-Cleveland's Executive Director, Chrissie France, for example, stated that she would "have no choice" but to refuse an abortion if she knew of a Down syndrome diagnosis. But, the majority argues, she "does not explain . . . why Preterm-Cleveland would not be able to provide abortions for such women if the doctor were unaware of their specific motive." The capacious definition of "knowledge" under Ohio's law provides the explanation. A doctor will not risk their license, money, and liberty on their hopes that a court might ignore Ohio's definition of knowledge as encompassing situations "when the person is aware that the person's conduct will *probably* cause a certain result or will *probably* be of a certain nature." True, "knowledge of the diagnosis" may indeed not be "knowledge of the reason" for having the abortion, as the majority posits, but knowledge of the diagnosis is certainly knowledge sufficient to forewarn a doctor that to perform an abortion is to risk their career and personal freedom. To find otherwise is to ignore the expansively-worded text of Ohio's penal code, to ignore the sworn statements of doctors in Ohio, and to ignore the costs at stake in the doctor's internal calculus when she learns of the Down syndrome diagnosis. I would not base the constitutionality of a law on the supposition that a doctor will turn a blind eye and skirt around the broad language of the Ohio penal code, much less that a court considering the case would ignore that same language.

The majority further explains there is no burden on women in terms of securing another doctor  if the woman "accidentally, defiantly, or without an understanding of the law" reveals her true reason. The majority claims she may simply secure a different doctor who is unaware of her reason. These burdens, according to the majority, are not objectively substantial obstacles;  the new-doctor search might simply cost her some money and time. However, the invasion of the

penal code into a private conversation between a doctor and her patient is not a minor burden akin to driving down the road to another doctor.  Consider this law's effect on the patient-client privilege.  Open and honest conversation between doctor and patient was the impetus behind Ohio's patient-client privilege.  *See State v. Garrett*, 456 N.E.2d 1319, 1322 (Ohio Ct. App. 1983) (explaining that the patient-client privilege was meant "to encourage patients to be forthcoming and candid in their statement to physicians by whom they are being treated in the belief that candor by the patient results in better treatment by the physician"); *see also State v. Desper*,  783 N.E.2d 939, 949 (Ohio Ct. App. 2002) (noting that a "lie to a physician regarding information used in treating the patient is not furthering the objective of the statute" that created the physician-patient privilege)[20]  In fact, Ohio's own abortion regulations require the provider to "meet[] with the pregnant woman in person in an individual, private setting and give[] her an adequate opportunity to ask questions about the abortion."   Ohio Rev. Code Ann. § 2317.56(B)(1).  Just apparently not questions about fetal Down syndrome.  To stifle the open communication between a doctor and their patient is to invade not only the realm of the doctor's office, but also the realm of privacy that our laws have long upheld.  That is no *de minimis* burden.

The *June Medical* concurrence analysis would end there.  Ohio's purported interests—the benefits of H.B. 214—would not counterbalance the holding that the law imposes a substantial obstacle because weighing such state interests against a woman's right to choose an abortion would "invite a grand balancing test in which unweighted factors mysteriously are weighed." *June Med. Servs.*, 140 S. Ct. at 2135 (Roberts, C.J., concurring) (internal quotation marks and citation omitted).  Ohio essentially asks the Court to weigh its purported interests—the protection of the Down syndrome community from discrimination, safeguarding medical ethics, and preventing coercive abortions—against the constitutional right to an abortion, but according to the *June Medical* concurrence, "[t]here is no plausible sense in which anyone, let alone this

---

[20]The majority also dismisses the alleged burden a woman may face in finding a new doctor or traveling out of state.  I agree that *Casey* informs us delays and travel are not, without more, substantial obstacles. *See Casey*, 505 U.S. at 886.  I do fear, however, that the delay and increased expense resulting from H.B. 214 will disproportionately affect low-income women.  These are the very women who would have the most difficulty finding another doctor, the women who would be least likely to have the time or funds to travel to another state to obtain the procedure, and—most importantly—the women who would most acutely experience the financial challenges of raising a child with Down syndrome.

Court, could objectively assign weight to such imponderable values and no meaningful way to compare them if there were." *Id.* at 2136.  To face those competing interests against one another "would be like 'judging whether a particular line is longer than a particular rock is heavy.'"  *Id.* (quoting *Bendix Autolite Corp. v. Midwesco Enters., Inc.*, 486 U.S. 888, 897 (1988) (Scalia, J., concurring in judgment)).  However, even if those interests are legitimate, the state cannot impose a substantial obstacle.  Chief Justice Roberts' approach considered the legitimacy of the state's interests as a "threshold" requirement wherein once a showing of legitimacy is made, "the only question for the court is whether a law has the 'effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus.'"  *Id.* at 2138 (quoting *Casey*, 505 U.S. at 877).  That is to say, because we undertake no balancing under Chief Justice Roberts' *June Medical* approach, Ohio's interests—however legitimate they may be—do not allow the law to stand when the law otherwise imposes an undue burden.

The *June Medical* plurality, on the other hand, asks courts to consider the burdens a law imposes along with the benefits conferred.  *Id.* at 2120.  Ohio asserts three interests that the law furthers: (1) preventing discrimination against those with Down syndrome, (2) safeguarding the integrity of the medical profession, and (3) protecting the Down syndrome community and its civic voice.  The lead opinion considers each of these benefits and holds that they are "more than enough to overcome the burdens" that H.B. 214 imposes and thus establish that the law is a valid regulation.[21]  I disagree.

Ohio's first purported interest is to protect the Down syndrome community "from the societal effects of eugenic abortions" and to combat "invidious discrimination."  Ohio asserts that a Down syndrome-selective abortion sends a message to the Down syndrome population that they are not wanted.  The majority describes the law as preventing the Down syndrome community from receiving the message that they are not as valuable as others.  Why, then, does H.B. 214 protect only the Down syndrome community?  What message does the explicit protection of the Down syndrome community send to those with spina bifida or cystic fibrosis?  A group of mothers who have raised children with Down syndrome highlight this deleterious

---

[21]As noted above, three judges declined to join the majority in Part VI, the *June Medical* plurality discussion, thus rendering that part a lead opinion rather than majority.

effect of H.B. 214. *See* Br. for Mothers as Amicus Curiae Supporting Appellees at 6-7 ("By politicizing children with Down syndrome, H.B. 214 perpetuates a sense of 'otherness' between the disability community at large and those with Down syndrome . . . By separating the rest of the disability community from those who have Down syndrome, H.B. 214 also hurts parents' efforts at promoting inclusion, diversity[,] and rights to all persons with disabilities. H.B. 214 unfairly singles out one group for disparate treatment under the guide of 'protection.'").[22]

Moreover, Ohio's supplemental brief asserts that on a practical level, "[i]f the number of people with Down syndrome drops, so will the resources dedicated to the population's needs." "After all," Ohio continues, "the smaller the number of people affected by a problem, the less likely are elected officials, medical professionals, and others to do anything about it." Not only does Ohio here refer to Down syndrome as "a problem," it also remarkably claims that the state will devote fewer resources to do anything about that "problem" if the number of persons with Down syndrome decreased. This assertion alone sends the very message to the Down syndrome community that Ohio purports to avoid through H.B. 214: you are valued only to the extent you are numerous. We will provide resources, support, and attention only if there are enough of you to merit addressing the "problem" of Down syndrome; Ohio's own words—in its briefing before this Court—belie the very message it purports to send through H.B. 214.

---

[22]In that same amicus brief, the group of mothers list the challenges they face as mothers of those children, and—most importantly here—the ways in which Ohio fails to mitigate the challenges of raising a child with Down syndrome. Br. for Mothers as Amicus Curiae Supporting Appellees at 8-9. Similarly, a group of disability rights organizations and academics list lawsuits they brought against Ohio to seek assistance from the state in improving the quality of life for persons with disabilities. Suppl. Br. for Disability Rights Organizations, Advocates and Academics et al. as Amici Curiae Supporting Appellees at 7-10. Additionally, they note that in 2001, Ohio urged the Supreme Court *not* to afford suspect class treatment to those with disabilities, instead relegating them only to rational basis review. *Id.* at 9 (citing amicus brief filed in *Univ. of Alabama v. Garrett*, Case No. 99-11240). If Ohio eased the burden on those raising children with Down syndrome, that may change the decision-making context in which a woman decides whether she can raise that child. The context—including the availability of complete, accurate information and state support through the childrearing process—affects the choice. *See* Samuel R. Bagenstos, *Disability and Reproductive Justice*, 14 Harv. L. & Pol'y Rev. 101, 110-11 (forthcoming) (offering ideas for increasing support for persons with disabilities—including fully funding the Individuals with Disabilities in Education Act, ensuring paid family leave, and ensuring the continued support of Medicaid—and positing that these "sorts of societal and policy interventions would help to change the broader context in which individuals make decisions about disability-selective abortions").

Second, Ohio claims that H.B. 214 prevents coercive abortions.  As the lead opinion notes, "some in the medical community believe that Down syndrome can and should be eradicated through a systemic abortion program," and thus "a woman with a fetal diagnosis of Down syndrome might face pressure from the doctor to abort that pregnancy."  These doctors—those who do coerce women in making this decision—already violate Ohio physicians' ethical rules, which require physicians to respect their patients' autonomy and self-determination in making medical decisions.  *See* Suppl. Br. for Am. College of Obstetricians and Gynecologists et al. as Amicus Curiae Supporting Appellees at 10.  Rather than addressing those doctors who may unduly seek to coerce their patients, H.B. 214 takes ethics out of the doctors' hands and places it in the State's.[23]  The solution to doctor coercion should be either assuring the public availability of unbiased information, or strengthening the enforcement of Ohio's preexisting ethical obligations; the solution should not be the overinclusive state overreach into the physician's office.[24]

Finally, Ohio asserts that H.B. 214 will protect the integrity and ethics of the medical profession.  "It is hard to imagine," Ohio claims, "anything more damaging to the medical profession than a re-emergence of the early twentieth century's pro-eugenics mindset."  This use

---

[23] Ohio and others on this Court spend a great deal of time addressing abortion trends in Iceland and other countries.  Those trends are irrelevant to what is happening in the United States.  Indeed, the American College of Obstetricians and Gynecologists provided evidence that "the rate of live births with Down syndrome has increased over the last decade despite the widespread availability of early detection."  Suppl. Br. for Am. College of Obstetricians and Gynecologists et al. as Amici Curiae Supporting Appellees at 9 (citing *Down Syndrome: Update on the State of the Science and Potential for Discoveries Across Other Major Diseases*, Hr'g Before the Subcomm. On Labor, Health and Human Servs. Of the H. Comm. On Appropriations, 115th Cong. (Oct. 25, 2017) (statement of Dr. Joaquin M. Espinosa, Exec. Dir., Linda Crnic Inst. for Down Syndrome)).

[24] Stereotypes of those with disabilities abound, and accurate and non-misleading information from a woman's doctor should be of paramount importance.  Many states encourage doctors "to provide pregnant women with information that might counteract the negative stereotypes about fetal and childhood disability."  *See* Bagenstos, *supra* note 22 at 111. Pennsylvania, for example, mandates that doctors who diagnose a fetus with Down syndrome "provide the pregnant woman with information about the positive life prospects of people with that condition, as well as connections to support services."  *Id.* Other states go beyond just Down syndrome diagnoses. Missouri, for example, mandates that upon a prenatal diagnosis "including but not limited to Down [s]yndrome," a doctor must "provide the patient with … resources for obtaining support services for such conditions, including information hotlines specific to Down [s]yndrome or other prenatally diagnoses conditions, resource centers, and clearinghouses for such conditions, support programs for parents and families, and the alternatives to abortion services program."  Seema Mohapatra, *Law in the Time of Zika: Disability Rights and Reproductive Justice Collide*, 84 Brook. L. Rev. 325, 362-63 (2019) (quoting Mo. Rev. Stat. § 191.923(3) (2007)).

of "eugenics" fundamentally misunderstands that term.[25]  Eugenics is "the practice or advocacy of controlled selective breeding of human populations (as by sterilization) to improve the population's genetic composition."  *Eugenics*, Merriam-Webster Dictionary (2020); *see also* Lisa Powell, *Eugenics and Equality: Does the Constitution Allow Policies Designed to Discourage Reproduction Among Disfavored Groups?* 20 Yale L. & Pol'y Rev. 481, 482 (2002) (defining eugenics as "any method of attempting to improve humanity or a specific society in the future by changing the future composition of that society").  As Justice Thomas noted in his *Box* concurrence, Sir Francis Galton—who coined the term "eugenics" in 1883—defined it as "the science of improving stock."  *Box*, 139 S. Ct. at 1784 (Thomas, J., concurring).  Galton further explained eugenics as "the study of the agencies under social control that may improve or impair the racial qualities of future generations either physically or mentally."  Sir Francis Galton, *Essays in Eugenics* 81 (1909).

So-called "mainline eugenics" in the United States in the early 1900s supported "social policies regarding immigration restrictions, the segregation of those judged socially unfit, and state-sanctioned sterilization."  Steven Selden, *Transforming Better Babies into Fitter Families: Archival Resources and the History of the American Eugenics Movement, 1908-1930*, 149 Proceedings of the American Philosophical Society 199, 201-02 (2005).[26]  Another form of

---

[25]Ohio is not alone in hastily stamping the term "eugenics" upon a disability-selective abortion.  *See* Griffin Concurring Op. at 36 (noting that "[e]ugenics was the root of the Holocaust and is a motivation for many of the selective abortions that occur today"); *PPINK*, 888 F.3d at 311 (Manion, J., concurring in part) ("Surely, Indiana has a compelling interest in attempting to prevent this type of private eugenics."); *Planned Parenthood of Ind. and Ky. v. Comm'r of Ind. State Dep't of Health*, 917 F.3d 532,  536 (7th Cir. 2018) (Easterbrook, J., dissenting from denial of reh'g en banc) (describing Indiana's law as a "eugenics statute"); *Rutledge*, 984 F.3d at 694 (Erickson, J., concurring) (describing selective abortions as part of a "neo-eugenics movement").  Similarly, Judge Sutton asks, "How did it happen that an anti-eugenics law is not the kind of law that reasonable people can compromise over in the context of broader debates about abortion policy?"  Sutton Concurring Op. at 32.  The answer is that this is not an anti-eugenics law.  Because these invocations of the term "eugenics" are so ubiquitous, because they are so misguided, and because the labeling of any anti-abortion statute as "preventing eugenics" preordains the judge's ultimate conclusion as to the statute's constitutionality—precedent notwithstanding—I address at length the use of that term.

[26]Eugenics deeply affected immigration policy in the 1920s, and that history reveals the widespread support among politicians and the elite regarding eugenics.  For example, the Immigration Restriction Act of 1924, also known as the Johnson-Reed Act, was intended to combat the "rising tide of defective germ-plasm" carried by migrants from southern and eastern Europe, in particular Italians and Jewish persons.  *See* Paul A. Lombardo, *Medicine, Eugenics, and the Supreme Court: From Coercive Sterilization to Reproductive Freedom*, 13 J. of Contemp. Health L. and Pol'y 1, 5 (1996) (internal citations omitted). One representative from West Virginia noted that "[t]he primary reason for the restriction of the alien stream . . . is the necessity for purifying and keeping pure

eugenics policy at the time involved the restriction of persons with disabilities from marrying. *See* Jonathan Matloff, *Idiocy, Lunacy, and Matrimony: Exploring Constitutional Challenges to State Restrictions on Marriages of Persons with Disabilities*, 17 Am. U. J. Gender Soc. Pol'y & Law 497, 501 (2009). One contemporary legal commentator described this sort of "eugenic marriage legislation" as "so firmly bound up with the very life of the state and with its social, moral, and economic welfare as to be distinctively and preeminently within the police power." Edward W. Spencer, *Some Phases of Marriage Law and Legislation from a Sanitary and Eugenic Standpoint*, 25 Yale L. J. 58, 64 (1915).

With this background understanding of the 20th century American eugenics movement, the invocation here of that term is wrong for two key reasons. *First*, in tying reproductive rights to the eugenics movement, the concurrences and Ohio omit the fundamental difference between state and individual actors and also present an inaccurately tidy history connecting reproduction rights, abortion, and the eugenics movement. *Second*, in describing a Down-syndrome-selective abortion as eugenics, the concurrences and Ohio impute upon women a eugenicist mindset for which there is no evidentiary basis, much less a basis in common sense, thereby ignoring the difference between a woman today making an individual choice and a historical movement tightly fastened upon "improving stock."

*Historical Context*. Start with the use of history as a cudgel against reproductive rights broadly and Down syndrome-selective abortions specifically. In its briefing, Ohio invokes the notorious case of *Buck v. Bell*, 274 U.S. 200 (1927), in support of its argument that to permit Down syndrome-selective abortions is a "subtle" modern-day version of the horrors of eugenics. In that case, the Supreme Court upheld Virginia's state-enacted sterilization law. *Buck*, 274 U.S. at 206-07. Justice Holmes described Carrie Buck as a "feeble-minded white woman" committed to a "State Colony" and ordered sterilized under a Virginia law that mandated sterilization "upon

---

the blood of America." Matthew D. Martin III, *The Dysfunctional Progeny of Eugenics: Autonomy Gone AWOL*, 15 Cardozo L. Rev. 371, 378 (2007). Calvin Coolidge himself, who signed the Immigration Restriction Act of 1924 into law, previously remarked that "[i]t is a duty our country owes itself to require of all those aliens who come here that they have a background not inconsistent with American institutions . . . Biological laws tell us that certain divergent people will not mix or blend. The Nordics propagate themselves successfully. With other races, the outcome shows deterioration on both sides . . . ." *Id.* (citing Marouf A. Hasian, Jr., *Conserving the Nation's 'Germplasm': Nativist Discourse and the Passage of the 1924 Immigration Restriction Act*, 24 Legal Stud. F. 157, 172 (2000)). These examples show that eugenics was (1) policy driven and (2) widely adopted.

any patient afflicted with hereditary forms of insanity [or] imbecility[.]"  *Id.* at 205-06.  In other words, in that case the Commonwealth of Virginia was acting under the unambiguously eugenicist rationale that sterilization "is for the best interest of the patients and of society" because without sterilization, those individuals might "become a menace" on society.  *Id.* Though the outcome in the Supreme Court was different—this time striking the law down—in *Skinner*, the Supreme Court addressed an Oklahoma law that mandated sterilization of certain habitual criminals.  *Skinner v. State of Okl. ex rel. Williamson*, 316 U.S. 535, 536 (1942).  In both cases, the state enacted a policy.  A woman choosing to have an abortion because of a Down syndrome diagnosis, on the other hand, involves no state policy or mandate; rather, it is merely a woman making a choice, ideally free from any state action, interference, or imposition of its professed values.

It is hard to overstate the extent to which the distinction between private and state action is fundamental to our law.  *See, e.g.*, *Manhattan Cmty. Access Corp. v. Halleck*, --U.S.--, 139 S. Ct. 1921, 1928 (2019) (Kavanaugh, J., explaining that in the First Amendment context, the "state-action doctrine distinguishes the government from individuals and private entities" and that "[b]y enforcing that constitutional boundary between the governmental and the private, the state-action doctrine protects a robust sphere of individual liberty"); *see also Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 936 (1982) ("Careful adherence to the 'state action' requirement preserves an area of individual freedom by limiting the reach of federal law and federal judicial power.").  All of this is to say, the use of historical examples in which the *state* acted with some plainly and repugnantly eugenicist rationale is wholly inapposite to a *private* person making a profoundly *personal* decision.  Ask: who is making the decision here?  Is it the state or a private individual?  Is it a policy or a choice?  In *Buck*, it was the state's policy.  In *Skinner*, it too was the state's policy.  For a woman in Ohio, it is an individual choice.

The erroneous or misleading use of history extends beyond the failure to distinguish between state and private action.  Considering history more broadly, Justice Thomas's concurrence in *Box* first raised the specter of eugenics when considering Indiana's similar selective-abortion law.  *Box*, 139 S. Ct. at 1783-1793 (Thomas, J., concurring).  In that concurrence, Justice Thomas drew a straight line between eugenics and any form of selective

abortion; similarly here, Judge Griffin placed a disability-selective abortion on the same continuum as the practices of Nazi Germany. The history presented here—that tidily connecting reproductive rights and eugenics—is not nearly as clean as either describes. *See, e.g.*, Adam Cohen, *Clarence Thomas Knows Nothing of My Work*, The Atlantic (May 29, 2019), https://www.theatlantic.com/ideas/archive/2019/05/clarence-thomas-used-my-book-argue-against-abortion/590455/ (critiquing Justice Thomas's reliance on Cohen's book in his *Box* concurrence). Cohen, the author of a recent book on eugenics, explains that "Thomas used the history of eugenics misleadingly, and in ways that could dangerously distort the debate over abortion." *Id.* Judge Griffin's concurrence proves that Cohen was correct.

By way of example, both Justice Thomas and Judge Griffin tie Margaret Sanger, founder of Planned Parenthood, to eugenics, a connection that presumably spoils any future work of Planned Parenthood, or any other abortion provider, based on Planned Parenthood's founder's century-old associations. *See Box*, 139 S. Ct. at 1787; Griffin Concurring Op. at 37. There are three primary issues with this "Sanger argument": (1) it is irrelevant, (2) even if it were relevant, the argument ignores the ubiquity of eugenics in the early 1900s, and (3) the link between Sanger and eugenics is not as clear-cut as presented. *First*, the simple response is to question how Sanger's history is relevant to the case before us. At some point we get so far beyond the issue at hand that we forget the question before this Court: the constitutionality of H.B. 214. How do a long-deceased founder's beliefs affect the constitutionality of a law that would affect (among many others) the organization that person founded? Similarly, can an organization's beliefs and practices change over the course of a century, or do the founder's beliefs forever taint the organization she founded, a sort of fruit-of-the-poisonous tree grafted onto the abortion debates? Even further, how do Sanger's beliefs—associated here with Planned Parenthood—affect the other plaintiffs in this case? Do Sanger's past practices or beliefs poison the well for all organizations seeking to maintain reproductive rights? In other words, is a litigant like Preterm-Cleveland infected by the centuries-old beliefs of Planned Parenthood's founder? Our consideration of H.B. 214 rests upon consideration of the *facts* before us and the *law* binding upon us. Our consideration does not—or at least *should* not—rest upon whatever Sanger might have believed or done in the 1920s.

*Second*, even if Sanger's past were relevant to the validity of H.B. 214, this argument omits just how widespread support for eugenics was in the early 20th century, an omission that places disproportionate antipathy upon Sanger for adhering (at least to an extent, as noted below) to a position that was widely adopted at the time.  Consider first Theodore Roosevelt, who wrote in 1914: "I wish very much that the wrong people could be prevented entirely from breeding: and when the evil nature of these people is sufficiently flagrant, this should be done.  Criminals should be sterilized, and feeble-minded persons forbidden to leave offspring behind them."  Theodore Roosevelt, *Twisted Eugenics*, 106 The Outlook 30, 32 (1914).  Roosevelt's eugenicist views were patently in line with the mainline eugenics movement's desire to "improve stock," as he wrote that "[n]either material prosperity, nor cultivation of the mind, nor softness of life, nor philanthropic devotion to lesser duties, atones from the race standpoint, from the point of humanity, for failure to perform the prime duty [of reproducing]."  *Id.* at 33.[27]  He continued, "Tell both man and woman that no 'career' is more than a poor substitute for the career of married lovers who bring into the world, and rear as they should be reared, children sufficiently numerous so that the race shall go forward and not back."  *Id.*  Plainly put, Roosevelt professed that "eugenics is an excellent thing."  *Id.* at 32.  Other prominent supporters of eugenics from this time period include Woodrow Wilson[28] and leading industrialists like John D. Rockefeller, Jr., Andrew Carnegie, and John Kellogg.[29]

Support for eugenics extended beyond politicians and businesspersons.  Many religious leaders supported the American eugenics movement[30]; in 1921, Henry Fairfield Osborn organized the Second International Congress of Eugenics, and in a letter to another eugenics leader, Osborn wrote: "I have the best possible news for you, namely, the hearty endorsement of

---

[27]In his tenure as president, Roosevelt signed two laws denying entry to immigrants with a history of epilepsy or insanity.  *See* Martin, *supra* note 26 at 375-76.

[28]Corinna B. Lain, *Three Supreme Court "Failures" and a Story of Supreme Court Success*, 69 Vand. L. Rev. 1019, 1039 (2016).  In one parliamentary speech, Churchill "decried the deplorable procreation of the 'feeble minded classes.'"  Malcolm Roubaix, *Are There Limits to Respect for Autonomy in Bioethics?*, 27 Med. and L. 365, 386 (2008).

[29]Bret D. Asbury, "Backdoor to Eugenics"? The Risk of Prenatal Diagnosis for Poor, Black Women, 23 Duke J. of Gender L. & Pol'y 1, 5 (2015).

[30]Yet we do not today tie those religious organizations down to the professed eugenicist beliefs of their former leaders.

the Eugenics Congress by the leading Roman Catholic prelate[31] in America, Archbishop Hayes of the Diocese of New York[.]"   Graham J. Baker, *Christianity and Eugenics: The Place of Religion in the British Eugenics Education Society and the American Eugenics Society, c. 1907-1940*, 27 Soc. Hist. of Med. 281, 293 (2014) (quoting Letter from Henry Fairfield Osborn to Major Leonard Darwin, 5 December 1921, Henry Fairfield Osborn Papers, Archives of the American Museum of Natural History); *see also Pastors for Eugenics*, N.Y. Times (June 6, 1913), https://timesmachine.nytimes.com/timesmachine/1913/06/06/issue.html (describing broad religious support for eugenics, and quoting one Congregationalist pastor as saying "I heartily approve of this present [eugenics] movement, and think Christian ministers may well forego vacations to push it.   If we will deliver man and woman from the shackles of ignorance concerning themselves we shall effect a reform that is vital to the whole of the human family, and especially to our own country").   One prominent minister in Indianapolis, Oscar McCulloch, was "one of the first . . . to speculate that forcible restrictions on matrimonial and reproductive rights might be the best method of dealing with the biologically unfit."   Brent Ruswick, *The Measure of Worthiness: The Rev. Oscar McCulloch and the Pauper Problem, 1877-1891*, 104 Ind. Mag. of Hist. 3, 5 (2008).   In 1912, Reverend Walter Taylor Summers of the Protestant Episcopal Cathedral of Saints Peter and Paul declared that no couple could be married in his church without a physician's "certificate of health," and only two months after issuing that declaration, nearly 200 clergymen of the Federated Churches of Chicago adopted that same declaration.   Saul Lerner, *Preaching Eugenics: Religious Leaders and the American Eugenics Movement (review)*, 25 An Interdisc. J. of Jewish Studies 182, 183-84 (2006).   All of this is to say, to pin the label of "eugenics" upon Margaret Sanger ignores the widespread adoption of and advocacy for eugenics during the so-called Progressive Era.   Sanger was not alone or unique in her views.

    *Third*, the connection between Sanger and eugenics is not straightforward.   In 1919, Sanger herself explained the tension between her movement (largely centered around birth control) and the eugenicist movement:

---

[31]A prelate is "an ecclesiastic (such as a bishop or abbot) of superior rank."  Merriam Webster Dictionary (2020).

> Eugeni[cists] imply or insist that a woman's first duty is to the state; we contend that her duty to herself is her first duty to the state. We maintain that a woman possessing an adequate knowledge of her reproductive functions is the best judge of the time and conditions under which her child should be brought into the world.

Margaret Sanger, *Birth Control and Racial Betterment*, 3 The Birth Control Rev. 1, 11-12 (1919). Many historians note that Sanger's association with the eugenics movement was politically expedient; she "began seeking allies in eugenics circles only after growing disenchanted with the socialist and feminist organizations with which she had previously aligned." Mary Ziegler, *Eugenic Feminism: Mental Hygiene, the Women's Movement, and the Campaign for Eugenic Legal Reforms*, 31 Harv. J. L. & Gender 211, 230 (2008).[32] In support of her primary goal of advocating for birth control, Sanger developed an argument as to why eugenics supporters should also support birth control reforms: if women were "freed from unchecked reproduction," they would be able to better care for the fewer children they did have, and this—according to Sanger—was aligned with the eugenicist goal of "improving future generations of the race." *Id.* at 230. Even with this tenuous and strategically convenient link between Sanger and eugenicists, "[e]ven a cursory reading of the history of the [eugenics] movement would dispel any notion that M. Sanger played a leadership role within it. She was at best a tangential figure who sought, and largely failed, to co-opt the growing eugenics movement as a means of supporting her efforts to increase support for the birth control movement." Gerald V. O'Brien, *Margaret Sanger and the Nazis: How Many Degrees of Separation?*, 58 Soc. Work 285, 285 (2013).

One key distinction between Sanger and the mainstream eugenics movement was that Sanger believed all women should have the right to control their own reproduction and that limiting family size through birth control would benefit mothers; mainstream eugenicists, on the other hand, believed that "fit" mothers should have as many children as possible and, as such,

---

[32]Ziegler noted that "[b]ecause of tensions with mainstream eugenic science and law, eugenic feminism was contradictory in significant ways and the feminists included in this article [including Sanger] were never successful in their efforts to fully reduce the tensions between their theories and those of mainstream eugenicists." *Id.* at 233. She continued, "[s]ince many feminists supported policies at odds with mainstream eugenic positions, feminists tended to give up their eugenic views when such views became less widespread and influential, or less politically expedient." *Id.*

any birth control was anathema to their eugenic goals.  *See id.* at 286 ("Although M. Sanger attempted to join ranks with the eugenicists as a tactic for gaining support for the birth control movement, most American eugenicists opposed any such collaboration, fearing that greater access to birth control would principally limit births among the 'desirable classes[.]'").  In sum, invocations of the history of eugenics are irrelevant and unduly simplify and distort the history of the eugenics movement and its relation to the reproductive rights movement.

*Movement vs. Choice*.  Beyond the use of history, Ohio's and the various concurrences' invocations of the term "eugenics" fail to acknowledge the difference between (1) the purpose with which a woman may decide to have an abortion after a Down-syndrome diagnosis, and (2) the goals of eugenics as a means of "improving stock," a definition of eugenics that Justice Thomas himself used in his *Box* concurrence.  *Box*, 139 S. Ct. at 1784.  Put simply, the use of the term "eugenics" ignores the difference between a private *choice* and a social *movement*.  I find it exceedingly, if not undeniably, unlikely that a woman choosing an abortion because of a prenatal Down syndrome diagnosis is doing so with any intention of improving the quality of humankind.  Does she make that decision with the intention of "improving stock" through reducing the prevalence of Down syndrome?[33]  Surely not.  Rather, she likely makes the decision based on a multitude of deeply personal factors, including her financial and emotional ability to commit to raising a child with Down syndrome as well as the sufficiency, accuracy, and completeness of the information her doctor provides.[34]  The state legislature now commandeers that personal decision-making, which interferes not only in a profoundly private personal decision, but also does violence to the ethical norm of patient autonomy, likely leading to doctors withholding

[33]Another point here on eugenics.  The labeling of a Down-syndrome selective abortion as "eugenics," when tied to Justice Thomas's quoted language of eugenics as "improving stock," necessarily implies that the prevalence of Down syndrome in society "*deteriorates* stock."  In other words, the labeling of these selective abortions as eugenics must mean that—at least according to a eugenicist view—that the Down syndrome population is somehow a problem that so-called eugenicists would want to remove.

[34]In his concurrence, Judge Bush asserts that "a private choice that contributes to the elimination of a disfavored genetic trait can be fairly called eugenics because it accomplishes eugenic ends."  Bush Concurring Op. at 44, n.5.  This novel eugenics-effects test is remarkably broad.  Consider an individual or a couple who decide, based on their genetic composition, that they would rather not conceive a child due to the risk that the child might be born with any number of genetic disorders.  This decision, though motivated by no discriminatory animus, would still fall under the umbrella of eugenics under Judge Bush's eugenics-effects test because by not conceiving a child who risks some genetic disorder, that individual or couple makes "a private choice that contributes to the elimination of a disfavored genetic trait[.]"

information from patients and patients concealing information from their doctors.  This sort of "don't ask, don't tell" law has no place in medical ethics, and the tiptoeing around that will now take place inside the doctor's office can hardly be said to safeguard the integrity of the profession.  This has nothing to do with eugenics and everything to do with the state ripping away from a woman her right to make a tremendously personal decision.

Finally, I consider the lead opinion's analysis of *Gonzales*, to the extent it exemplifies a distinct approach.  Under that approach, the lead opinion considers whether there are "reasonable alternatives."  In *Gonzales*, the Supreme Court upheld a ban on a particular method of partial birth abortion (intact dilation and evacuation) in part because a "commonly used and generally accepted" alternative method was still available.  *Gonzales*, 550 U.S. at 165.  The availability of that alternative allowed the Court to hold the law did not impose a substantial obstacle.  *Id.*  So too here, the lead opinion argues.  Although "the effect [of H.B. 214] is to deter the woman from sharing her beliefs and motive with that doctor[,]" a woman may "have a full, open, and honest conversation with the doctor . . . *about anything else*[.]"  This is internally contradictory, as a full and open conversation may not be qualified by "about anything else."  Full and open means just that, particularly where the "about anything else" may be a vital part of that conversation insofar as a woman may have questions about what her Down syndrome diagnosis means, what raising a child with Down syndrome would look like, and what her options are.  Omitting these parts of the conversation renders that conversation not full, not open, and not honest.  Shuttering a woman from speaking openly to her doctor is not something I would cast aside as a reasonable alternative.  Nor is the fact that she can speak to anyone else—such as a social worker, minister, friend, neighbor, or family member, as the majority explains—a reasonable alternative.  A woman should be able to speak to her abortion provider about her abortion; she should not have to turn to a neighbor or minister, just as one would not expect a criminal defendant to turn to a neighbor, a minister, or a tax lawyer for legal support.

The majority also uses *Gonzales* to cast aside the lack of a health exception in H.B. 214 as an "afterthought so far in this litigation."[35]  The majority explains that a facial challenge—like plaintiffs—is the improper route for challenging the failure to include a health exception; only an as-applied challenge will suffice.  Ohio, on the other hand, squarely addresses the merits of the lack of a health exception, asserting in its supplemental reply brief—as "an aside"—that the law does not affect abortions which are necessary to save a woman's health or life because "a woman who must abort to save her health or life is not aborting 'because of' Down syndrome."  This argument flatly ignores the plain language of H.B. 214.  Ohio's assertion might be accurate under Indiana's similar provision in *PPINK* or Arkansas' provision in *Rutledge*, both of which banned selective abortions only if the purportedly discriminatory reason was the *sole* reason for the abortion, but Ohio's law bans doctors from performing these abortions if the reason is even *in part* due to a Down syndrome diagnosis.  Ohio Rev. Code Ann. § 2919.10(B).  A doctor may no longer perform an abortion if they know that the abortion is even in part due to a Down syndrome diagnosis; the law does not permit an exception if, say, the woman later learns of health conditions necessitating an abortion.  Nothing in H.B. 214 allows her to overcome the complete prohibition; even if a Down syndrome diagnosis is one of ten reasons a woman seeks an abortion, the Down syndrome-related reason trumps any other reason, no matter the consequences.[36]

---

[35]The discussion of the lack of a health exception comes from Part V-C which is part of the majority, not lead, opinion.  It is worth noting that the lack of a health exception is one of the few "burdens" that Plaintiffs *do* mention in their briefs.  *See* Appellees' Br. at 3.

[36]H.B. 214's "or in part" language was not accidental.  In 2015, Ohio representatives Sara LaTourette (who sponsored H.B. 214) and David Hall introduced a similar bill, which would ban abortions "because of" a Down syndrome diagnosis.  That bill, which failed to pass, required doctors to report that the doctor "does not have knowledge that the pregnant woman was seeking the abortion *solely* because of a test result indicating Down syndrome."  *See* H.B. 135, H. Cmty. and Fam. Advancement Comm., 131st Gen. Assemb., Reg. Sess. (Ohio 2015--16), available at https://www.legislature.ohio.gov/legislation/legislation-summary?id=GA131-HB-135.  Ohio and the majority's assertions regarding the lack of a health exception would ring true under the prior iterations of H.B. 214, but per the language of the statute, there is no such exception.

## IV. Conclusion

Abortion is controversial, there is no doubt.  Some "believe that life begins at conception" and thus "abortion is akin to causing the death of an innocent child," while others "fear that a law that forbids abortion would condemn many American women to lives that lack dignity, depriving them of equal liberty and leading those with least resources to undergo illegal abortions with the attendant risks of death and suffering."  *Stenberg*, 530 U.S. at 920. "[C]onstitutional law must govern a society whose different members sincerely hold directly opposing views[.]" *Id.* at 921.  Considering these opposing views and the mandates of the Constitution, the Supreme Court has "determined and then redetermined that the Constitution offers basic protection to the woman's right to choose." *Id.* (citing *Roe*, 410 U.S. at 113; *Casey*, 505 U.S. at 846).  A woman has "the right . . . to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972).  Her "right to terminate her pregnancy before viability is the most central component of *Roe v. Wade*.  It is a rule of law and a component of liberty that we cannot renounce." *Casey*, 505 U.S. at 871.  Today's majority renounces that very rule of law and component of liberty, and in so doing, its "hostility to the right *Roe* and *Casey* secured is not concealed." *Gonzales*, 550 U.S. at 186 (Ginsburg, J., dissenting).  I vigorously dissent.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 18-3329

PRETERM-CLEVELAND; PLANNED PARENTHOOD
SOUTHWEST OHIO REGION; WOMEN'S MED GROUP
PROFESSIONAL CORPORATION; ROSLYN KADE, M.D.;
PLANNED PARENTHOOD OF GREATER OHIO,

      Plaintiffs - Appellees,

      v.

STEPHANIE MCCLOUD, Director, Ohio Department of
Health; KIM G. ROTHERMEL, Secretary, State Medical
Board of Ohio; BRUCE R. SAFERIN, Supervising Member,
State Medical Board of Ohio,

      Defendants - Appellants.

> **FILED**
> Apr 13, 2021
> DEBORAH S. HUNT, Clerk

Before:  COLE; Chief Judge; BATCHELDER, MOORE, CLAY, GIBBONS, SUTTON,
GRIFFIN, KETHLEDGE, WHITE, STRANCH, DONALD, THAPAR,
BUSH, LARSEN, NALBANDIAN, and READLER, Circuit Judges.[*]

# JUDGMENT

On Petition for Rehearing En Banc
United States District Court for the Southern District of Ohio at Cincinnati.

      UPON CONSIDERATION of the petition for rehearing en banc and the supplemental briefs and
arguments of counsel,

      IT IS ORDERED that the judgment of the district court is REVERSED.

**ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk

---

[*]Judge Murphy recused himself from participation in this case.